## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
## 8:17-cv-03066-MSS-TGW

CHERYL STAPLE,

      Plaintiff/Counter-defendant,

v.

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY,

      Defendant/Counter-plaintiff.
_____/

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY,

      Defendant/Counter-plaintiff,

v.

ESTATE OF DESMOND H. STAPLE AND
CHERYL STAPLE,

      Plaintiff/Counter-defendants.

_____/

## DEFENDANT'S *DAUBERT* MOTION TO
## EXCLUDE PLAINTIFF'S EXPERTS

      Defendant, The Northwestern Mutual Life Insurance Company ("Northwestern Mutual"),

pursuant to Federal Rules of Evidence 104(a) and 702 and Federal Rule of Civil Procedure

26(a)(2), respectfully requests this Court exclude any testimony by Plaintiff's proffered experts,

Dr. Vernard Adams, Dr. Joshua Lenchus, Dr. Stephen Gerrish, Dr. Jaime Fernandez, and Robert

Beverly, on topics included in Plaintiff's Expert Reports, served by Plaintiff, Cheryl Staple,

("Plaintiff"), on October 15, 2018, and states in support:

1

# I.  INTRODUCTION

The Court's function as the gatekeeper for expert testimony rarely is as important as when an expert seeks to offer testimony based upon false facts and whose opinion is no more than "dressed-up" closing argument.  Such is the case here.

Plaintiff is suing Northwestern Mutual for $4,000,000 allegedly owed to her as the beneficiary of four (4) life insurance policies (the "Policies") issued by Northwestern Mutual to her late husband, Desmond Staple ("Staple"), in 2015  On March 14, 2016, at approximately 4:00 p.m., Staple was found unconscious in his car in a Walmart parking lot.  He was admitted to the hospital that day and died on March 16, 2016.  The Hillsborough County Medical Examiner, Selly Rivers, M.D., concluded the "cause" of death was "fulminant hepatic necrosis due to acetaminophen poisoning," *i.e.*, a Tylenol overdose.  That cause of death stands undisputed by the parties.

The Medical Examiner also concluded the "manner" of death was "suicide," based primarily on the toxicological results of Staple's autopsy, finding that, at the time of his hospitalization, Staple had 860 mg/L of acetaminophen in his blood.  Dr. Kennon Heard, a Board-Certified Forensic Toxicologist, has determined that this level of acetaminophen equates to 112 Extra-Strength Tylenol pills and, considering that the body metabolizes that drug fairly rapidly once ingested, Staple had to take even more than that number to achieve that level. (Heard Depo 23/7-24/18)[1].

Dr. Heard also calculated that, using the amount of Tylenol found in Mr. Staple's blood upon admission to the hospital, the well-established "half-life" of Tylenol once ingested, and Mr. Staple's body weight, Mr. Staple had to ingest the 112 Extra-Strength Tylenol pills within 30

---

[1]  Citations to depositions will be referenced as "[NAME] Depo page/line-page/line".

2

hours of his being found in his car at approximately 4:00 p.m. on March 14, 2018.  (Heard Depo 35/20-36/10).  Dr. Heard also stated that it was "not medically possible" for Staple to have reached 860 mg./L through a "staggered accidental overdose" (Plaintiff's "theory"); to reach that high a level (literally exceeding the measurement capability of the hospital's equipment) he had to ingest the Tylenol acutely, or he would have died at a much lower acetaminophen level. (Heard Depo 36/3-39/8).

Dr. Julia Pearson, the Hillsborough County Chief Forensic Toxicologist, who participated in Staple's autopsy, testified that Staple's 860 mg/L was one of the highest acetaminophen levels she had ever seen and that such a high concentration could only be reached by Staple taking "close to a whole bottle of Tylenol."  (Pearson Depo 15/23-19/10]   Because Mr. Staple's suicide occurred within one (1) year of his purchase of the Policies, Northwestern Mutual denied Plaintiff's claim for the $4 million death benefit, and instead returned to her the premiums paid for the Policies.

Eight (8) months later, Plaintiff filed this lawsuit, contending that Staple's Tylenol overdose death was not suicide, but was "accidental," and she is entitled to the $4 million death benefit, plus attorneys' fees and costs.  In attempted support of this "accidental overdose" theory, Plaintiff proffers the testimony of Dr. Vernard Adams (a forensic pathologist), Dr. Joshua Lenchus (an internist), Dr. Stephen Gerrish (a gastroenterologist/hepatologist), Jaime Fernandez (a psychiatrist), and Robert Beverly (insurance) (collectively "Plaintiff's Experts").

While Northwestern Mutual assumes *arguendo,* for purposes of this motion only, that all of Plaintiff's Experts are experts in their particular specialties, none of them offer any admissible opinion testimony in this action under the standard set forth in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).  First, none of Plaintiff's Experts is (or even claims to be) an expert in

the field of toxicology, the only "scientific" issue relevant to this case.  Accordingly, none of Plaintiff's Experts can competently dispute the opinions of Drs. Pearson and Heard, set forth above.

Because they are unable to attack the "science," Plaintiff's Experts instead offer the Court their pure speculation, *i.e.*, their theory that it is "possible" that Staple died from an "accidental staggered overdose of acetaminophen."  Their opinions, however, are in no way based upon the scientific method or any real analysis.  Rather, they are based upon the experts' subjective beliefs, relying on facts provided to them by Plaintiff's counsel, *many of which are demonstrably untrue.*  See Defendant's Motion to Dismiss for Fraud on the Court [DE 54].  Because Plaintiff's Experts' opinions are nothing more than Plaintiff's counsel's regurgitated closing argument, they should not be admitted.

## MEMORANDUM OF LAW

This Court, in a case strikingly on point here, aptly described the "Daubert"[2] standard for admissibility under Rule 702.  See Arquette v. Eslinger, No. 6:08-cv-1836-Orl-35DAB, 2010 WL 11453163, at *1 (M.D. Fla. Jan. 22, 2010).  As this Court stated:

> In Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), the Supreme Court set out the applicable standard for the admissibility of expert testimony under Federal Rule of Evidence 702 ("Rule 702"). The Court noted a two-part analysis for expert scientific testimony, finding that the trial court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Id. at 592. This determination, in turn, involves an "assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93; see also Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996) (court "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation

---

[2] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

offered by a genuine scientist."). In other words, the purpose of this gatekeeping inquiry is to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589.12

Specifically, the Court considers whether:

> (1)[T]he expert is qualified to testify competently regarding the matters he intends to address; the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assist the trier if fact, through the application of scientific, technical, or specialize expertise, to understand the evidence or to determine a fact in issue.
>
> City of Tuscaloosa v. Harcos Chems., Inc., 158 F.3d 548, 562-63 (11th Cir. 1998). The Eleventh Circuit describes these three distinct concepts separately as "qualification, reliability, and helpfulness." United States v. Frazier, 387 F.3d 1244, 1260. The proponent of expert testimony maintains the burden of establishing qualification, reliability, and helpfulness. Id.

Id. at *2.

"Although the Daubert opinion specifically addressed scientific evidence, the Supreme Court later acknowledged, in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147-48 (1999), that the reliability standard enunciated in Federal Rule of Evidence 702 applies 'to all scientific, technical, or other specialized matters within its scope.'" Id. at 2 n.11. "While scientific testimony need not be known to a certainty, Daubert does require that assertions be derived from 'scientific knowledge.' 'Scientific' means proper grounding in the methods and procedures of science, or the 'scientific method.' 'Knowledge' is more than subjective belief or unsupported speculation, but 'applies to any body of known facts or to any body of ideas from such facts or accepted as truths on good grounds.'" Id. at 2 n.12 (quoting Allison v. McGhan Med. Corp., 184 F.3d 1300, 1319 (11th Cir. 1999)).

Simply put, no matter how qualified an expert may be, **"[s]ubjective belief and unsupported speculation are henceforth inadmissible."** See Daubert, 509 U.S. at 590 (emphasis added).   As explained by the Eleventh Circuit Court of Appeals:

> Moreover, it is proper and necessary for the trial judge to focus on the reliability of a proffered expert's sources and methods.  Under Daubert, the district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist. Courts have deemed expert opinion testimony inadmissible when the only connection between the proffered opinion and the existing data is the expert's own assertions—*ipse dixit* (because I say so).

Chapman v. Procter & Gamble Distributing, LLC, 766 F.3d 1296, at 1306 (2014) (citing Allison v. McGhan Med. Corp., 184 F.3d 1300, 1316–17 (11th Cir.1999)).

In this Court's Arquette case, plaintiff attempted to introduce a medical expert's opinion that the trauma plaintiff allegedly endured during her arrest caused or contributed to a miscarriage.  Arquette, 2010 WL 11453163, at *3.  In granting defendants' motion to exclude the causation testimony, the Court discussed a number of points directly applicable to the instant motion.  First, the Court recognized that "[O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." Id. (citing Quiet Tech. DC-8 v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003)).   The Court also stated, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average layperson." Id. at  *4.  As explained by the Court:

> Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63. Thus, when the trier of fact is entirely capable of determining issues in the case without the technical assistance of experts, exclusion of the proffered expert testimony is appropriate. See id. The purpose of this requirement is to prevent the trier of fact from giving the expert testimony undue weight due to the expert's special status.

See <u>Cook v. Sheriff of Monroe County</u>, 402 F. 3d 1092, 1111 (11th
Cir. 2005).

<u>Id.</u>  In excluding the plaintiff's causation testimony, this Court in <u>Arquette</u> found that it was not reliable (as it was not scientifically tested), nor was it helpful, as it "presents only a possibility that the alleged incident caused the injury.  This proffered imprecise and unspecific expert opinion will not assist the trier of fact."  <u>Id.</u> (citing <u>Frazier</u>, 387 F.3d at 1266).

Such is the case here, where Plaintiff's Experts opine as to mere "possibilities," based on speculation, precariously mounted on false facts.  In <u>Arquette</u>, the Court considered three (3) distinct factors in determining whether an expert should be permitted to testify: 1) Qualifications of the witness; 2) Reliability of the witness's testimony; and 3) The helpfulness of the witness's testimony.  Examining Plaintiff's Experts in a similar fashion leads to the inescapable conclusion that their testimony should be excluded from this action.

## I.     DR. VERNARD ADAMS SHOULD BE EXCLUDED.

### A.     Dr. Adam's qualifications are not relevant to this action.

The only subject matter in this litigation appropriate for expert witness testimony is toxicology.  The jury will need an explanation of the following toxicological issues:

1.     how the level of acetaminophen is determined;

2.     the medical significance of Staples acetaminophen level of 860 mg/L;

3.     the fact that 860 mg/L equates to 112 Extra-Strength Tylenol pills; and

4.     an explanation of why, using pharmacokinetic analysis, Staple had to have taken the +112 pills within 30 hours of being found, in the afternoon of March 14, 2016.

Dr. Adams can shed no light on any of those matters.  Dr. Adams is a former Medical Examiner for Hillsborough County.  He is neither a forensic toxicologist nor a toxicologist (Adams Depo  27/22-28/25); he does not know how many Tylenol one has to take to reach 860

mg/L (id. at 156/16-18); he does not know the half-life of Tylenol once ingested (id. at 156/22-24), he does not know the maximum daily recommended amount of Tylenol (id. at 156/19-21); and he does not perform pharmacokinetic analysis for opinion purposes (id. at 28/2-8). Instead, when he was an active Medical Examiner, he relied on the department's toxicologist to "perform the assays to detect the drugs and determine what the concentrations were and body samples." (Id. at 29/1-7). Here, that toxicologist is Dr. Pearson, who has already opined that she has "no doubt" that Mr. Staple's death was a suicide. (Pearson depo. 19/7-13).

Based on the above, it is clear that Dr. Adams does not have any relevant qualifications to speak on the one subject that requires "expert" knowledge in this case – toxicology. Accordingly, he is not qualified to testify in this action.

**B.** **Dr. Adams opinion are not reliable or helpful and should be excluded.**

As set forth more fully in Defendant's Motion to Dismiss for Fraud on the Court [DE 54], not only are Plaintiff's Expert's opinions unsupported and purely subjective, they are based on a number of false facts provided to them by Plaintiff and her counsel. In his report, Dr. Adams opines that Staple's death was the result of an "accident" rather than suicide, basing his opinion, not on any type of scientific analysis or data, but on his conclusions drawn from "circumstantial evidence." The Medical Examiner, Selly Rivers, M.D., however, based her opinion on medical science, stating that 95% of her "suicide" opinion was based on the toxicology report and the other 5% on the histology (i.e., Mr. Staple's extensive liver damage). (Rivers Depo 104/9-105/7).

Dr. Adams' reliance on "subjective" factors is clear from his report, where, after recognizing that the Hillsborough County Fire Department report and St. Joseph's Hospital records contain multiple reports of Plaintiff admitting that Staple had expressed "suicidal

ideation" prior to his death, Dr. Adams concluded that "suicidal ideation" evidence was "in conflict" and other "circumstances…point clearly to an accidental manner of death":

> 5.   However, the circumstances leading up to Mr. Staple's illness are not in conflict and point clearly to an accidental manner of death:
>
>> a.   No medicaments or medicament containers were found in the car.  When a person commits suicide by medicament in a parked motor vehicle, the cabin of the vehicle contains medicament containers, and often, un-ingested medicaments.

See Dr. Adams report, marked as Exhibit "A" at 5.  This "fact," however, is false, as Mr. Staple's car did contain a bottle of prescription Ibuprofen and a Walgreen's bag containing two (2) prescriptions, one for the Ibuprofen and another for acetaminophen/hydrocodone pills.  (DE 54] at pp. 6-10).  The acetaminophen/hydrocodone pills and bottle are missing.

Even if the "no pills or pill bottles" statement was true, however, an opinion based upon that so-called "data" is hardly the proper subject of expert testimony.  The jury could readily understand, on its own, Plaintiff's argument that the lack of pills and pill bottles indicates that there were no such items in his car.  Clearly, Plaintiff is attempting to add "undue weight" to this "fact" by having it uttered by a former Chief Medical Examiner for Hillsborough County.

Moreover, Dr. Adams' conclusion as to the import of that "fact" is in no way reliable. The evidence also shows that Staple entered the Walmart on the evening before he was found unconscious in his car, where he was filmed vomiting in the men's clothing department.  One could just as likely argue (and it is more likely) that Staple threw away the empty pill bottles in the Walmart.  After all, it is undisputed that he took over 112 acetaminophen pills and the bottle of the pills containing the acetaminophen/hydrocodone pills is missing, while the Ibuprofen bottle is not.  It is reasonable to assume that Staple discarded the missing bottles or else they

would still be in the Walgreen's bag.  In any event, Dr. Adams' personal opinion as to which explanation he thinks is "true" simply is irrelevant.  He's not sitting on the jury.

The second "fact" relied upon by Dr. Adams in his report is also now known to be a lie, created out of whole cloth by Plaintiff and her counsel:

> b.   Just before Mr. Staple entered his parked car, he withdrew $300 from the ATM at Walmart, and then used the cash to purchase three shirts, leaving him with $244 in cash.  The purchase of three shirts just before becoming moribund is not compatible with any reasonable suicide scenario.

Exhibit "A" at 5; ([DE 54] at pp. 22-25).    At the deposition of plaintiff's expert, Dr. Gerrish, Plaintiff's counsel admitted he "made a mistake" in telling his experts to rely on these facts (for over two (2) years):

> [BY MR. CORLESS]
>
> Q: Let's begin by addressing a couple of things that we chatted about.  I want you to be very open about what we talked about before your deposition today.
>
> Did I have an opportunity to explain to you an error that had shown up about Mr. Staple buying three shirts?  Do you recall me bringing up that issue up to you?
>
> A:  Yes.  You told me that he did not withdraw money from the ATM.
>
> *   *   *   *   *
>
> Q   My question to you is did we have the benefit of me correcting those mistakes that I had given to you regarding the ATM and the shirts?
>
> *   *   *   *   *
>
> Q:  Did I?  You can answer.
>
> A:  I could not correct it in my report.  No, I did not correct it in my report.

Q:  But did we have a conversation about that?

A: Yes.

(Gerrish Depo [DE 58-9], at 70/21-71/20).

However, as with the first "false fact," even if true, the argument that Staple was "forward looking" because he withdrew a large sum of cash and bought three shirts does not require expert testimony.  A layperson can readily understand it without Dr. Adams' "expertise."

Dr. Adams' next "fact," that Staple had been sick "for days," also is pure speculation, unsupported by any type of scientific analysis:

> c.   While in Walmart, Mr. Staple vomited.  Clearly, in retrospect, he had been ill with acetaminophen intoxication for days.  This non-acute development of illness weighs against suicidal intent.

Exhibit "A" at 5.  At deposition, after some wrangling back and forth, Dr. Adams ultimately admitted that he had **no evidentiary basis** for his statement that Staple had been "sick for days" or that his sickness was "non-acute," to wit:

> Q.   Tell me why for days he had been sick.
>
> What is your evidentiary basis for your statement that clearly he had been sick for days, of acetaminophen intoxications, for days?
>
> A.   Because I don't believe it was suicide.  Therefore, it was unintentional overdosing, and that's going to be over days, not acutely.
>
> Q.   I am going to keep asking you what your evidentiary basis is other than your conclusion, and you back up the facts or your belief to match your conclusion.
>
> I am asking, what is your evidentiary basis?  Is there a witness who says he was sick?  Is there a hospital record that says he was sick?

> Is there any evidence other than him throwing up on March 13th in the Walmart that indicates he was sick for days rather than just sick that day?
>
> A.    Right.  I understand your question.  I didn't say he was visibly sick to witnesses.  I said he had been ill with intoxication for days.
>
> **Q.    Please tell me what your evidentiary basis is for that.**
>
> **A.    That is an opinion.**
>
> **Q.    So you have no evidentiary basis; you just believe that's so?**
>
> **A.    Yes.  That's correct.**
>
> **Q.    So you can't point to any data to support that opinion; fair enough?**
>
> **A.    That's correct.**

(Adams Depo [DE 58-5] 71/1-72/6).  A finer example of inadmissible "*ipse dixit*" testimony could not be crafted by a law school professor.  Dr. Adams starts with his conclusion ("not suicide") and then "supports it" with pure speculation ("sick for days").  See Guinn v. AstraZeneca Pharm. LP, 602 F. 3d 1245, 1254-56 (11th Cir. 2010) (expert opinion testimony inadmissible when the only connection between the proffered opinion and the existing data is the expert's own assertions).  See also Chapman, 766 F.3d at 1306.

Of course, Staple's vomiting in the Walmart the night before he was discovered is entirely consistent with Dr. Heard's pharmacokinetic calculation, determining that Staple had to have ingested the Tylenol within 30 hours of being found around 4:00 p.m. on March 14, i.e., sometime after he left his mother's house the morning of March 13.  (Heard Depo [58-8], at 35/20-36/10).

Nor can Plaintiff argue that the "false facts" relied upon by Dr. Adams did not impact his opinion.  The proof is in the pudding.  After learning at deposition that the above-facts, given to him by Mr. Corless, were untrue, **Dr. Admas receded from his opinion that an "accidental" manner of death was "more likely than not" to merely "a reasonable possibility":**

> Q.    Do you believe your consideration of clinical circumstances is sufficient to reach an opinion?
>
> A.    **I think based on what you have told me today about those two errors that accident is no longer more likely than not.  It's a reasonable possibility, and suicide is a reasonable possibility**, and medical examiner failed to investigate to sort it out.
>
> Q.  So that I'm clear, you went from more likely than not to – so you were saying there was a preponderance of evidence in your opinion that it was an accident; you have changed that to, what, it's a 50/50 call?
>
> A.    Two reasonable possibilities, neither of which rises to the level of more likely than not because of inadequate investigation by the medical examiner.  (emphasis supplied)

(Adams Depo [DE 58-6], at 153/10-24).   The fact that a retained expert of Dr. Adams' experience changes his opinion at deposition is the best evidence of just how unsupported that opinion was.

The remainder of Dr. Adams' report is made up of more subjective opinions, unsupported by any scientific analysis, including legal opinions as to the "burden of proof":

> 1.    Staple "was taking acetaminophen for the purpose of analgesia, for the amelioration of real pain (Exhibit "A" at 5);
>
> 2.    "It is not reasonable to posit that Mr. Staple faked flank pain for the purpose of obtaining acetaminophen, because acetaminophen is freely available without a prescription (Id.);
>
> 3.    "The opining of a manner of death as suicide requires evidence of intent similar to that required for a conviction of first degree murder.  In other words, there can be no other reasonable possibility" (Id. at 6); and

**4.** Plaintiff's repeated statements about Staple's threats of suicide might be unreliable "because the hospital records do not actually state what Mrs. Staples said. None of the records quote Mrs. Staple as saying, for example, that her husband had said he was going to get a gun and shoot himself, or that he felt hopeless, or that he though life was worthless, or that he was depressed. There is no information as to what Mrs. Staple actually said to the paramedics and hospital personnel that would point to suicidal ideation. She may well have been responding to leading questions in a spirit of helpfulness. In sum, with respect to suicidal intent, the records of Fire Rescue and St. Joseph's give opinions without the factual basis for the opinions. In other words, they offer editorials without giving the news." (Id. at 6).

These "opinions" may be acceptable closing argument by Plaintiff's attorney, but do not constitute proper expert testimony under Daubert and its progeny.

For the above-stated reasons, Plaintiff cannot satisfy her burden of establishing that the opinions of Dr. Adams satisfies the requirements of Daubert and its progeny and, therefore, he should be stricken as an expert witness in this action.

## II.   DR. JOSHUA LENCHUS SHOULD BE EXCLUDED.

### A.   Dr. Adam's qualifications are not relevant to this action.

As with Dr. Adams, Joshua Lenchus, D.O., has no expertise relevant to this action. Currently, Dr. Lenchus is a hospital administrator with no clinical duties. (Lenchus Depo [DE58-10] 5/11-6/9). Dr. Lenchus is not a medical doctor, but an osteopath who is Board-Certified in internal medicine, passing his Board on his third attempt. (Id. at 9/8-13/15).[3] Dr. Lenchus is not a toxicologist. (Id. at 104/2-3). He has never testified as an expert in toxicology and has never been recognized as an expert by any Court. (Id. at 24/24-25/7). When asked whether he had any specialty involving drug overdose cases, he replied, "Not particularly." (Id. at 18/2-4). While acting as a clinical pharmacist from 1994 to 1996, he dealt with "less than 10"

---

[3]   Dr. Lenchus did not get accepted to any of the medical schools to which he applied over the course of three (3) years, finally being accepted to Nova Southeastern College of Osteopathic Medicine. (Lenchus Depo [DE 58-10] 13/9-15).

acetaminophen overdose cases.  (Id. at 18/24-19/17).  In his 22 years as a doctor, he has dealt with "about six" acetaminophen overdose cases.  (Id. at 20/10-17).

Plaintiff's counsel located Dr. Lenchus as a result of comments the Doctor made in a phone interview in 2011-12 about an article regarding "staggered overdoses of acetaminophen…" (Id. at 49/8-15).  He was not involved in the writing or researching of that article and did not remember to whom he gave the interview.  (Id. at 51/10-25).  He has not performed any research on "staggered overdoses".  (Id. at 52/22-53/5).

Note that Plaintiff's counsel misrepresented Dr. Lenchus' qualifications and experience to both the Hillsborough County Medical Examiner and Northwestern Mutual.  In his effort to get the Medical Examiner to change its finding of "suicide," Mr. Corless wrote:

> Dr. Lenchus is a toxicologist with extensive experience not just in toxicology but also in dealing with toxicity associated with acetaminophen-based products.

See December 12, 2016 Corless letter to Medical Examiner, attached as Exhibit "B".  Similarly, in submitting Dr. Lenchus' report to Northwestern Mutual, challenging its claim denial, he wrote:

> The second report attached is from Dr. Joshua Lenchus.  Dr. Lenchus was identified after I review [sic] **an article he wrote** about the common deaths associated with Tylenol and other acetaminophen based products**.**  According to Dr. Lenchus, **a toxicologist**, Mr. Staple's death is consistent with an accidental ?staggered overdose? [sic] in his use of over the counter medicines containing acetaminophen and a prescription provided to him one week earlier.  None of this information as [sic] known to the Medical Examiner at the time of her investigation. (emphasis supplied).

See Corless January 6, 2017 email, marked as Exhibit "C".  Clearly, even Plaintiff did not believe Dr. Lenchus' true credentials qualified him to testify as an expert in this matter.

**B.** <u>**Dr. Lenchus' opinions are not reliable or helpful and should be excluded.**</u>

Dr. Lenchus' testimony suffers from the same deficiencies as Dr. Adams'.  First, he was supplied the same misinformation by Plaintiff that "no pills or pill bottles were found in the car." (Lenchus Report, marked as Exhibit "D" at p. 3, ¶3).  This "fact," he said in his report, "lends credit to the possibility of a plausible alternative explanation."  <u>Id.</u>  Despite his deposition being taken a week after Dr. Adams', where the falsity of this fact was established, Plaintiff's counsel did not tell Dr. Lenchus it was untrue.  (Lenchus depo [DE 58-10] 43/16-44/1).

Moreover, after conceding that "the mere presence of a toxic blood level may imply **that this was a clear case of acetaminophen induced suicide…**" (Exhibit "D" at 2), he goes onto state his "belief" that that there is "more to the story . . . ."  <u>Id.</u>  One need go no further than his report's conclusion to determine that his "story" is pure inadmissible speculation:

> Based on the information I have reviewed, it is my professional opinion **that there exists a possibility** that Mr. Staple did not commit suicide, but rather suffered acetaminophen-induced acute, decompensated liver failure as a result of an unintentional, staggered overdose, ultimately leading to his demise. (emphasis supplied).

Exhibit "D" at 5.  At deposition, Dr. Lenchus doubled-down on just how uncertain his opinion was:

> Q.   So you would agree with me that sometime between March 7, 2016 and March 14, 2016, the date he was admitted to the hospital, Mr. Staple had suffered severe liver damage due to a Tylenol overdose"
>
> A.   Yes.
>
> Q.   Okay.  Now, you do not believe – it is your opinion that that was what you called a staggered overdose; correct?
>
> A.   It may have been a staggered overdose.
>
> Q.   That's possible; correct?

16

A.    That is possible.

**Q.    Can you say any more than that or is it just possible?**

**A.    I can say that it's possible.**  I don't know – I was not provided with any records between March 7th and March 14th when he went to the emergency room **so I don't know what happened in the ensuing week.**

Q.    So you have no data backing up your conclusion that it was possible that he had a staggered overdose; is that fair to say?

\*     \*     \*     \*     \*

A.    Based on the article that we went over before, Exhibit 4, he does fit some of the criteria that are encompassed within this study.

**Q.    I'm not asking about any studies.  I'm asking about objective data that you had regarding specifically Desmond Staple.  Isn't it true that you have no data of any kind supporting a conclusion that this was a staggered overdose?**

**A.    I did not examine Mr. Staple so I have no objective data except for any data that I was provided, and this possible based on the data that I was presented.**

**Q.    No, what I'm saying is:  You have no data showing that it happened; correct?**

**A.    I have no data showing that it either happened or did not happen; that would be correct.**

**Q.    It's a mere possibility in your mind; correct?**

**A.    Correct.**

(Lenchus Depo [DE 58-10] 63/15-65/10).  But, "mere possibilities" are insufficient to satisfy the

Daubert standard.  As was the case with the expert witness stricken by this Court in Arquette,

*supra*, Dr. Lenchus does not (and cannot) opine that Staple suffered an "unintentional, staggered

overdose" to a "reasonable degree of medical certainty."  See Arquette, 2010 WL 11453163, at

*4.  When asked to explain how Staple's acetaminophen level could reach 860 mg/L through a "staggered overdose" (something Dr. Heard, a Board-Certified Forensic Toxicologist said is a "medical impossibility"), Dr. Lenchus could only give "several scenarios," none of them having any basis in fact:

> Q.   Explain to me how he got [to a level of 860 mg./L of acetaminophen] through a staggered overdose.
>
> A.   So there's several scenarios.  You can have –
>
> Q.   Give them all to me, please.
>
> A.   You can have – he could have had a staggered overdose in the beginning of that week that led him to the point of hepatic encephalopathy where he was confused and stuporous and then decided to consume an entire bottle of pills.  It's similarly possible that he could have been an alcoholic in the beginning part of that week and then drank to the point where he was induced in a coma.
>
>     I can – we can hypothesize a lot of things –
>
> Q.   Right.
>
> A.   -- about what happened in a week –
>
> Q.   You would agree anything –
>
> A.   -- but I don't have any records.
>
> Q.   -- anything is possible; right?
>
> A.   Of course.
>
> Q.   So these are just possibilities that you're pulling out of the air?
>
> A.   Well, these are possibilities.  You asked me to describe to you some possibilities as to how he got there….

(Lenchus Depo [DE58-10] 69/24-70/25) (bracketed material supplied).  Dr. Lenchus also posited the "possibility" that Staple had "genetic polymorphisms related to the metabolism (i.e. breakdown) of acetaminophen."  (Exhibit "D" at 4).  As with all of his other scenarios, however, he had absolutely no evidence that Staple had such a condition.  (Lenchus Depo [DE58-10] 37/8-16); see also (Id. at 38/24-39/7)(admitting that, as to the three (3) ways Dr. Lenchus says one can overdose using a therapeutic amount of Tylenol, he "doesn't have evidence to support any of those three.").

In addition to being purely speculative, Dr. Lenchus's opinions are unreliable.  He performed no analysis at all to reach his conclusions, so his opinions cannot be tested or replicated.  As was true in Arquette, "he simply offers a theory" that Staple's death could "possibly" have resulted from an unintentional staggered overdoes, with nothing more.

Dr. Lenchus's opinion also is unhelpful, as it presents only the "possibility" that what he says is so, without any evidence.  As stated in Arquette, such "proffered imprecise and unspecific expert opinion will not assist the trier of fact."  Accordingly, Dr. Lenchus should be excluded.

## III.   DR.  STEPHEN GERRISH SHOULD BE EXCLUDED.

### A.   Dr. Gerrish's qualifications are not relevant to this action.

If possible, Dr. Gerrish's qualifications have even less to do with this case than Drs. Adams and Lenchus.  Dr. Gerrish is not a forensic toxicologist, not a toxicologist, and has no training in toxicology.  (Gerrish Depo [DE 58-9] 20/24-21/4).  He admits he has no expertise regarding the question of the "when the ingestion of Tylenol was taken prior to an acetaminophen overdose."  (Id. at 26/24-27/2).  He does not perform pharmacokinetic analyses. (Id. at 27/24-28/6).  He does not know the half-life of Tylenol.  (Id. at 28/9-10).  He has never published any articles having anything to do with the issues in this case.  (Id. at 24-31/12).

Dr. Gerrish is Board Certified in "gastroenterology." (Id. at 4/20-21).  After first stating that he was "Board Certified" in "hepatology," he later admitted he is not.  (Id. at 4/20-6/6).  During his fellowship at Ochsner Medical Center in New Orleans, he worked with pre and post-transplant liver patients.  (Id. at 8/22-4).  Since moving to Florida in 2008, he has not been involved in liver transplants.  As a gastroenterologist, he performs endoscopies and colonoscopies and other like procedures.  (Id. at 10/12-18).  Regarding his treatment of acetaminophen overdose patients, he is called in if the testing shows liver damage.  (Id. at 14/2-4).  He helped treat about 20 acetaminophen overdose patients in the past year, and "a few a year" prior to that.  (Id. at 13/22-14/1).

While qualified as a gastroenterologist, those qualifications do not relate to the issues in this case.  Staple's death from liver damage is not in dispute.  Moreover, the only evidence of existing liver damage is at the time of Staple's admission to the hospital on March 14, 2016.  Dr. Gerrish agrees that all the liver tests performed at Mr. Staple's Mach 7, 2016 Emergency Room visit, a week before his death, were normal.  (Id. at 29/9-30/23).

**B.      Dr. Gerrish's opinions are not reliable or helpful and should be excluded.**

As with Drs. Adams and Lenchus, Dr. Gerrish was fed the same untrue facts regarding "no pills or pill bottles in his car" and "he had taken out a large sum of money at the ATM".  *See* Gerrish report marked as Exhibit "E".  His report finds that the fact that "No medication bottles were found in his car, [make] it unlikely that he ingested acetaminophen during this time period."  As with Adams and Lenchus, he proceeds to throw out multiple speculative theories of how it is "possible" that Staple did not "intentionally" take his +112 Tylenol pills.  With surprising candor, Dr. Gerrish makes clear his opinions are based on pure guesswork:

> Q.      Let me ask you; have I covered everything upon which you base your opinion that he was so

> confused he accidentally consumed 112 Tylenol extra-strength tablets?
>
> A.    So, again, well, the answer is – would be yes, but my opinion is that I'm **postulating possibilities.** I'm not saying that is what happened; I am not saying it's not what happened.  I am saying that there's other possibilities that need to be considered on why he – why the events unfolded as they did.

(Id. at 49/20-50/4) (emphasis supplied).  The particular "possibility" that Dr. Gerrish was "postulating" here was his statement that Staple's ingestion of 112 pills in 30 hours could have resulted from his being "encephalopathic," which means "that they are confused, they can sometimes confuse medications with vitamins, candy, food, and take them unintentionally."  (Id. at 35/4-9).  When asked to identify any evidence of Staple's "confusion," Dr. Gerrish said there were two (2) items:  First, Staple was a "reportedly successful business person" buying clothes at Walmart using cash (Id. at 36/14-23); and, second, Mr. Staple told his sisters he was running late for a meeting and then was seen two hours later shopping for clothes at Walmart (Id. at 35/10-25).  Dr. Gerrish eventually admitted that he really had no idea whether those two (2) pieces of "data" indicated confusion:

> Q.    What else showed confusion?  I think you left it off at shopping at Walmart for clothes.
>
> A.    Yes.  So, mainly those are my two points on possibly showing some level of confusion inconsistent with maybe someone that – again, my opinion – to be seemingly a successful person, and two, you know, telling his sisters that he was running late for a meeting, then two hours after that shopping for clothing which, in my opinion, is not really consistent with normal behavior.
>
> Q.    So he lied to his sisters?
>
> A.    I don't know.

Q.   Well, I mean, he said something that contradicted itself; he said he was to a meeting, and instead he went to buy clothes at Walmart?

A.   Or he was confused and didn't know what he was saying.

Q.   You don't know which one it was, right?

A.   Neither do you.

Id. at p. 40/21- 41/14.  As with all of Plaintiff's experts, these "opinions" are pure argument and there's nothing "technical" about them.

Even Dr. Gerrish's medical-sounding opinions are not based on any evidence in this case. He postulates the possibility that Staple's 860 mg/L of acetaminophen may have been caused by some pre-existing hepatic failure (Id. at 52/2-13), or a genetic deficiency (52/25-53/25), or cirrhosis of the liver (Id. 54/8-13).  But, then, after doing so admits there is no evidence of any such conditions:

Q.   So, to be clear, although there are other possibilities, none of those possibilities were evidenced in the data that you reviewed, correct?

A.   Correct.

(Id. at 54/14-17).  None of Dr. Gerrish's opinions are given to a "reasonable degree of medical certainty."  Accordingly, his rank speculation about what "is possible" does not satisfy the Daubert standard and he must be stricken.


IV.   **DR. JAIME FERNDEZ SHOULD BE EXCLUDED.**

A.   **While Dr. Fernandez is qualified as a psychiatrist, she cannot competently opine about Staple's state of mind, when she neither treated nor examined him.**

Dr. Fernandez has not yet been deposed in this action.  However, her Report, standing alone, justifies exclusion.  See Dr. Fernandez Report, marked as Exhibit "F".  Her Report makes clear that she never examined or treated Mr. Staple.  It is also apparent from her report that she

did not review any of the records of family therapy in which he appears, according to Plaintiff's counsel. Although never produced to Northwestern Mutual, such therapy records allegedly exist, according to the "Corless Cover Letter" written by Plaintiff's counsel to Plaintiff's expert, Dr. Adams. As Mr. Corless stated therein:

> Mr. Staple has no psychiatric history whatsoever. In fact he did attend multiple therapy sessions to support Cheryl the year prior as a result of her grief counseling from the death of her mother**. In the records,** he is described by the treating therapist as being a normal, healthy male with no psychiatric features or symptoms.

<u>See</u> Corless "Cover Letter", marked as Exhibit "G" at p. 1. Assuming Mr. Corless is telling his expert the truth, it is difficult to see how Dr. Fernandez could opine, as she does, that "Mr. Staple had no known psychiatric history" (Fernandez Report at 3) or about Staple's state of mind, when she *has not even reviewed the available records in Plaintiff's possession.*

Moreover, the information given to her by Plaintiff and her counsel contain the now-familiar misrepresentations that "no pills or pill bottles were found" and that he "purchased three shirts in the amount of $56.57," both of which figure prominently as bases for her opinion that Staple's death was accidental. Exhibit "F" at 3.

The remainder of her report reads like a closing argument. Her speculation, that the hospital doctors and nurses were guilty of "Confirmation Bias" when they were writing, multiple times, that Plaintiff told them Staple had expressed "suicidal ideation" in the days before his Tylenol overdose, is not based upon any data or scientific analysis, nor could it be, since she has never spoken to anyone involved. In fact, it does not even appear she spoke with Plaintiff, who, when asked at deposition whether she had admitted her husband's suicidal ideation to multiple persons **did not deny doing so – but only said she "could not remember."** (Plaintiff's Depo [DE 58-12] 171/23-173/7). This lack of any real, let alone rigorous, inquiry establishes that Dr.

Fernandez's opinions are inadmissible.

Moreover, her opinion about "confirmation bias" is not even directed at Mr. Staple – it refers to the EMT's, nurses, and doctors involved in his care and treatment.  Certainly, she has never examined any of those people.  Dr. Fernandez's opinions merely are closing argument, unreliable and unhelpful to the jury, and should be stricken.

**V.      ROBERT BEVERLY SHOULD BE EXCLUDED.**

**A.      Mr. Beverly's qualifications are not relevant to this action and his opinions are neither reliable nor helpful.**

Mr. Beverly has not yet been deposed in this action, but his report contains no admissible testimony and, therefore, he should be excluded. (Robert Beverly report, marked as Exhibit "H"). His report is a compendium of unsupported, improper, and inflammatory arguments that would not even constitute appropriate argument in an attorney's closing argument to the jury.  These include his "opinions" that Northwestern Mutual:

1. engaged in "unethical practices… beginning at the time of application" (Id. at 6);
2. violated multiple Florida Statutes, including Sections 626.9541, 627.407, and 627.408 (Id. at 8-9); and
3. "set out to deny the Staple family's claim, rather than investigate facts."  (Id. at 16).

Mr. Beverly's report also goes into great detail as to Northwestern Mutual's "claims processes." Id. at 4-5; 16-18.  This is not a "bad faith" case, however.  The insurance issues here involve only breach of contract and rescission.   Therefore, all of Mr. Beverly's "claim handling" opinions are simply irrelevant.  Moreover, the only "basis" for these "opinions," is Mr. Beverly, himself, which does not satisfy the Daubert standards.

Further, although he denies it, Mr. Beverly is providing improper legal opinions, arguing that Northwestern Mutual violated the law.  As stated in Dahlgren v. Muldrow, 2008 WL 186641, at *5 (M.D. Fla. 2008):

> Regardless of whether a witness is a lay witness or an expert witness, all witnesses generally are prohibited from testifying as to questions of law regarding the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct. The determination of which law applies and what the law means is for the Court to decide. The determination of compliance with a law is for the jury to decide. Expert opinion testimony must assist the trier of fact, through specialized knowledge, to understand the evidence or to determine a fact in issue. Expert testimony that merely tells the jury what legal conclusion to reach fails to do that.

In essence, in addition to smearing Northwestern Mutual's "ethics," Mr. Beverly plans to tell the jury that Northwestern Mutual "broke the law."  That is not the proper subject of expert testimony.

Mr. Beverly also improperly attempts to tell the Court how to "interpret" the Policy.  See Exhibit "H", §1.3 "**Interpretation of Document 600**".  Under Florida law, however, the interpretation of an insurance contract is a matter of law to be decided by the court.  Gulf Tampa Drydock, Co. v. Great Atlantic Ins. Co., 757 F.2d 1172, 1174 (11th Cir. 1985).

Finally, with no apparent medical training, experience or qualifications, Mr. Beverly attempts to opine on medical issues, saying he is "troubled" by a portion of Kennon Heard, M.D.'s expert report and proceeds to provide his critique of same.  See Exh. "H" at 18.  Dr. Heard, however, is a Board-Certified Forensic Toxicologist and Medical Doctor while Mr. Beverly, by all appearances, is not.  Accordingly, his opinions on medical issues also should be excluded under Daubert.

## CONCLUSION

For the above-stated reasons, Defendant, The Northwestern Mutual Life Insurance Company, moves this Court for entry of an Order excluding the testimony of Drs. Adams, Lenchus, Gerrish, Fernandez, and Mr. Beverly, and granting Northwestern Mutual such other and further relief as this Court deems appropriate.

25

Respectfully submitted,

**SHUTTS & BOWEN LLP**
*Attorneys for The Northwestern Mutual*
*Life Insurance Company*
200 S. Biscayne Boulevard
Suite 4100
Miami, Florida 33131
Tel: (305) 358-6300
Fax: (305) 381-9982

By: */s/ John E. Meagher*
    John E. Meagher
    Florida Bar No. 511099
    jmeagher@shutts.com
    Jake Monk
    Florida Bar No. 100321
    jmonk@shutts.com

## CERTIFICATE OF SERVICE

       I HEREBY CERTIFY that on December 21, 2018, I filed the foregoing document with the Clerk of Court.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or via US Mail, an authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

       */s/ John E. Meagher*
       Of Counsel

## SERVICE LIST

Theodore A. Corless, Esq.
Mary Catherine Lamoureux, Esq.
Corless Barfield Trial Group, LLC
6812 W. Linebaugh Ave.
Tampa, FL 33625
service@corlessbarfield.com
tcorless@corlessbarfield.com
mlamoureux@corlessbarfield.com
*Counsel for Plaintiff*
Served by CM/ECF

MIADOCS 17398672 4 N0009.0728