UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NUMBER: 8:17-cv-03066-MSS-TGW

CHERYL STAPLE,

    Plaintiff,

v.

NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY,

    Defendant,
_____/
NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY,

    Counter-Plaintiff,

v.

ESTATE OF DESMOND H. STAPLE and
CHERYL STAPLE,

    Counter-Defendant,
_____/

**PLAINTIFF/COUNTER-DEFENDANT CHERYL STAPLE'S
MEMORANDUM IN OPPOSITION TO DEFENDANT'S
<u>MOTION TO EXCLUDE PLAINTIFF'S EXPERTS</u>**

Plaintiff, CHERYL STAPLE, responds in opposition to Defendant's *Daubert* Motion to Exclude Plaintiff's Experts, as follows:

### *I.   Introduction*

Plaintiff filed the instant action against Northwestern Mutual Insurance Company (NM) seeking benefits under four policies of life insurance issued by NM on the life of Plaintiff's husband, Desmond Staple. Plaintiff's prima facie case is undisputed – NM issued the insurance policies and Mr. Staple is deceased. In order to avoid liability under the policies, NM advances

two affirmative theories: (1) that Mr. Staple committed suicide; and (2) that the last and largest ($3 million) of the three policies should be rescinded based on alleged misrepresentations in the application. NM bears the burden of proof on both issues.

## II.     *Suicide*

Not only does NM have the burden to prove that Mr. Staple's death was caused by suicide, Florida law presumes his death was ***not*** caused by suicide. *New York Life Ins. Co. v. Satcher*, 12 So. 2d 108, 108 (Fla. 1943). In cases such as this, "when the defendant comes forward with a plea of suicide, [the insurer] must prove it ***beyond a reasonable doubt just as he would the defense in a criminal case. The evidence must exclude every other reasonable hypothesis of death***." *Id.* (emphasis added). "When [the defendant] came forward with its plea of suicide ***it assumed the burden of proving it beyond a reasonable doubt to the exclusion of every other reasonable hypothesis of death***." *Vendola v. S. Bell Tel. & Tel. Co.*, 474 So. 2d 275, 280 (Fla. 4th DCA 1985) (emphasis added). In sum, NM carries a heavy burden, i.e., to prove that Mr. Staple committed suicide to the exclusion of "every other reasonable hypothesis of death." *Satcher*, 12 So. 2d at 108. Put another way, Plaintiff need only identify a "reasonable hypothesis" of death which cannot be excluded by NM "beyond a reasonable doubt." *Id.*

It is precisely because of its heavy burden of proof that NM cannot admit the possibility that there are competing viewpoints concerning the manner of Mr. Staple's death. This is also why NM's motion practice has devolved into personal attacks on Plaintiff's counsel and challenges to all contrary expert opinions; NM ***must*** discredit anyone who advances a contrary, reasonable explanation for the manner of Mr. Staple's untimely death. For NM to meet its burden, it must convince this Court and the trier of fact that its single expert, Kennon Heard, M.D., has the *only* valid opinion concerning the manner of Mr. Staple's death.  Hence, it argues:

2

> [N]one of Plaintiff's Experts is (or even claims to be) an expert in the field of toxicology, the only 'scientific' issue relevant to this case.

(Doc 59, at 3-4) (emphasis added). In this fashion, NM attempts to narrowly circumscribe the issue in this case to acetaminophen toxicology; as explained above, this is an invention born of necessity, particularly since Dr. Heard excluded consideration of psychiatric or social indicators of suicide (including motive to take his own life), explanation of co-ingested medications, pre-existing liver conditions, or behavior of Mr. Staple inconsistent with an attempt to take his own life.

The instant motion should be viewed in light of NM's heavy burden to exclude any other reasonable hypothesis of death other than suicide. Plaintiff's burden is very slight; to demonstrate a reasonable hypothesis inconsistent with suicide. NM's instant problem is that Plaintiff's experts opine that the toxicology data, standing alone, is insufficient to reach a conclusion about Mr. Staple's manner of death; such opinions are not only helpful to the trier of fact but are equally, if not more, valid opinions than that of Dr. Heard based upon the limited available information and relevant limitations in the field of medical science. Certainly, NM has shown no reason to exclude them.

### III.  *Plaintiff's Alternative Hypotheses*

It is undisputed that Mr. Staple died from liver failure caused by an overdose of acetaminophen. However, how and why Mr. Staple arrived at this condition is simply unknown. Plaintiff suggests that NM's theory of suicide, while constituting one possible explanation, ultimately suffers from a fatal lack of proof, both scientifically and factually. Before addressing the medical testimony, some background is warranted.

Mr. Staple was married to Mrs. Staple and had a beautiful home in which he and his wife lived with their four children, Sara, Chloe, and twins Desmond, Jr. and Benjamin, ages at the time of his death of twelve, seven, and two and one-half, respectively. On March 13, 2016, the

3

day before he was found unconscious in a Walmart parking lot, he was in the finals steps of opening his second location of "Mama Winnies Caribbean Kitchen." The day before being found in his car, Mr. Staple called and texted several people, including a friend with restaurant-related experience he was recruiting to bring to Tampa for the new restaurant location. Mr. Staple communicated with his sister to tell her he would be coming over later that evening for dinner. He also contacted the family babysitter to advise that would pick up the boys, Desmond, Jr. and Benji, later than originally planned. Mr. Staple was a religious man (and "pro-life") who was inseparable from his Bible, which he carried everywhere, and which was found in his car.

Mr. Staple would never make it to his sister's house nor would he make it to pick up the boys. Instead, the videotape from Walmart shows Mr. Staple entering the building and purchasing new clothes to wear since he had vomited on himself and in his car. He was seen vomiting in the clothing department and ultimately returning to his car, where he eventually lost consciousness. The video shows him remaining in the car until he was found unconscious, the next day, March 14, 2019. He remained unconscious until he was taken to the hospital, where he would remain alive but unconscious until he passed away on March 16, 2016, at 8:00am. His death was associated with liver failure from a toxic dose(s) of acetaminophen and acetaminophen-based medications with opioids he had been taking over the past week. At his autopsy, Associate Medical Examiner Dr. Sally Strauch Rivers would opine his cause of death was Fulminant Hepatic Necrosis due to Acetaminophen Poisoning.

While NM posits the existence of "factual absolutes" and "medical impossibilities," there are very real disputes in both the facts and the expert opinions surrounding the manner of Mr. Staple's death. The most obvious and glaring issue is that there is no direct evidence of suicide (e.g. no suicide note, no known plan to commit suicide, no threat of suicide made to others, no

obvious pre-planning of death, etc.). There is also the fact that a week prior to his discovery at Walmart, Mr. Staple sought treatment at the Emergency Room[1] complaining of lower quadrant, "flank" pain of unknown etiology; on March 7, 2016, following a CT Scan, he was discharged and prescribed two medications: a non-narcotic (ibuprofen) and Percocet (acetaminophen plus an opioid). Mr. Staple filled these prescriptions two days later, presumably still suffering from the pain which led him to the ER. Other than the 11 Percocet pills purchased at Walgreens on March 9, 2016, no other evidence of Tylenol or acetaminophen-based medication purchases has been discovered by either party. No evidence of Mr. Staple's actual consumption of Tylenol or acetaminophen-based medications has been discovered by either party.[2] It is unknown how many of the 11 Percocet pills were consumed between March 9 and March 13 but the ibuprofen was discovered in the trunk of the car.

The absence of information regarding Mr. Staple's actual dosing swings open the door for expert opinion. NM's expert, Dr. Heard, opines that Mr. Staple's presentation is "consistent with a single large ingestion of acetaminophen" occurring approximately 16-30 hours before he presented to the hospital. Without consideration of Mr. Staple's intent or social history, Dr. Heard proclaims that his death must have been suicide. However, Plaintiff's experts have a different view about what is possible or probable. Vernard I. Adams, M.D., a forensic pathologist and former Chief Medical Examiner of Hillsborough County from 1991 to 2012, opined that Mr. Staple's presentation is also "consistent" with him taking multiple doses over time, i.e., a "staggered overdose" reached by accident and without the intention to inflict self-harm. Dr. Adams adds, "[i]n

---

[1] It is unknown whether Mr. Staple was given Tylenol while in the ER, but Tylenol has always been touted as the "pain reliever hospitals use most" and there is no question that Mr. Staple was prescribed acetaminophen upon discharge.
[2] NM claims that it is undisputed that Mr. Staple took over 112 acetaminophen pills and the bottle of pills is missing. (Doc. 59, at 9) There is no evidence of these facts, only Dr. Heard's opinion.

reality, there is no way to determine the dosing from the blood concentrations."[3] He concludes that the correct approach to determining the manner of death is to evaluate the patient's history and circumstances first and then determine whether the laboratory data supports the resulting hypothesis. He opined that the manner of death was accident and that "accident is not only a reasonable possibility but, based on the circumstances, is more likely than suicide."[4]

Dr. Heard was questioned regarding the staggered overdose theory supported by Drs. Adams and Lenchus. He testified, in pertinent part:

> Q. Can you tell within a reasonable degree of medical certainty whether or not at the time he took his single large ingestion as you call it whether he had previously poisoned himself with a staggered overdose?
>
> A. I cannot.

(November 1, 2018 Deposition of Kenneth Heard, p. 19, line 25; p. 20, lines 1-5, attached as Exhibit 1). As was apparent throughout Dr. Heard's deposition, the entirety of his opinions rests on the toxicology report showing the concentration of acetaminophen in Mr. Staple's system. But he cannot tell when the acetaminophen was ingested; in what manner it was ingested, pill, liquid, etc.; what type of medication containing the acetaminophen was consumed, such as Pepto-Bismol,

---

[3] According to Dr. Heard, little was known about any dosing he had undertaken with the prescription medications or with any other over-the-counter acetaminophen or non-acetaminophen medications. When he arrived at the hospital where he would eventually die, his blood chemistry reflected a high level of acetaminophen but also a high level of other OTC medications. His level of salicylates was exceptionally high, a phenomenon explained by Dr. Heard as either co-ingestion of aspirin or "laboratory error." Of course, Mr. Staple could have ingested salicylates by taking Pepto-Bismol, for example, a medication often taken for lower quadrant pain and containing salicylates. The speculation as to what medications Mr. Staple took, in what doses, and at what times is endless.

[4] NM makes a big deal about the fact that Dr. Adams downgraded his opinion from "more likely than not" accidental to "reasonable possibility" of accidental after learning of errors in the history he was provided. He maintained, however, that the true explanation remains unknowable due to insufficient investigation and data and errors in the medical records. NM makes little effort to explain why Dr. Adams would be prohibited from giving that opinion.

Tylenol, etc.; or whether his liver was correctly processing the acetaminophen in the days leading up to his death. Dr. Adams points out that Dr. Heard's testimony and report do not state that Mr. Staple's consumption of acetaminophen took place in a large single dose to a reasonable degree of medical certainty. (Dr. Heard's Report, p. 3; Dr. Adams Supplemental Report, p. 1). Rather, he merely opined it was consistent with a large single dose. (Dr. Heard's Report, p. 3). Clearly, this does not *exclude* the hypothesis set forth by Drs. Adams and Lenchus.

NM's *Daubert* motion seeks to strike all of Plaintiff's experts; it should be denied because (1) NM's relevance argument is based primarily upon its own, subjective interpretation of facts; (2) the facts presented in the first four pages of the motion represent nothing more than NM's subjective, argumentative, "most-favorable-to-it" interpretation of facts and data, virtually all of which is subject to other, valid interpretations, none of which point to Mr. Staple committing suicide; (3) each of the experts engaged by Plaintiff base their opinions on objective, scientific criteria grounded in methods and procedures of science, which are the same or similar to those experts relied upon by NM. In simple terms, NM's "*Daubert*" motion is not a *Daubert* motion at all but instead constitutes factually-based critiques and arguments looking more like cross-examination and not an attack on the soundness of the science relied upon by the experts. The evidence shows no suicidal ideation and instead an accidental death associated with acetaminophen ingestion, an accident which occurs with frightening regularity in the United States.[5]

---

[5] Acetaminophen has been referred to as "the Most Dangerous Drug Every Made," accounting for about 50,000 emergency room visits, and 25,000 hospitalizations yearly. Analysis of national mortality files shows about 450 deaths occur each year from acetaminophen-associated overdoses, 100 of which are intentional. Aric Hausknecht, M.D. July 30, 2017. https://www.acsh.org/news/2017/09/11/tylenol-far-most-dangerous-drug-ever-made-11711.

As reflected below, the determination of whether NM can overcome the legal presumption against suicide requires consideration of a much broader spectrum of facts, not merely an opinion based entirely on a single value in a blood draw ("860 mg/L means suicide"). [6] Instead, there is a multitude of issues raised by the data, triggering many questions: What was Desmond Staple's state of mind leading up the date of his discovery in a Walmart parking lot? What was he doing immediately before he lost consciousness? When, where, and how much acetaminophen did he dose? Was he taking multiple medications not realizing that more than one contained acetaminophen? Why would a man deliberately take his own life using a method of suicide that would take him more than three days to die, in a horrible, painful way? Did he have nothing to say to his wife or four children such that he couldn't leave a suicide note? Were there any indications he wanted to take his own life? Did Mr. Staple metabolize acetaminophen in an expected way or could he have had pre-existing liver disease? These questions, and others, require the participation of a broad spectrum of experts, including experts capable of identifying suicide risks, an expert to describe the progression of acetaminophen toxicity, and an expert in determining the causes and manner of death. In the end, whether Mr. Staple committed suicide is, at worst, the province of the jury, aided by appropriate medical experts, and not the province of the Court to decide in a blanket *Daubert* challenge focusing on the relevance and not scientific strength of the opinions.

**IV.     Each of Plaintiff's experts are highly qualified in their fields to render relevant, reliable, helpful, and admissible opinions**

---

[6] The proposition that "it's only about toxicology," even contradicts the statements and argument made by NM in its recent Motion for Summary Judgment. In its motion, it argues from a broader spectrum of data, including "the medical evidence, in this case, made up of Mr. Staple's emergency room visit one (1) week before his hospitalization, the Medical Examiner's findings, and the toxicology results," which NM argues baldly that "standing alone" establishes suicide (Defendant's Motion for Summary Judgment, [Doc. 62], at 9).

    A.    The expert testimony demonstrating Mr. Staple's death as accidental meets the standards under *Daubert*.

The Federal Rules of Evidence and the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), require the trial judge, as a "gatekeeper" to determine whether an expert's testimony is reliable and relevant. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 598; *Kuhmo Tire Co.*, 526 U.S. at 141.[7] Under Federal Rule of Evidence 702, an expert opinion must satisfy three prerequisites before being admitted. First, the expert must be adequately qualified by virtue of "knowledge, skill, experience, training, and education," which is sufficiently related to the particular subjects at issue in the case. Federal Rule of Evidence 702; *see, e.g., Cooper v. Lab Corp. of Am. Holdings, Inc.*, 150 F3d 376, 380 (4th Cir. 1998). Second, the expert's opinion must assist "the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702(a). If the opinion "does not relate to any issue in the case," it is "not relevant and ergo not helpful." *Daubert*, 509 U.S. at 591. The question is "one of 'fit,' a quality that 'is not always obvious." *Id.* Third, the expert's opinion and methodology must be reliable, and the expert must reliably apply the methodology to the facts of the case. *Daubert*, 509 U.S. at 592-93.

In determining the reliability of an expert opinion, *Daubert* provides the following factors for consideration: "(1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Smith & Nephew, Inc.*, 259 F.3d at 199 (*citing Daubert*, 509 U.S. at 592-94). These factors are "neither definitive

---

[7] Federal law governs the admissibility of expert testimony in diversity actions. See, e.g., 429 F.3d 469, 476 (4th Cir. 2005).

nor exhaustive." *Id.* at 199-200. In light of the variability of the analysis, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kuhmo Tire Co.*, 526 U.S. at 152.

B.   Much of Plaintiff's experts' testimony addresses the errors, omissions, and limitations within the evidence proffered by NM

The presumption against suicide stands until overcome by evidence sufficient to outweigh it. In its examination of the foundation for suicidal ideation, the Florida Supreme Court held when examining the question of an individual's death as being accidental or intentional:

> [a] determination, such as the presence or absence of motive, physical facts surrounding the death, place where the body was found, its position, the presence or absence of powder marks when death was caused by firearms, the habits and temperament of the insured, his domestic and social environment, as well as pecuniary circumstances.

*Kincaid v. World Ins. Co.*, 157 So.2d 517, 523 (Fla. 1963). The experts designated by Plaintiff do not ignore these factors (as does Dr. Heard) but instead place the laboratory data into a proper context. NM's claim that the toxicology data is the only information in the case is simply contrary to Florida law; the physical facts surrounding the death are only one piece of the puzzle.

1.   <u>Jamie Fernandez, MD, Chief of Psychiatry, Memorial Hospital, Tampa</u>.

Dr. Jamie Fernandez, a Board-Certified Psychiatrist and Chief of Psychiatry at Memorial Hospital, in Tampa, concluded that Mr. Staple's death was consistent with an accidental ingestion of medication. (Doc. 59-6) She has conducted at least a hundred chart reviews in which suicide was considered the manner of death and has evaluated hundreds of patients for safety in the context of suicidal ideation. (Doc. 59-6, at 3) She is the sole mental health professional asked to consider the facts and circumstances surrounding Mr. Staple's life and death to opine on the issue of suicide. As an initial matter, and contrary to the unsupported assertions of NM's lawyers, Dr. Fernandez

10

clearly opined that "it is not possible to conclude that suicide is the manner of death based upon toxicology and histology alone." (Doc. 59-6, at 5)

As a psychiatrist, Dr. Fernandez also well understands how elevated levels of acetaminophen in the blood can impact an individual's mental state. This is not a "mere possibility"; Mr. Staple's medical records record that he was encephalopathic -- an inflammation of the nervous systems resulting from a supra-therapeutic dose of acetaminophen. (Doc. 59-6, at 3). Contrary to NM's unsupported statements, Dr. Fernandez's opinions are not "pure speculation" but instead are based upon record evidence (the St. Joseph's records clearly state that he had toxic encephalopathy, the condition examined by Dr. Fernandez). Dr. Fernandez described how being encephalopathic in the days before his presentation at the Walmart could easily have gone undetected and may have caused him to suffer from confusion about his medical state and the medicines he was using. She also addresses fundamental flaws in the medical and autopsy records regarding conclusions reached about Mr. Staple's intent or state of mind based on insufficient, incorrect, and biased data.

Dr. Fernandez further addresses a litany of social factors and data from the scene regarding Mr. Staple that weigh against suicide. Dr. Fernandez attacks the methodology and opinions of both Dr. Heard and Dr. River, the Associate Medical Examiner, rejecting the notion that suicidal intent can be based upon "toxicology and histology" alone. Contrary to NM's reliance on a toxicologist who determined "manner of death" based upon blood concentration alone ("he must have wanted to die, if it was *this* high"), courts have on multiple occasions found that a psychiatrist is well

qualified to offer opinions regarding an individual's likelihood of committing suicide. *See, e.g., Floyd v. United States*, 2010 U.S. Dist. LEXIS 125247 (M.D. Ala, November 26, 2010, at *31).[8]

Dr. Fernandez also addresses the lack of reliability of conclusions contained in Mr. Staple's medical records based upon incomplete or non-existent social history. In short, NM fails to identify how or why Dr. Fernandez's opinions are unreliable, unhelpful, or otherwise inadmissible, save and except its disagreement with them and talismanic reliance on toxicology data. She is a well-qualified psychiatrist and expert in dealing with suicidal patients. Her opinions are based upon the medical presentation and a proper history of the decedent. They are relevant, helpful, go to matters beyond the ordinary understanding of lay people, and are based upon reliable methods reliably applied. NM has not shown otherwise.

2. <u>Vernard I. Adams, MD, Former Chief Medical Examiner, Hillsborough County, Florida</u>.

Dr. Vernard Adams was the former Chief Medical Examiner for Hillsborough County, Florida, and has conducted more than 6,800 autopsies, including physical examinations of individuals for purpose of establishing manner of death. He directly rebuts AME Dr. River, who is relied upon and quoted regularly by NM; Dr. Adams rejects the opinion that Mr. Staple's death must have been intentional. Dr. Adams reviewed the complete medical documents, including the materials gathered from the days preceding his discovery in his car. AME Dr. River did not review the medical records from FHC Hospital from March 7, 2016 and admits she was unaware that Mr. Staple had been prescribed an acetaminophen-based pain medication or that he was suffering from flank pain. She also largely parroted assertions from the medical records and made unwarranted

---

[8] On the other hand, NM has not offered a single case where a toxicologist was admitted as an expert to opine whether an individual had the state of mind for suicide based on a toxicology value.

assumptions, all as pointed out by Dr. Adams. Certainly, if NM intends to present the Assistant Medical Examiner's conclusions then Dr. Adams' opinion directly rebuts it.

As with all of Plaintiff's highly-qualified experts, Dr. Adams rejects sole reliance on toxicology levels to support suicide. Instead, based upon the standard of care for a medical examiner, Dr. Adams identifies other, equally plausible explanations for how Mr. Staple may have reached the level of 860 mg/L in his blood that do not involve an intent of self-harm. His opinions are specific, credible, and highly relevant to the issues in the case.

NM focuses on a supposed mistake or misrepresentation about whether pill bottles were found in the car. NM points to the discovery of an "ibuprofen" pill bottle in the car, a totally irrelevant construct given that Mr. Staple did not overdose on ibuprofen. Clearly, the investigative reports and comments of Dr. Adams and Plaintiff's counsel were pointing to the absence of pill bottles with acetaminophen as the relevant fact in the case. This is entirely a red herring.

NM next focuses on an error in how many shirts Mr. Staple purchased at Walmart. Indeed, Dr. Adams noted that the purchase of three shirts was inconsistent with someone trying to kill himself. However, that fact only bolstered his opinion based upon the medical evidence and other information he reviewed. The fact that he only purchased one shirt, not three, does not establish suicide nor undermine Dr. Adams' opinion that the manner of death was inconclusive. It only tends to weaken his ability to affirmatively rule out suicide. This is hardly a reason to throw the baby out with the bathwater, as NM seeks to do.

In short, Dr. Adams' opinion is reliable, helpful, and drawn from a lifetime of experience in determining the causes and manners of unexplained deaths. NM's nitpicking attack on Dr. Adams is simply unavailing.

3. <u>Josh Lenchus, D.O., RPh., FACP, SFHM</u>

Dr. Lenchus is an Internal Medicine Doctor and a Registered Pharmacist; he examined the phases of toxicity that were observable in the data, both in the medical records and the information regarding Mr. Staple's behavior and presentation at Walmart. He described the three phases of acetaminophen toxicity, which includes (a) Phase 1: 30 minutes to 24 hours post-ingestion; (b) Phase 2: 18-72 hours post-ingestion, and (c) Phase 3: 72-96 hours post-ingestion. He identifies the specific values extracted from Mr. Staple's medical records, as well as examined the state of Mr. Staple's toxicity at Walmart, where he is observed on the video vomiting at a known time of day.

Contrary to the statements in NM's memorandum, Dr. Lenchus does not speak in terms of "mere possibilities" but instead identifies the lack of sufficient data to reach any particular conclusion about Mr. Staple's state of mind. He did not state that "staggered overdose is a mere possibility" as much as he opined that it would be a mistake to presume suicide. At bottom, Dr. Lenchus explains that there is no real data in the medical record that would enable one to distinguish between an intentional ingestion or an accidental staggered overdose, particularly given the lack of data regarding his levels in the days preceding his trip to the Walmart. He testified that there is not enough information to exclude a staggered overdose, leaving the notion of intentional overdose a "mere possibility" in itself. He suggests the strong possibility that it was an unintentional overdose, which he defines as "an ingested overdose absent the objective of self-harm," in light of obvious co-ingestion of other medications and self-medication efforts Mr. Staple must have been making.

4.    Stephen T. Gerrish, MD, MPH, Gastroenterologist/Hepatologist

Dr. Gerrish, among other things a hepatologist (liver physician), does not base his opinions upon "mere possibilities" but instead examined the available data. He too rejected Dr. Heard's interpretation of the toxicology level as the only possible interpretation, because Dr. Heard failed to account for multiple variables which could impact the calculus.[9] Dr. Gerrish offers multiple, alternative explanations for why the toxicology number was so high, some of which are not consistent with an intent to take his own life. For example, Dr. Gerrish points to Mr. Staple's behavior at Walmart and suggests that he may already have been encephalopathic as a result of chronic supratherapeutic dosing over several days in an attempt to address his documented but unexplained flank pain. A person with such encephalopathy might ingest more medication out of confusion or mistake. Similarly, Dr. Gerrish addresses the effects of chronic liver disease, genetic variability in acetaminophen metabolism, renal failure, and chronic fibrosis on his toxicology level. He notes the "flank pain" and salicylate toxicity as well, factors unexplained by Dr. Heard. In short, Dr. Gerrish opines that the intent of ingestion and time course of ingestion cannot be established from the presence of the significantly elevated acetaminophen level in Mr. Staple system.

5.    Robert A. Beverly, Insurance Consultant

NM also counterclaimed against Mr. Staple's estate and Plaintiff alleging misrepresentations based upon the insurance application. To support its claims, NM advances the testimony of Tim Labecki, a witness not involved in either the application or the underwriting

---

[9] NM admits that "neither the Medical Examiner (Selly Rivers, MD), and the County's Chief Forensic Toxicologist (Julia Pearson, Ph.D.) nor NM's retained toxicologist (Kennon Heard, MD) could recall seeing a higher level in their many years of experience in dealing with Tylenol overdoses." (Motion for Summary Judgment, [Doc. 62], Page 10).

15

process in this case and for which no Rule 26 report was furnished. NM claims that Mr. Staple lied about his occupational history and level of income, and Mr. Labecki opines that NM would not have issued the insurance policy had it known the true information. Again, he is rendering an opinion since he first became involved *after* NM denied the claim.

Mr. Labecki's opinions draw myriad conclusions about Mr. Staple, stating that (1) he deliberately withheld the fact he was disbarred (even though never asked); (2) he deliberately mispresented his income level to convince NM to sell him the amount of life insurance he purchased; and that (3) the agent of Northwestern Mutual, Aubrey Rosser, was unaware of either the change in occupation, or his change in jobs. He will also offer opinions, based upon Florida Statutes § Section 627.409, on the particular elements necessary to prevail on NM's rescission claim, which are most certainly "legal opinions" like those NM claims Mr. Beverly included in his report. Note, while NM looks to Mr. Labecki as its expert, it never designated him as one, and never filed a report signed by him, as required by the Case Management Order.

To the extent the Court permits Mr. Labecki to testify, expert testimony in response is highly appropriate. Mr. Beverly is highly qualified to render an opinion concerning the insurance application process. His background is in training agents and adjusters who look to Mr. Beverly to become licensed. Mr. Beverly addresses the fact that the application which NM claims was falsified was clearly forged, a fact not mentioned in NM's motion for summary judgment. He also discusses the terribly flawed process used by NM to obtain the application which created the opportunity for NM to contest coverage at a time Mr. Staple was unable to defend himself. Mr. Beverly places the life insurance application process in its appropriate context – the integrity of the application is paramount because the insured is not around to defend against attacks such as the one made here. When that integrity is compromised, for

example when a NM agent requests a signature without showing the insured the application, NM has no right to rely upon the application.

In his deposition, NM employee Aubrey Rosser admitted that protocol was not followed, which included presenting the completed application to its insured to confirm the information taken down by the agent. Described as "our protocol," Mr. Beverly can trace the documents exchanged to show how NM is relying upon its own errors as the basis of its claim for rescission. While the opinions offered by Mr. Beverly might also be relevant to a subsequent "bad faith" suit, that does not mean they are irrelevant to the instant dispute in which NM itself has placed into issue the information known by its agents, the integrity of the application upon which it relies, and the materiality of the information which NM now claims was so important to its decision but which it never requested or already knew.

Undoubtedly, Mr. Beverly's opinion is not flattering to NM. That is not the test under Daubert. His opinions are based upon the facts of this case, reliable, and extremely helpful to lay persons who do not deal with life insurance applications on a daily basis nor understand the complexities of underwriting and application completion.

III.   CONCLUSION

For the afore-mentioned reasons, PLAINTIFF/COUNTERCLAIM DEFENDANT, Cheryl Staple, prays the Court deny Defendant's motion and award Mrs. Staple and any all other relief the Court deems just and equitable.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this **4rd day of January 2019**, the foregoing has been served to **Jake Monk, Esquire and John E. Meagher, Esquire,** SHUTTS & BOWEN, LLP, 200

S. Biscayne Blvd., Suite 4100, Miami, Florida 33131, via email transmission.

        **CORLESS BARFIELD TRIAL GROUP, LLC**

        */S/ Theodore A. Corless*
        **THEODORE A. CORLESS, ESQUIRE**
        Florida Bar #: 176192
        **MARY CATHERINE LAMOUREUX, ESQUIRE**
        Florida Bar #: 872288
        6812 W. Linebaugh Avenue
        Tampa, Florida 33625
        Telephone: (813) 258-4998
        Facsimile: (813) 258-4988
        Primary email: service@corlessbarfield.com
        *Attorneys for Plaintiff/Counter-Defendant*