**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**8:17-cv-03066-MSS-TGW**

CHERYL STAPLE,

      Plaintiff/Counter-defendant,

v.

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY,

      Defendant/Counter-plaintiff.

_____/

## DEFENDANT NORTHWESTERN MUTUAL'S MOTION FOR SANCTIONS DUE TO PLAINTIFF'S SPOLIATION OF EVIDENCE

Defendant, The Northwestern Mutual Life Insurance Company ("Northwestern Mutual"), pursuant to Local Rule 3.01, Federal Rule of Civil Procedure 37, Federal Rule of Civil Procedure 41, and this Court's inherent authority, respectfully requests this Court's entry of an Order dismissing the instant action with prejudice due to Plaintiff, Cheryl Staple's, spoliation of evidence. The evidence improperly destroyed by Plaintiff includes both electronically stored information ("ESI") and tangible evidence, including numerous text message strings and individual messages to and from Desmond Staple's cell phone (which were deleted), access to Yahoo! mail (which Plaintiff accessed subsequent to Staple's death and during this litigation), and the disappearance of the handwritten note in red ink (the "Note") and Bible present in the car at the time Desmond Staple was found. In the alternative, this Court should impose an adverse inference in this action when considering the motion for Summary Judgment (and, if this case proceeds to trial, through an adverse jury instruction), that the Note on the front seat of Desmond Staple's Mercedes was a suicide note and that his laptop, cell phone, and email, now destroyed,

1

contained information establishing that his manner of death was suicide.  Finally, Northwestern Mutual should be awarded its fees and costs for having to defend this frivolous litigation.

## I.  INTRODUCTION

The evidence in this case unequivocally demonstrates that Desmond Staple committed suicide.  Found in the Walmart parking lot with the equivalent of 112 Maximum Strength Tylenol pills in his blood stream, his life had fallen apart.  He had been disbarred from the practice of law less than a year before his death and was subsequently reported to the Florida Bar for continuing to practice law by forging other attorneys' (some of whom he described as his "best friends") signatures.  He was under a mountain of debt that he could never pay back, resulting in the foreclosure of his home and his children's threatened expulsion from their private school.  And, most importantly, as we now know from evidence discovered by the Court-ordered forensic examination of his belatedly-produced computer and cell phone (both improperly concealed by Plaintiff, for which she was sanctioned), his marriage was failing, culminating in Plaintiff's threat to leave him, taking his four (4) children with her, on the very morning of his disappearance, March 13, 2016.  The fact that Desmond killed himself was obvious even to Plaintiff, as she, herself, reported Desmond's prior suicidal ideation to the Sheriff's officer, who called her from Desmond's phone at the scene, and told multiple physicians at the hospital where he was taken that he had threatened suicide in the days before being found at Walmart.

In light of this overwhelming evidence of Desmond's suicide, Plaintiff consciously decided on a course of action designed to enable her to collect the $4,000,000 in life insurance benefits (and accompanying statutory attorney's fees) she seeks in this lawsuit – she would selectively delete key emails and texts found on Desmond's laptop and cell phone and attempt to

conceal the very existence of those devices from Northwestern Mutual.[1]  Moreover, as part of her scheme, she would selectively destroy evidence found in Desmond's car at the time he was found in the Walmart parking lot, including the Note found on the front seat and Desmond's Bible found in the back seat.[2]

As set forth below, the overwhelming evidence establishes that Plaintiff engaged in the intentional spoliation of critical evidence, which has resulted in the type of prejudice to Northwestern Mutual that cannot be "cured," but can only be alleviated by the dismissal with prejudice of this lawsuit.

## A.   At  and After the Time of Desmond's Hospitalization, Plaintiff had Possession of Desmond's Phone and Was Receiving Legal Advice.

On March 14, 2016, while Desmond Staple was at the hospital unconscious, Plaintiff was given Desmond's cell phone by the hospital staff.  Pltf.2nd, 253:14-16.[3]  Because Desmond's phone was receiving numerous text messages about his debts, including his creditors' threats to take legal action and contact The Florida Bar, Plaintiff consulted an attorney, Deanne West (with

---

[1] In this re-opened discovery period, Northwestern Mutual also learned in Plaintiff's second deposition that Plaintiff admitted to having her and her minor daughter's old cell phones used in (or  containing data from) communications with Desmond Staple at the time of his death.  See Motion for Sanctions for Staple's Newly Discovered Discovery Violations … [DE 134].  The Motion [DE 134] is presently pending.  As can be seen in the Motion [DE 134], Plaintiff is continuing to hamper Northwestern Mutual's ability to obtain responsive discovery because Plaintiff admitted that she never opened those phones to search for responsive information and that they may contain responsive text messages. Motion [DE 134], at ¶11.

[2] Plaintiff claims that the Bible was buried with Desmond, but she cannot identify who placed it in the casket, and all deposed family members deny having a role in that.  Even were it buried with Desmond, that would still constitute spoliation, especially because it appears that it may have provided additional evidence of suicide based on what Desmond appears to have been reading, which will be discussed below.

[3] Northwestern Mutual intends to file the depositions under seal, pursuant to the pending Motion to File Deposition Transcripts Under Seal [DE 170], along with the depositions of Lorena Valbuena, Rodolfo Simpson, Charmaine Staple, Deane West, Eunice Staple, Bevan Staple, Hopeton Staple, and Adam Sharp.  Aside from Plaintiff's second deposition, which will be under seal, and which will be cited as "Pltf.2nd," Each of those sealed deposition transcripts will be cited here by last name, such as "West, [page]:[line]."

whom Desmond shared office space when he was a licensed attorney), to determine how Plaintiff should respond.   Pltf.2nd, 254:7-11; 255:22-256:6; 256:13-20; 389:11-18; 390:21-391:2.  Plaintiff was asking and receiving legal advice from attorney Deanne West.  West, 43:1-44:18.  Moreover, West contacted another attorney who told West what to tell Plaintiff.  West, 53:16-54:4.  Plaintiff, therefore, was receiving legal advice regarding how to proceed while she was at the hospital, before Desmond's death.  On March 16, 2016, on the very morning Desmond Staple died, Plaintiff submitted to Northwestern Mutual a $4,000,000 claim for life insurance proceeds.

Plaintiff admits she kept possession of Desmond's phone the entire time she was at the hospital.  Pltf.2nd, 254:19-23.   And, in May 2016, several months after Desmond's death, Plaintiff was still monitoring Desmond's phone and responding to text messages.  Pltf.2nd, at 385:13-20.[4]

## B.  At least 24 complete text message strings from March 6, 2016 through March 20, 2016 are missing and have been deleted from Desmond Staple's cell phone.

In total, in the Stipulated ESI protocol, the Parties requested court-appointed expert eHounds to provide the "complete text message strings" from over 104 numbers.[5]  ESI Protocol [DE 98], pp.3-4. Of those, 102 numbers were taken from AT&T text message records, showing text messages received by and sent to Desmond Staple's cell phone from March 6, 2016 through March 20, 2016.  See AT&T Records, attached as **Exhibit 1**, at CM/ECF pp. 27-37.   Thus, Northwestern Mutual expected to receive text message strings from 102 unique numbers, as they can clearly be seen incoming and outgoing from Desmond Staple's cell phone on the AT&T

---

[4] All this despite the fact that, in her May 23, 2018 discovery responses, she denied knowing "what specific Electronic Devices" Desmond used.  See Plaintiff's Response to NWM's First Request for Production [DE 49-3], No. 13.
[5] In total, the ESI protocol actually requests complete text message strings from 105 numbers, however, one number was duplicated; thus, there were only 104 unique numbers.

records.  In total, this should have resulted in 931 text messages and 27 picture/video messages. Exh. 1, CM/ECF pp. 37, 42.

However, eHounds' examination of Desmond Staple's cell phone contained only 379 text messages in total, Sharp, 104:18-20, from 78 unique phone numbers.  See Text Message Spreadsheet, attached as **Exhibit 2**.[6]  Thus, *at least 24 complete text message strings* created from March 6, 2016 through March 20, 2016 are missing and had been deleted from Desmond Staple's cell phone. In Plaintiff's counsel's examination of eHounds, its principal, Mr. Adam Sharp, confirmed that the phone was put in service in February 2016.  Sharp, 158:15-24.  Thus, any argument suggesting that text messages sent or received in March 2016 are missing from the phone as a result of a phone upgrade would fail.  There is no legitimate explanation for the non-existence of these text messages other than Plaintiff deleting them.

**C.  Individual Text Messages, Including Those Showing Cheryl Staple Threatened to Leave Desmond the Morning he Disappeared, were Deleted from His Phone.**

*Sharon Unruh's Texts*

In addition to the deletion of entire text messages strings, after comparing AT&T's records with eHounds' text message report, Northwestern Mutual learned that specific damaging text messages had been selectively deleted, as well.  As can be seen in the following chart, which combines the AT&T Records with the texts eHounds was able to recover from Desmond Staple's phone, certain of Desmond's texts with outside number Redacted-3125 (belonging to Sharon Unruh), sent and received on March 13, 2016, the morning he disappeared, were missing from his phone:

---

[6] This same exhibit was used at Sharp's deposition.  Sharp, 101:24-104:20 (depo exhibit 16).  In preparing this Exhibit for Sharp's Deposition, Northwestern Mutual removed the columns containing no data so that the spreadsheet would fit on a single page for the Court's convenience. The original electronic copy of the Reports and Document Productions will be produced to the Court in native format.

Desmond Staple (██████-9887)
Call-Text Messages Between Desmond Staple and Sharon Unruh

| | Date | Time | Call/Text | Length (in min) | Person | Telephone # | Message |
|---|---|---|---|---|---|---|---|
| 1 | | | | | | | |
| 2 | 3/10/2016 | 4:36 PM | Text from Sharon Unruh | | Sharon Unruh | Redacted 3125 | Mamma Winnie's... Sharon |
| 3 | 3/10/2016 | 6:31 PM | Call to Sharon Unruh | 2 | Sharon Unruh | 3125 | |
| 4 | 3/12/2016 | 2:37 PM | Text to Sharon Unruh | | Sharon Unruh | 3125 | MISSING FROM PHONE |
| 5 | 3/12/2016 | 2:49 PM | Text from Sharon Unruh | | Sharon Unruh | 3125 | MISSING FROM PHONE |
| 6 | 3/12/2016 | 2:49 PM | Call to Sharon Unruh | 32 | Sharon Unruh | 3125 | |
| 7 | 3/13/2016 | 8:08 AM | Text from Sharon Unruh | | Sharon Unruh | 3125 | Please text me when you are up |
| 8 | 3/13/2016 | 8:08 AM | Text to Sharon Unruh | | Sharon Unruh | 3125 | MISSING FROM PHONE |
| 9 | 3/13/2016 | 08:11AM | Text to Sharon Unruh | | Sharon Unruh | 3125 | MISSING FROM PHONE |
| 10 | 3/13/2016 | 08:11AM | Text from Sharon Unruh | | Sharon Unruh | 3125 | MISSING FROM PHONE |
| 11 | 3/13/2016 | 8:12 AM | Text from Sharon Unruh | | Sharon Unruh | 3125 | MISSING FROM PHONE |
| 12 | 3/13/2016 | 8:12 AM | Text to Sharon Unruh | | Sharon Unruh | 3125 | MISSING FROM PHONE |
| 13 | 3/13/2016 | 8:15 AM | Text to Sharon Unruh | | Sharon Unruh | 3125 | MISSING FROM PHONE |
| 14 | 3/13/2016 | 8:15 AM | Text to Sharon Unruh | | Sharon Unruh | 3125 | MISSING FROM PHONE |
| 15 | 3/13/2016 | 8:15 AM | Text from Sharon Unruh | | Sharon Unruh | 3125 | MISSING FROM PHONE |
| 16 | 3/13/2016 | 8:16 AM | Text to Sharon Unruh | | Sharon Unruh | 3125 | MISSING FROM PHONE |
| 17 | 3/13/2016 | 8:16 AM | Text from Sharon Unruh | | Sharon Unruh | 3125 | MISSING FROM PHONE |
| 18 | 3/13/2016 | 8:17 AM | Text from Sharon Unruh | | Sharon Unruh | 3125 | MISSING FROM PHONE |
| 19 | 3/13/2016 | 8:17 AM | Text from Sharon Unruh | | Sharon Unruh | 3125 | MISSING FROM PHONE |
| 20 | 3/13/2016 | 9:26 AM | Text from Sharon Unruh | | Sharon Unruh | 3125 | Ok? |
| 21 | 3/13/2016 | 9:29 AM | Text to Sharon Unruh | | Sharon Unruh | 3125 | I will call you later. I really need your emotional support and to just talk to someone |
| 22 | 3/13/2016 | 9:30 AM | Text from Sharon Unruh | | Sharon Unruh | 3125 | I am here!!! |
| 23 | 3/13/2016 | 9:30 AM | Text from Sharon Unruh | | Sharon Unruh | 3125 | I will do anything to help you! |
| 24 | 3/14/2016 | 4:30 PM | Text from Sharon Unruh | | Sharon Unruh | 3125 | Morning...just making sure you're OK... |
| 25 | 3/15/2016 | 10:38 AM | Text from Sharon Unruh | | Sharon Unruh | 3125 | You are and always will be the very best man I know! |

Call-Text Chart between Desmond Staple and Sharon Unruh, attached as **Exhibit 3**.[7]

  After identifying the number as Sharon Unruh's, Northwestern Mutual deposed Ms. Unruh, who, luckily, had not deleted the messages from her phone. S.Unruh, p.21:2-22:15. To Northwestern Mutual's utter surprise, these deleted messages contradicted Plaintiff's story regarding the events of that morning, including her testimony that she and Desmond did not argue that morning and that he had left the house with his twin 2-year old boys.[8] Pltf.1st [DE 58-12], 163:11-17. Far worse, these deleted messages show the type of damning messages Plaintiff was trying to hide, namely, that on the morning he disappeared, Plaintiff threatened to leave

---

[7] Northwestern Mutual is attaching the chart that combines the AT&T Records with the records eHounds produced as an exhibit should the court need to zoom in for clarity.

[8] At her November, 2018, deposition, Plaintiff testified that Desmond had taken his twin 2 year-old boys with him when he left the house and she did not know what time the twins were brought to the baby-sitter Valbuena's house. Pltf.1st [DE 58-12], 128:5-129:12 After Valbuena's deposition in July 2019, where she contradicted Plaintiff's version of events, Valbuena, 41:8-10; however, Plaintiff admitted that her initial testimony was incorrect, stating that Desmond did <u>not</u> take the boys with him that morning. Rather, they were picked up at the house by Valbuena. Moreover, Plaintiff was not only awake when they were picked up, but Plaintiff had a conversation with Valbuena in which they discussed movie rental recommendations. Pltf.2nd, 323:1-325:7.

Desmond, taking his children with her:



Texts from Sharon Unruh's Phone, attached as **Exhibit 4**.  Also deleted was his plea that he "really need[ed] . . . to just talk to someone."  **Exh. 4**, p.2. As can be seen from the chart above and screenshot above, because texts sent before and after the deleted texts were left intact on Desmond's phone, Plaintiff specifically <u>chose</u> to delete the damaging messages, while leaving the remaining innocuous messages intact.  Plaintiff's actions show a conscious intent to destroy the most prejudicial messages.

### *Rudy Simpson's Individual Texts*

Plaintiff also appears to have deleted text messages between Desmond and Rudy Simpson for periods both before and after Desmond disappeared, as follows:

Desmond Staple (█████ 9887)
Calls and Texts beween Rudy Simpson and Desmond Staple

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| 1 | Date | Time | Call/Text | Length in min. | Person | Telephone # | Message |
| 2 | 3/6/2016 | 12:41pm | Text to Desmond | | Rudy Simpson | Unknown -6645 | MISSING FROM PHONE |
| 3 | 3/7/2016 | 11:23am | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 4 | 3/7/2016 | 12:38pm | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 5 | 3/7/2016 | 1:53pm | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 6 | 3/7/2016 | 6:19pm | Text from Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 7 | 3/8/2016 | 6:22pm | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 8 | 3/8/2016 | 9:43am | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 9 | 3/8/2016 | 9:43am | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 10 | 3/8/2016 | 1:51pm | Text from Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 11 | 3/8/2016 | 1:52pm | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 12 | 3/8/2016 | 2:35pm | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 13 | 3/9/2016 | 7:32am | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 14 | 3/9/2016 | 8:09am | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 15 | 3/10/2016 | 3:55pm | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 16 | 3/11/2016 | 8:56am | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 17 | 3/11/2016 | 8:57am | Text from Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 18 | 3/11/2016 | 8:57am | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 19 | 3/12/2016 | 11:54am | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 20 | 3/12/2016 | 2:12pm | Text from Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 21 | 3/12/2016 | 2:14pm | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 22 | 3/13/2016 | 3:58pm | Text to Desmond | | Rudy Simpson | -6645 | Happy Sunday, remember I love you like a brother and I am here if you ever need my help with anything |
| 23 | 3/13/2016 | 3:58pm | Text to Desmond | | Rudy Simpson | -6645 | May God continue to bless you |
| 24 | 3/14/2016 | 4:31pm | Text to Desmond | | Rudy Simpson | -6645 | Good morning, remember that I love you like a brother and I would do anything for you. Please let me know if there is something I can help you with today |
| 25 | 3/14/2016 | 4:31pm | Text to Desmond | | Rudy Simpson | -6645 | Desmond, you know that I love you like a brother, please let me help you. I have a condo on the other side of Dana Shores,   1 minute from your house, and you can crash there confidentially while you gather your thoughts. Please let me know. The place is furnished like a bed and breakfast place and it is empty right now |
| 26 | 3/14/2016 | 4:31pm | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |
| 27 | 3/14/2016 | 4:31pm | Text to Desmond | | Rudy Simpson | -6645 | MISSING FROM PHONE |

Call-Text Chart Between Desmond Staple and Rudy Simpson, attached as **Exhibit 5.**

Unlike Northwestern Mutual's luck in recovering missing text messages Desmond exchanged with Sharon Unruh, Northwestern Mutual could not recover deleted text messages with Rudy Simpson, because he testified he upgraded his phone and could not transfer his data. Simpson, 12:15-22.  Based on the content of the messages that were produced in the eHounds examination, however, Desmond appears to have discussed leaving the marital home, as Rudy stated he "would do anything for [Desmond]," offering Desmond a condo on Dana Shores for Desmond to "crash . . . confidentially while [Desmond] gathers [his] thoughts." **Exh. 5,** row 25.

**D.  Complete Text Message Strings With Key Witnesses Were Deleted by Plaintiff After Desmond Staple was Unconscious and are Not Recoverable.**

In addition to the above, other text message strings were deleted after Desmond was found unconscious (and he never recovered consciousness prior to his death).  For example, the following chart, combining the AT&T Records with the texts eHounds produced from Desmond Staple's phone, show that <u>all of Cheryl Staple's text messages with Desmond Staple were</u>

deleted from Desmond Staple's phone:

| | A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|---|
| | | | | | Calls-Text Spreadsheet beween Cheryl Staple (Redacted -1587) and Desmond Staple (Redacted -9887) | | |
| | | | | | Taken from Desmond Staple's Phone Logs for No. Redacted -9887 | | |
| 1 | Date | Time | Call/Text | Length in min. | Person | Telephone # | Message |
| 2 | 3/6/2016 | 3:09pm | Call to Desmond | 4 | Cheryl Staple | 1587 | |
| 3 | 3/8/2016 | 4:08pm | Text to Desmond | | Cheryl Staple | 1587 | MISSING FROM PHONE |
| 4 | 3/8/2016 | 4:10pm | Text from Desmond | | Cheryl Staple | 1587 | MISSING FROM PHONE |
| 5 | 3/9/2016 | 9:09am | Text to Desmond | | Cheryl Staple | 1587 | MISSING FROM PHONE |
| 6 | 3/9/2016 | 9:26am | Call from Desmond | 1 | Cheryl Staple | 1587 | |
| 7 | 3/10/2016 | 2:53pm | Text to Desmond | | Cheryl Staple | 1587 | MISSING FROM PHONE |
| 8 | 3/10/2016 | 3:06pm | Text from Desmond | | Cheryl Staple | 1587 | MISSING FROM PHONE |
| 9 | 3/14/2016 | 4:30pm | Text to Desmond | | Cheryl Staple | 1587 | MISSING FROM PHONE |
| 10 | 3/14/2016 | 4:30pm | Text to Desmond | | Cheryl Staple | 1587 | MISSING FROM PHONE |

See Call-Text Chart Between Desmond Staple and Cheryl Staple, attached as **Exhibit 6**.

Similarly, complete text message strings between these people were deleted from the phone:

- Text messages between S.S. (Desmond's daughter) and Desmond Staple.  See Call-Text Spreadsheet Between Desmond and Daughter, attached as **Exhibit 7**.
- Text messages between Eunice Wilson (Desmond's mother) and Desmond Staple.  See Call-Text Spreadsheet Between Desmond and Eunice Wilson, attached as **Exhibit 8**.
- Text messages between Charmaine Staple-Burney (Desmond's sister) and Desmond Staple. See Call-Text Spreadsheet Between Desmond and Charmaine Staple, attached as **Exhibit 9**.

Each of these charts (representing Desmond's AT&T records by phone number) shows the influx of text messages received when the first responders turned on his phone in the Walmart parking lot on March 14, 2016 at 4:30pm (Desmond had turned his phone off while in the car after he returned there upon buying his new set of clothes).   At that time, sixty-eight (68) messages, which had been pending while Desmond was unconscious and his phone was turned off, flooded in.  **Exh. 1**, at CM/ECF pp. 34-35.  This is of paramount importance because it shows that Desmond, himself, could not have deleted the messages **because he was unconscious and never regained consciousness before his death**.  Similarly, the phone would not have deleted the messages because eHounds confirmed that when it inspected the phone, there was no automatic deletion policy set on the phone at that time. Sharp, 127:22-128:4.  Instead, it was Plaintiff who possessed his phone, used it to review and send text messages, and used it to destroy damning evidence, all while Desmond was unconscious and, later, deceased.

9

Sharp confirmed that deleting the text messages would have been a "slow and methodical process" and a "deliberate act." Sharp, 123:13-23.  He also confirmed that eHounds was unable to produce text messages deleted from Desmond Staple's phone and that those deleted text messages are not recoverable.  Sharp, 124:5-15.  Sharp confirmed that the processes and best practices eHounds used were unable to recover deleted messages.  Sharp, 125:16-19.  He also confirmed that there were no alternative explanations for missing (and therefore deleted) text messages. Specifically, there were no apps found on the phone that would intercept AT&T carrier-received messages.   Sharp, 167:2-16.  There was no evidence that a SIM card was being changed on the phone.  Sharp, 167:17-19. Based on the assumption that the phone actually received the messages (which is shown by the AT&T records, **Exh.1**), he confirmed the only reason the messages would have been missing from the phone was because they were deleted. Sharp, 167:25-168:5.

## F.  Others Did Not Possess Desmond Staple's Phone or Delete Text Messages.

It is anticipated that Plaintiff may contend that others outside of her control possessed the phone (such as Desmond's brother, Hopeton Staple), creating an inference that someone else tampered with the phone.   See Pltf.2nd, 260:5-261:23.   Such a contention, however, is unsupported by the record.

First, Hopeton Staple testified he never took possession of Desmond Staple's belongings, never took possession of the wallet or cellphone, and did not delete any text messages.  Hopeton Staple, 35:17-36-11; 37:7-12.  Rudy Simpson did not use Desmond's phone.  Simpson, 113:15-17. Charmaine Staple did not use Desmond's phone and is not aware whether anyone else deleted messages from the phone.  Charmaine Staple, 58:23-59:9. Joy Staple-Faulkner did not possess Desmond's phone and is not aware whether anyone else deleted messages from the

phone.  Joy Staple, 53:6-12.  Deanne West did not use Desmond Staple's phone and is not aware whether anyone else deleted messages from the phone.  West, 12:11-17.  And Desmond's other brother, Bevan Staple, never took possession of Desmond Staple's belongings, never took possession of the wallet or cellphone, and did not delete text messages.  Bevan Staple, 24:25-25-6; 26:2-17.

## G. Cheryl Staple Had Access to Desmond Staple's Email, Changed the Password, and Refused to Provide Login Information or Produce Desmond's Email.

Cheryl Staple previously denied having access to Desmond Staple's Yahoo mail.  For example, on May 23, 2018, in Response to Northwestern Mutual's First Request for Production No. 15, which sought information for dstaplelaw@yahoo.com and thestaplelawgroup@yahoo.com, Plaintiff stated that "decedent's email accounts may no longer exist, may have been deleted prior to, or post, Desmond Staple's death and/or the email addresses registered to such accounts cannot be recalled or are no longer accessible as Mr. Staple is unable to reset the accounts' login requirements."  See May 23, 2018 Response to Request for Production [DE 49-3], at 15. No access to this information or emails was ever produced in this case.  As will be shown below, Plaintiff's response was a patent misrepresentation.

*Specifically, the eHounds' analysis shows that Plaintiff did in fact have access to Desmond Staple's Yahoo mail, she reviewed multiple inbox messages, she changed his password, she viewed his contacts, and more.*  eHounds prepared the "Internet Explorer 10-11" report (the "10-11 Report"), which represents internet and file history on Desmond's computer. Sharp, 51:20-52:10.[9]  As Sharp explained, the report is generated from a section of eHounds' software that parses all history that runs through Microsoft Internet Explorer.  Sharp, 51:20-52:10.  Because Windows uses Internet Explorer to determine what to do with the file, this report

---

[9] The "Internet Explorer 10-11 Report, used in Sharp's depo, is attached here as **Exhibit 10**.

includes the file history in addition to internet activity.  Sharp, 51:20-52:10.  Importantly, in this report, Column C represents the "actual URL, which includes the files that are being accessed as well as websites."  Sharp, 52:16-18.  Column E represents the "actual date of access," which means "somebody clicking a file to open and look at it."  Sharp, 52:19-22; 53:4-10.

Sharp testified that on April 5, 2016, just three weeks after Desmond's death and while Plaintiff's claim to Northwestern Mutual was pending, thestaplegroup@yahoo.com e-mail account at Yahoo was accessed.[10]  Sharp, 72:15-72:21.  He also confirmed that the password to the Yahoo mail was changed on April 5, 2016.[11]  Sharp, 70:25-71:25.  He then confirmed that the contacts in the Yahoo account were accessed.  Sharp, 74:20-75:8.  And on April 5, 2016, someone was accessing Desmond Staple's Yahoo mail and viewing individual messages in Yahoo mail.  Sharp, 68:3-21.  Sharp confirmed, based on the URLs, that message after message was viewed in the Yahoo inbox on April 5, 2016.  Sharp, 68:22-70:24.

eHounds also prepared another report, titled "Internet Explorer Main History" (the "Main History Report") which shows actual history and documents that were opened and which includes the webpage title.  Sharp, 80:20-81:2.[12]  Based on the webpage titles, Sharp was able to confirm that the subject of one of the emails being viewed on April 5, 2016 was "Re: Loan" in the Yahoo inbox.  Sharp, 81:16-82:6.  Another email had the subject "RE: Desmond Staple."  Sharp, 82:22-83:16.  And, consistent with the 10-11 Report, the Main History Report confirmed the Contacts in Yahoo Mail were viewed on April 5, 2016.  Sharp, 83:17-21.  Importantly, and as

---

[10] On cross examination, Sharp again confirmed that thestaplegroup@yahoo.com was the email account accessed on the device.  Sharp, 153:10-11.

[11] When counsel for Plaintiff attempted (by changing a password to his own Yahoo account on his iPad) to impeach Mr. Sharp's ability to interpret the Yahoo URLs, Mr. Sharp explained that URL's from Desmond Staple's computer were readable because they were created before Yahoo suffered a data breach at the end of 2017, which caused Yahoo to overhaul its security.  Sharp, 151:10-153:2.

[12] The "Main History Report," used in Sharp's deposition, is attached here as **Exhibit 11**.

previously noted, Plaintiff had already consulted attorney Deanne West a month prior and had engaged (and was questioning her choice) of Corless Barfield.[13]  Pltf.2nd, 418:8-419:1.

Sharp also prepared a report, titled "Internet Explorer Typed URLs," which shows that someone manually entered (or copy and pasted) http://mail.yahoo.com/ into internet explorer on August 22, 2018 (this was shortly before Plaintiff, reversing course, admitted the existence of the computer and cell phone, but represented falsely that the devices could not be opened by any party due to instructions from the Florida Bar[14]).  Sharp, 86:20-23.[15]   On September 7, 2018, when Plaintiff and her counsel amended their Rule 26 Disclosures, they revealed the existence of the devices and pushed the false narrative that The Florida Bar instructed them that the device could not be opened by any party.   See Plaintiff's Suppl. R.26 Disclosures [DE 49-5], at CM/ECF p.11.   Apparently, Plaintiff and her counsel's false May 15, 2018 Florida Bar instruction that the electronic devices could not be opened by any party did not apply to Plaintiff, as the eHounds reports clearly show Plaintiff accessing the computer and email in the following months.  Indeed, based on the 10-11 Report, Sharp testified that on August 22, 2018, a user was attempting to log into Yahoo mail.  Sharp, 63:25-64:7.  And, based on a report Sharp prepared, titled "Parsed Search Queries," which shows all search queries in the computer, Sharp, 96:14-25,[16] Sharp testified that searches were conducted on August 22, 2018, ***in Yahoo mail*** for

---

[13] Mr. Corless specifically instructed Plaintiff not to answer questions based on attorney-client privilege, but the email Plaintiff sent on April 15, 2016 stated that she was not sure "Corless Barfield was the best choice."  Pltf.2nd, 418:11; Depo Exhibit 58, at PDF p.326.

[14] Plaintiff's position at that time was (as stated in Plaintiff's May 23, 2018 Response to Northwestern Mutual's First Request for Production [DE 49-3], Nos. 13, 15) that Plaintiff and her counsel had disclaimed the ability to access Desmond Staple's email accounts and had no knowledge of Desmond's computer and cell phone.

[15] The "Internet Explorer Typed URLS" report, used in Sharp's deposition, is attached here as **Exhibit 12**.

[16] The "Parsed Search Queries" report, used in Sharp's deposition, is attached here as **Exhibit 13**.

multiple iterations of the name "Cheryl Staple."  Sharp, 97:1-15, 98:1-9.

**H.  Plaintiff's Spoliation of Tangible Evidence—the Note and the Bible**

Both Plaintiff, through her deposition, and her counsel, at the hearing on the motion to dismiss for fraud on the court, have sent Northwestern Mutual on a fool's errand regarding the chain of custody for the crucial missing contents of the car (the handwritten Note and Bible).  At her deposition, Plaintiff represented that Rudy Simpson cleaned out the car at Deanne West's request.  Pltf.2nd, 271:11-14; 272:9-13.  At the March 6, 2019 hearing on the motion to dismiss for fraud on the court, this Court took great interest in what happened to the handwritten Note, which was missing from the cardboard box of the car's contents.  Hearing [DE 103], pp.22:21-23:13; 25:3-21.  The crisp white paper with red handwriting can be seen on the front seat:



At the hearing, Ted Corless tried to point the finger at non-parties and sow doubt regarding the chain of custody.  Hearing [DE 103], p. 25:14-18.  ("MR. CORLESS: I have no information. We do know that there were at least two different groups of people that got to the car prior to the individual that emptied the contents into the box, and no one identified the presence of any kind of Note from Desmond Staple.").  Specifically, Ted Corless pointed the finger at Rudy Simpson, stating he was the person who "went to get the car and put the contents

in the box" and that Rudy Simpson "took the responsibility of going to get the car, taking the car back to the rental, and emptying the contents into a box."  Hearing [DE 103], 9:1-19.  Ted Corless also claimed that Rudy Simpson delivered the box to the brother.  Hearing [DE 103], 10:5-11 ("That's right, Your honor.").

Like the handwritten letter, the Bible, shown on the rear passenger seat with (with what appears to be a loose-leaf page tucked inside) was missing from the cardboard box of car contents:



Plaintiff stated that Bevan and his wife took the Bible.  Pltf.2nd, 274:9-11.  At the hearing, Plaintiff's counsel put the burden of attempting to discover what happened to Plaintiff's destroyed evidence on Northwestern Mutual.  Hearing, 10:19-21 ("MR. CORLESS: I don't know the answer to that question because none of these witnesses were deposed by the insurance company.").

Northwestern Mutual subsequently deposed those "chain of custody" witnesses, all of whom deny the sort of involvement proclaimed by Plaintiff and Ted Corless.  First, Rudy Simpson specifically testified that he took photos of the car.  Simpson, 61:13-15.  He does not remember any of the contents of the car.  Simpson, 69:14-15.  He did not arrange any items in the car when he took the photos.  Simpson, 70:23-25; 72:9-13.  He did not touch any of the items

in the car.  Simpson, 71:1-5.  He did not take any contents out of the car. Simpson, 72:9-15.  He did not look at the red handwritten Note on the front seat of the car.  Simpson, 73:22-75:3.  Finally, Rudy Simpson does not know what happened to the contents of the car after he took the photographs.  Simpson, 75:4-6.

Bevan Staple testified that he saw the contents of the car. Bevan Staple, 32:2-5. He looked inside the car at Desmond Staple's house, saw the Bible, and looked at the Bible.[17] Bevan Staple, 33:4-35:3.  He did not take the Bible from the car, he did not clean out the car, and had no idea what happened to the Bible.  Bevan Staple, 35:1-20.  Bevan Staple never examined the Note on the front seat of the car, never took the Note from the car, and denies disposing of the Note.  Bevan Staple, 36:12-37:22.

Hopeton Staple testified he had never seen the red Mercedes in which Desmond Staple was found, denied cleaning out the car, and never examined the contents of the car. Hopeton Staple, 49:21-50:21.  He never saw the Bible, he never saw the Note, and he did not destroy the Bible or Note. Hopeton Staple, 50:22-53:18.  The handwritten Note in red ink on the front seat of the car has never been found and no one (other than Plaintiff and her counsel) can explain its absence.  Indeed, no one can corroborate Plaintiff's and Ted Corless's story.  There can be only one conclusion—Plaintiff destroyed a red, handwritten suicide Note displayed on the front seat.[18]

## I.  Native Pictures of the Car

Northwestern Mutual's efforts to get clearer pictures of the Note by requesting them in

---

[17] Bevan Staple's specifically recalled that the Bible was bookmarked to the famed Psalm, "The Lord is My Shepherd,"  Bevan Staple, 34:14-16, which suggests that Desmond was seeking the Lord's comfort on the eve of death, as it reads, in pertinent part: "Yea, though I walk through the valley of the shadow of death, I will fear no evil . . . ."

[18] It should not be forgotten that, as discussed in the Motion to Dismiss for Fraud on the Court [DE 54], Plaintiff denied the existence of a suicide note in a discovery response, which Plaintiff subsequently removed.  Motion [DE 54], p.26.  This Court, questioning Ted Corless over the removal, said that Corless' explanation was "not believable."  Hearing [DE 103], 79:14.

native format was thwarted by Plaintiff's concealment of the photos during this litigation.  The

passage of time occurring from the date the photos were taken until the day Plaintiff produced

them to Northwestern Mutual, shortly before Dr. Adams' October 30, 2018 deposition, rendered

the original photos unrecoverable, as the photographer had upgraded his phone. Rudy Simpson

admits he took the photograph of the Note on the front seat of the car.  Simpson, 86:15-16.  Rudy

Simpson never sent the photographs of the car to anyone other than Cheryl Staple.  Simpson,

85:14-16.  He testified that he does not save information in the cloud and does not have his old

phone.  Simpson, 8:7-8.  When he upgraded from the iPhone 6s to the iPhone 8 Plus, he could

not transfer the data from the old phone to the new phone.  Simpson, 12:15-22.  Cheryl Staple

did not ask Rudy Simpson to keep the pictures for any particular period of time.  Simpson,

69:11-13.

## ANALYSIS

### A.  Burden of Proof

In determining whether Plaintiff is guilty of spoliation, this Court should apply a

preponderance of the evidence standard.  See McIntosh v. U.S., 14-CV-7889 (KMK), 2016 WL

1274585, at *33 (S.D.N.Y. Mar. 31, 2016) ("To the contrary, '[a] party seeking spoliation

sanctions has the burden of establishing the elements of a spoliation claim by a preponderance of

the evidence.'" (quoting Dilworth v. Goldberg, 3 F. Supp. 3d 198, 200 (S.D.N.Y. 2014))).  It is

worth noting that, although some courts consider it an open issue as to whether a preponderance

of the evidence standard or a clear and convincing standard applies to Rule 37(e), Yoe v.

Crescent Sock Co., 1:15-CV-3-SKL, 2017 WL 5479932, at *9 n.7 (E.D. Tenn. Nov. 14, 2017),

this Court should apply the preponderance of the evidence standard.

As the Eastern District of Pennsylvania reasoned, when applying a preponderance of the

evidence standard, there is no value in applying a higher standard of proof where it is the "aggrieved party who is left trying to understand and explain facts of which it could not definitely know absent the spoliating party's admission." <u>DVComm, LLC v. Hotwire Comms., LLC</u>, CV 14-5543, 2016 WL 6246824, at *6 (E.D. Pa. Feb. 3, 2016).  Indeed, a "higher onerous standard" on an aggrieved party may be "contrary to the purposes of Rule 37" and "allow the spoliator to benefit from its conduct."  <u>Id.</u>

## B.  Spoliation of Evidence

"Spoliation of electronically stored information (ESI) is now governed by Federal Rule of Civil Procedure 37(e), which applies to all civil cases commenced after December 1, 2015." <u>In re Disposable Contact Lens Antitrust</u>, 329 F.R.D. 336, 429 (M.D. Fla. 2018) (citation omitted).  Thus, sanctions for spoliation of ESI are available only under Rule 37(e), whereas sanctions for spoliation of tangible evidence can be imposed pursuant to this Court's inherent authority <u>See e.g.</u>, <u>Living Color Enter., Inc. v. New Era Aquaculture, Ltd.</u>, 14-CV-62216, 2016 WL 1105297, at *4 & n.2 (S.D. Fla. Mar. 22, 2016) (recognizing that the advisory committee notes to Rule 37(e) forecloses reliance in inherent authority or state law to determine when certain measures should be used for spoliation of ESI, but separate legal analysis based on inherent authority continues to exist for spoliation of tangible evidence).[19]

## i.  Spoliation of ESI Under Rule 37

When considering spoliation of ESI under Rule 37, the Court first looks to whether a duty to preserve the data existed, whether reasonable steps were taken to avoid the loss of data, and whether the lost data can be acquired through other means of discovery.  <u>In re Disposable Contact Lens Antitrust</u>, 329 F.R.D. at 429–30 (citing <u>Wooden v. Barringer</u>, 3:16-CV-446-MCR-

---

[19] Accordingly, Northwestern Mutual will address spoliation of ESI first, followed by spoliation of tangible evidence under their respective factors.

GRJ, 2017 WL 5140518, at *7 (N.D. Fla. Nov. 6, 2017)).  If the Court finds Plaintiff acted "with the intent to deprive another party of the information's use in the litigation," the Court may impose the harsher sanctions—including dismissal—delineated in Rule 37(e)(2). <u>Id.</u>[20]

**a. Plaintiff anticipated litigation and therefore had a duty to preserve the spoliated ESI.**

Under Rule 37, "reasonable anticipation of litigation means just that: whether a reasonable person would anticipate, based on the totality of circumstances surrounding the dispute, that litigation might arise as a result of a dispute between the parties."  <u>Title Capital Mgmt., LLC</u>, 2017 WL 5953428, at *4 (rejecting plaintiff's argument that Rule 37 requires plaintiff to know the "type" of litigation, "especially when the party advancing such an argument is the alleged spoliator" because such a requirement would "would allow misbehaving parties to escape their obligations to preserve evidence through the careful splitting of hairs").  "Once a party anticipates litigation, it must preserve potentially relevant evidence that might be useful to an adversary." <u>Borum v. Brentwood Vill., LLC</u>, 332 F.R.D. 38, 45 (D.D.C. 2019) (citations omitted).  "Federal courts across the country have recognized that a 'plaintiff's duty [to preserve] is more often triggered before litigation commences, in large part because plaintiffs control the timing of litigation.'" <u>Cohn v. Guaranteed Rate, Inc.</u>, 318 F.R.D. 350, 354 (N.D. Ill. 2016) (collecting cases).

Here, Plaintiff anticipated litigation the very night her husband was found unconscious on March 14, 2014.  When Desmond was found, she told first responders via telephone that he had been experiencing suicidal ideation the week prior.  And at the hospital, before Desmond died,

---

[20] The electronically stored text messages and emails are ESI.  <u>See, e.g.</u>, <u>Title Capital Mgmt., LLC v. Progress Residential, LLC</u>, 16-21882-CV, 2017 WL 5953428, at *4 (S.D. Fla. Sept. 29, 2017) (collecting cases where emails, information stored on laptop, iPhone, and external hard drives constituted ESI).

Plaintiff repeated these statements to medical staff.[21]   Plaintiff's anticipation of litigation is confirmed by her contact with Deanne West (an attorney), who provided advice regarding the text messages on Desmond Staple's cell phone.[22]   West guided Plaintiff on how to respond to the repeated text messages, and, the day after Desmond was hospitalized, Plaintiff sent her first text message from Desmond's phone. Pltf.2nd, 389:11-391:5.   Two days later, on March 16, 2016, Desmond Staple died.   That same morning, Plaintiff submitted a claim for insurance benefits to Northwestern Mutual, knowing that the claim would be contested because Desmond's death was a result of suicide.

One (1) day after leaving the hospital, in an email dated March 18, 2016, Plaintiff wrote to her insurance agent, "We may also be hiring another attorney for assistance, because when his car came home yesterday, I found several things that have greatly changed my thoughts regarding cause of death." Rosser [DE 58-1], 168:22-169:7.   Plaintiff then requested (through attorney West) to have Rudy Simpson, an accident reconstruction engineer/photographer, photograph the contents of the car, which occurred on March 21, 2016.   Pltf.2nd, 272:9-18.   The computer, Note, and Bible were in the car when it was photographed.

By April 15, 2016, Plaintiff had already hired Corless Barfield and, in an email to her sister, Plaintiff was questioning whether Corless Barfield was the best choice.   Plft.2nd, 418:8-21.   In a May 27, 2016 text message exchange with her insurance agent, Rosser, in 2016, Plaintiff was concerned that her conversations with her agent could be subpoenaed.   After being

---

[21]  She had been informed at the hospital that he was denied a potentially life-saving liver transplant due to the fact that his death was a "suicide." Pltf.2nd, 253:22-254:6.

[22]  A factor supporting anticipation of litigation is retention of counsel. Cohn, 318 F.R.D. at 354 ("By that point Cohn was making explicit references to legal action against GRI and its officers, and she had retained the attorney who represents her in this lawsuit."); Innis Arden Golf Club v. Pitney Bowes, Inc., 257 F.R.D. 334, 340 (D. Conn. 2009) (duty to preserve arose before litigation when plaintiff retained counsel in connection with "potential legal action").

asked by Rosser "What is being said?  What is the attorney saying.", Plaintiff responded :

> I can't afford to let my mouth potentially negatively impact the outcome and my children.  Can you confirm that if I call you, you won't be subpoenaed to testify in court about our conversations down the road?

Rosser Texts, attached as **Exhibit 14**.  Accordingly, Plaintiff's conduct before Desmond Staple died and in the moments after his death, unequivocally show Plaintiff reasonably anticipated litigation in this case.

**b.  The spoliated ESI was lost because Plaintiff failed to take reasonable steps to preserve it.**

Moreover, "[a] party's preservation duties attach only to evidence within that party's possession, custody, or control." In re Disposable Contact Lens Antitrust, 329 F.R.D. at 430 (citing Watson v. Edelen, 76 F.Supp.3d 1332, 1343 (N.D. Fla. 2015)).  Thus, there can be no question that, at the hospital, when Plaintiff consulted attorney West on how to respond to Desmond Staple's text messages, Plaintiff had a duty to preserve the ESI in the cell phone.  And when Plaintiff (through attorney West) had Rudy Simpson take pictures of the car (which showed the laptop), Plaintiff had a duty to preserve the ESI in the laptop computer.

Plaintiff has implied that others may have possessed the phone or laptop (perhaps to set up an excuse for why data is missing), but those witnesses expressly disclaim Plaintiff's statements that others possessed or used the laptop or phone.  Those devices were her responsibility even if she let her children use them for games.  "A party may nonetheless 'be in control of information that it does not own or physically possess.'" Id. (quoting Selectica, Inc. v. Novatus. Inc., No. 6:13-CV-1708-ORL-40, 2015 WL 1125051, at *4 (M.D. Fla. Mar. 12, 2015)).  Moreover, "[c]ontrol has been construed broadly by the courts as the legal right, authority or practical ability to obtain the materials sought on demand." Id. (quoting Selectica, Inc., 2015 WL 1125051, at *4); accord NASDAQ Market-Makers Antitrust Lit., 169 F.R.D. 493, 530 (S.D.N.Y.

1996).  To be clear, from the moment Desmond was found unconscious, the devices were never outside Plaintiff's control.

The utter lack of reasonableness in Plaintiff's actions—and the complete absence of any steps to preserve data—is shown by Plaintiff's knowledge. From the time she was at the hospital on March 14, 2016, she responded to text messages from aggrieved people who were threatening Desmond.  When she accessed the laptop on April 5, 2016, Plaintiff viewed emails, changed the Yahoo! password, searched for the name of the person who reported Desmond to the Bar for forging signatures.  Plaintiff knew that these devices contained damning information at a time when she was already represented by counsel and had sought their advice. The only reasonable step would have been shutting the devices off and providing them to her attorneys immediately. Instead, however, Plaintiff herself accessed them on multiple occasions (deleting information and changing access to his Yahoo!) and gave them to children.[23]

### c.  The spoliated ESI cannot be restored or replaced through additional discovery.

Northwestern Mutual has taken every available step to attempt to recover the ESI; however, it is irremediably lost. Spoliated ESI is "irremediably lost" if it "cannot be restored or replaced from additional discovery."  Borum, 332 F.R.D. at 46.  Unlike cases where electronically stored information was equally available to the requesting party from another source, see In re Disposable Contact Lens Antitrust, 329 F.R.D. at 431 (collecting cases), the information here was not available to Northwestern Mutual through other third-party discovery.

After learning that at least 24 complete text message strings and individual texts were deleted from Desmond Staple's phone after he was unconscious, Northwestern Mutual

---

[23] Even if Plaintiff's children possessed the phone, it defies reason to believe that Plaintiff's children accessed the text messages and accidentally deleted damning messages while leaving the innocuous texts.

subpoenaed and deposed the most pertinent individuals with whom Desmond had been texting, including but not limited to his mother, his sister, and Plaintiff. However, none produced or could recall the specific messages being sent. And no subpoena to AT&T would have been effective. See, e.g., Mintz v. Mark Bartelstein & Assocs., Inc., 885 F. Supp. 2d 987, 991 (C.D. Cal. 2012) (quashing subpoena, in part, because Stored Communications Act prohibits AT&T from disclosing contents of text messages).

Similarly, Northwestern Mutual cannot obtain Desmond's emails from Yahoo! Under Rule 45, Northwestern Mutual would have had to attempt to compel compliance in the N.D. Cal., but Northwestern Mutual would not have been able to able to obtain the contents of emails directly from Yahoo! due to the Stored Communications Act, 18 USC §2701, et seq., which prohibits providing the contents of electronically stored communications. Occupy Columbia v. Haley, 13MISC80010EMCEDL, 2013 WL 12149696, at *1 (N.D. Cal. Feb. 15, 2013) (quashing subpoena to third-party Yahoo!); Hone v. Presidente U.S.A., Inc., C08-80071 JF HRL, 2008 WL 9010061, at *1 (N.D. Cal. July 21, 2008) (quashing subpoena to third-party Yahoo! because disclosure would violate the Stored Communications Act because defendants are not the authors nor the claimed recipients of the emails); In re Facebook, Inc., 923 F. Supp. 2d 1204, 1205 (N.D. Cal. 2012) (quashing subpoena for access to deceased accountholder's account and holding that the court is not persuaded that the surviving family members' consent distinguishes precedent so as to justify compelling production).[24] Because the aggrieved party could not fully

---

[24] When confronted with Northwestern Mutual's belief that Plaintiff had access to Yahoo! accounts, Plaintiff's counsel agreed to provide consent for Yahoo! to provide access the Yahoo! accounts, among others. When Plaintiff's counsel was provided with draft consents, Plaintiff's counsel contended that she needed authority for the consents and would only sign a consent that was factually accurate and supported by authority, which prevented Northwestern Mutual from subpoenaing Yahoo! See Letter from Plaintiff, attached as **Exhibit 15**. Plaintiff's refusal based on "lack of authority" only supports Northwestern Mutual's point: Northwestern Mutual could

recover the emails, "no amount of discovery will confirm the extent of the information lost." Borum, 332 F.R.D. at 46.  Northwestern Mutual is left wondering what messages or other notes Desmond may have sent via email in the moments leading up to his death.

**d.**     **Plaintiff acted with intent to deprive under Rule 37(e)(2).**

Plaintiff acted with "intent to deprive" Northwestern Mutual of ESI relevant to this case, therefore, this Court can (and should) dismiss this case with prejudice. Id. at 49 (noting that sanction of dismissal is only available when "intent to deprive" under Rule 37(e)(2) has been shown).  Courts in the Eleventh Circuit have analyzed the "intent to deprive" standard under the Eleventh Circuit's definition of bad faith.  Nationwide Life Ins. Co. v. Betzer, 5:18-CV-39-OC-30PRL, 2019 WL 5700288, at *10 (M.D. Fla. Oct. 28, 2019) ("The Eleventh Circuit recently suggested that the "bad faith" standard and the "intent to deprive" standard in Rule 37(e) are connected." (citing  ML Healthcare Services v. Publix Super Markets, Inc., 881 F.3d 1293, 1308 (11th Cir. 2018)); Alabama Aircraft Indus., Inc. v. Boeing Co., 319 F.R.D. 730, 746 (N.D. Ala. 2017) ("At least one court has suggested that "the "intent to deprive" standard in Rule 37(e)(2) may very well be harmonious with the "bad faith" standard previously established by the Eleventh Circuit." (citing Living Color Enters., 2016 WL 1105297, at *6).[25]

When analyzing the "intent to deprive" prong, courts consider factors such as "a fail[ure] to timely disclose evidence that was unquestionably relevant and responsive to discovery

---

not recover information from the Yahoo! accounts through additional means of discovery. Moreover, Plaintiff cannot now argue that authority exists (which, it does not) to permit overcoming the secured communications act (and its broad reach), when Plaintiff refused consent based on her belief there was a lack of authority.

[25] Note that to seek sanctions under Rule 37(e)(2), Northwestern Mutual does not need to show it suffered prejudice.  Incardone v. Royal Carribean Cruises, Ltd., 16-20924-CIV, 2019 WL 3779194, at *19 (S.D. Fla. Aug. 12, 2019) (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment)).  As prejudice is a factor for spoliation of tangible evidence, the prejudice to Northwestern Mutual will nevertheless be considered in a subsequent section.

requests." <u>Betzer</u>, 2019 WL 5700288, at *12.  Here, Plaintiff failed to timely disclose and, in fact, concealed the existence of, the laptop and mobile phone.  Specifically, on March 23, 2018, at the outset of discovery in this case, Northwestern Mutual requested phones and internal hard drives for forensic inspection.  <u>See</u> [DE 49-3], no. 13.  And on May 23, 2018, Plaintiff responded that she was "unaware what specific Electronic Devices Mr. Staple used." <u>Id.</u> This is despite the fact that Plaintiff had been aware of, had accessed, and had in her possession the electronic devices since March 2016.  Even after belatedly disclosing the devices, Plaintiff and her counsel raised spurious objections to their examination, falsely claiming the Florida Bar had forbidden access.  Sanctions Order [DE 94], ¶6. Moreover, Plaintiff has yet to check her phone and her daughter's phone for messages deleted from Desmond's phone.  Motion [DE 134], ¶11.

Similarly, "evidence only discovered during a forensic examination" supports a finding of "intent to deprive."  <u>Betzer</u>, 2019 WL 5700288, at *12.  In this forensic examination of the concealed phone, Northwestern Mutual discovered damning text messages threatening Desmond. It was only through these text messages that Northwestern Mutual learned of Desmond's texts with Sharon Unruh, with whom Desmond Staple confided.  Most notably, Sharon Unruh's texts were the only deleted messages Northwestern Mutual was able to recover from an outside source (because Ms. Unruh, by pure happenstance, saved the messages). And these messages, which Plaintiff cherry-picked for deletion from Desmond's phone, showed (contrary to Plaintiff's testimony) that she threatened to leave Desmond and take the children the morning he disappeared. Selective deletion of prejudicial evidence, while leaving other non-damaging evidence intact shows a conscious intent to destroy evidence relevant to Northwestern Mutual's case.

Moreover, absence of a reasonable explanation for the destruction of ESI supports a

finding of bad faith where the spoliator stands to gain the most by the destruction of evidence. Id. ("This circumstance casts significant doubt upon her assertion that, after taking possession of decedent's computer, she merely deleted information because 'it had nothing to do with me and she had told me to get rid of everything.' (Doc. 63-1). It is difficult to imagine a single source of information that would be more highly relevant to the central issues in this case than Cheryl Betzer's personal computer. . . . it is apparent that Robinson was and is the person who would stand the most to gain . . ."). Plaintiff here had the most to gain from destruction of evidence showing Desmond committed suicide. She was acutely aware due to her messaging, from her messages to first responders in the Walmart parking lot to physicians at the hospital, that Desmond committed suicide. And she sent messages two days after he passed away regarding hiring a different attorney because she knew she could not recover benefits due to her husband's suicide. Regarding ESI, she then destroyed numerous text message strings and changed the password to his Yahoo! account. It should not be overlooked that (as will be set forth more fully below), she spoliated tangible evidence (the handwritten red Note), as well, which supports a finding that she had an intent to deprive Northwestern Mutual of relevant evidence.

Factor upon factor supports that Plaintiff acted with intent to deprive Northwestern Mutual of relevant evidence. There is no sanction less severe that would deter the type of misconduct Plaintiff has engaged it, and no sanction less severe that would cure the prejudice Northwestern Mutual has suffered throughout this ligation.[26] Accordingly, the sanction of dismissal with prejudice and costs and attorney's fees is warranted in this case.

## ii.  Spoliation of Tangible Evidence Under this Court's Inherent Authority

---

[26] As previously noted, Northwestern Mutual need not show it suffered prejudice for this Court to impose the sanction of dismissal under Rule 37(e)(2). However, the extreme prejudice Northwestern Mutual suffered is a result of Plaintiff's intentional conduct, and that prejudice cannot be cured.

Similar to sanctions for spoliation of ESI under Rule 37(e)(2), sanctions for spoliation of tangible evidence include: "'(1) dismissal of the case; (2) exclusion of expert testimony; or (3) a jury instruction on spoliation of evidence which raises a presumption against the spoliator.'" Oil Equip. Co. Inc. v. Modern Welding Co. Inc., 661 Fed. Appx. 646, 652–53 (11th Cir. 2016) (quoting Flury v. Daimler Chrysler Corp., 427 F.3d 939, 945 (11th Cir. 2005)). "To determine whether and what sanctions are warranted for spoliation of evidence, courts should primarily consider the extent of prejudice caused by the spoliation (based on the importance of the evidence to the case), whether that prejudice can be cured, and the culpability of the spoliator." Id. at 652.[27]   Importantly, "[w]ith regard to the spoliator's culpability, 'this circuit does not require a showing of malice in order to find bad faith . . . .'" Id. at 653 (quoting Mann v. Taser Intern., Inc., 588 F.3d 1291, 1310 (11th Cir. 2009)).  And, the Eleventh Circuit has found that "that dismissal may be warranted where the 'spoliation of critical evidence . . . deprive[s] the opposing party of an opportunity to put on a complete defense.'" Id. at 652-53 (quoting Flury, 427 F.3d at 947).  Like the Court held in both Flury and Oil Equip., dismissal is the appropriate remedy here due to the spoliation of tangible evidence.

---

[27]   In Flury, the Eleventh Circuit resolved whether federal law governed the imposition of sanctions for spoliation of evidence in a diversity suit and held federal law applies.  427 F.3d at 944.  The Court also held that it could look to state law to the extent it was not inconsistent with federal law.  Because this Circuit had not yet set forth specific guidelines for spoliation of evidence, the Flury court looked to Georgia law.  Id. at 945 (citing Bridgestone/Firestone N. Am. Tire, LLC v. Campbell, 574 S.E.2d 923, 926 (Ga. Ct. App. 2002).  Later in Oil Equip. Co. Inc., the Eleventh Circuit looked to Alabama law for its factors.  Oil Equip., 661 Fed. Appx. at 652 (citing Story v. RAJ Props., Inc., 909 So. 2d 797, 802-03 (Ala. 2005)).  Because the Eleventh circuit has not yet analyzed Florida's law, it should be noted that Florida courts consider substantially similar factors as those applied in prior cases, and in particular Oil Equip, when determining which sanction to apply: "(1) the willfulness or bad faith, if any, of the party who lost the evidence, (2) the extent of the prejudice suffered by the other party, and (3) what is required to cure the prejudice." Landry v. Charlotte Motor Cars, LLC, 226 So. 3d 1053, 1058 (Fla. 2d DCA 2017) (citations and internal brackets omitted).

**a.  Northwestern Mutual Has Suffered Severe Prejudice.**

As was the case in both Flury and Oil Equip., "Plaintiff's spoliation of critical [tangible] evidence in this case deprived" Northwestern Mutual "of an opportunity to put on a complete defense." Oil Equip., 661 Fed. Appx. at 654 (quoting Flury, 427 F.3d at 947).  It goes without saying that Desmond's red ink, handwritten Note—indeed, his last expression of conscious thought before passing into unconsciousness after ingesting at least 112 extra-strength Tylenol— is critical evidence at the center of a case on suicide.  Suspiciously, the Note and the Bible (with its protruding piece of paper tucked therein) are the only items missing from the contents of the car (and the preservation of the other contents of the car was so meticulous that it included three (3) empty liquid bottles and a half-eaten sausage biscuit sandwich!).

Plaintiff has chosen to capitalize on her destruction of the Note by employing Dr. Fernandez, a purported psychiatric expert, who testified that she sees "no evidence of . . . clear suicidal thinking or suicide note."  Fernandez.2nd, 254:5-8.  But, this is because Plaintiff destroyed the Note.  As the Eleventh Circuit recognized in Oil Equip., the potential for prejudice is heightened because any witness that might shed light on the Note are Plaintiff's, who would testify favorably to Plaintiff; thus, Plaintiff could use their testimony to rebut the contents of the missing Note.

This is the exact type of prejudice the Eleventh Circuit was concerned with in Flury, a case in which a plaintiff's expert could rely on photographic evidence of a car that Plaintiff destroyed where defendant was precluded from examining the much more reliable evidence (the car, itself) that would prove or disprove the validity of the plaintiff's expert's statements.  427 F.3d at 946 ("Specifically, plaintiff's expert Barry Riner presented testimony regarding the vehicle's condition based on post-accident photographs and an accident report. While this

evidence has some value, we cannot ignore the fact that defendant was precluded from obtaining much more reliable evidence tending to prove or disprove the validity of Riner's statements."). Stated another way, the Eleventh Circuit equated the type of prejudice as "trial by ambush." Through Plaintiff's spoliation of material tangible evidence (the red ink handwritten Note), Plaintiff has created a trial by ambush, whereby her expert can disclaim the existence of suicidal intent while depriving Northwestern Mutual access to the Note.

**b.  Prejudice to Northwestern Mutual Cannot be Cured.**

As was the case in <u>Oil Equip.</u>, the prejudice in this case is incurable because the information the Note would have yielded is otherwise unavailable.  <u>Oil Equip.</u>, 661 Fed. Appx. 656 (holding prejudice incurable and no sanction less severe than dismissal would be because photographs were no substitute for examination of tank, extrapolating results would be less reliable than examination, once-sided witnesses heightens the potential for prejudice).

Here, there are no alternative sources (for example, a draft on his computer), because Desmond Staple handwrote the red Note.  And Northwestern Mutual has been forced to rely upon much less reliable means of examining the Note (by attempting to "blow up" the photographs) or by attempting to rely on Plaintiff's witnesses to ascertain the contents of the Note and his state of mind in his final moments.  Rudy Simpson testified that he did not keep originals and that Plaintiff did not ask him to retain the photographs.  Thus, the original native photographs of the contents of the car were spoliated, as well.

Finally, no sanction less severe than dismissal would be effective because the handwritten Note in red writing on the front seat of the car where Desmond Staple was found is the very subject of this lawsuit (whether he committed suicide), and the evidence (a Note with Desmond Staple's state of mind in his final moments before passing out) strikes at the heart of

the matter. <u>Oil Equip. Co.</u>, 661 Fed. Appx. at  657 (holding spoliation of evidence that struck at the heart of the matter and was the subject of the lawsuit prevented defendant from putting on a complete defense (citing <u>Flury</u>, 427 F.3d at 946 n.14 & 947)).

### c.  Plaintiff Acted in Bad Faith.

The record in this case is consistent with other findings of bad faith.  <u>Id.</u> at 658 (holding that spoliating party's anticipating litigation, ability to preserve evidence, and destruction of evidence that would be "supportive of the interest of the opponent" while not destroying evidence favorable to spoliating party's position supports finding of bad faith).

As previously noted, while Plaintiff was at the hospital, she consulted with attorneys.  No later than the morning Desmond passed away, Plaintiff submitted the $4,000,000 claim to Northwestern Mutual.  On March 18, 2016, Plaintiff claims to have examined the contents of the car, which informed her decision to hire a different attorney—knowing that litigation was on the horizon.[28]  She attempted to hide who cleaned out the contents of the car (accusing Rudy Simpson and Desmond's brothers, all of whom vehemently denied Plaintiff's tale).  Moreover, the intent of her actions is easily discernable from the evidence she chose to destroy.  She destroyed the red handwritten Note and Bible, while leaving the other items in the car, much of which she has attempted to use in support of her case.

As the Eleventh Circuit stated in <u>Oil Equip.</u>, the duty to preserve the evidence critical to this case rested with the spoliating party, who exclusively possessed the critical (and now destroyed evidence) before this litigation commenced.  Indeed, culpability here rest squarely with Plaintiff because she "was the only party in a position to preserve the" contents of the car

---

[28] <u>See</u> Plaintiff's email to Aubrey Rosser, attached as **Exhibit 16** ("because when his car came home yesterday, I have found several things that have greatly changed my thoughts regarding cause of death").

"and failed to do so."  Oil Equip., 661 Fed. Appx. at 658 ("And we found that culpability rested squarely with the plaintiff because the plaintiff 'was the only party in a position to preserve the vehicle and failed to do so.'" (quoting Flury, 427 F.3d at 946).

### iii.  Dismissal is the Only Sufficient Sanction for Plaintiff's Wide Ranging Spoliation

Although dismissal with prejudice should be entered for either spoliation of ESI under Rule 37(e)(2) or under this Court's inherent authority, when considered together along with Plaintiff's prior conduct, dismissal with prejudice is especially warranted.  Specifically, Plaintiff previously concealed the existence of these electronic devices and never disclosed the photos of the car showing the Bible or Note.  Those photographs were produced to Northwestern Mutual from Plaintiff's expert, who had received them from Plaintiff's counsel in 2016, long before discovery began in this case.  Her concealment of devices (including the false claim that The Florida Bar had forbidden anyone from opening the devices) and failure to produce photographs shows consciousness of her and her counsel's culpability; they were trying to cover her tracks after she knew that she destroyed tangible evidence and ESI on multiple electronic devices. There can be no question that Plaintiff's actions show intent to deprive and bad faith.

And, unequivocally, Northwestern Mutual has been deprived the opportunity to present a complete defense in this case.  Boiled down, Northwestern Mutual has been deprived of the key evidence (communications) that would reveal Desmond's state of mind: the paramount issue. These were communications made just before his death.  Throughout this litigation, Northwestern Mutual has had to expend significant sums of money to wade through deception after deception.  There is no reason, in light of this continuing misconduct, that the case should precede further.

In addition to dismissal, Northwestern Mutual should be awarded its attorney's fees

under this Court's inherent authority.  <u>See, e.g.</u>,  <u>Mack v. Delta Air Lines, Inc.</u>, 639 Fed. Appx. 582, 587 (11th Cir. 2016) ("Under its inherent authority, a federal court may assess attorney's fees and costs against a party or his lawyer 'when either has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  (citations omitted)); <u>In re Graffy</u>, 233 B.R. 894, 899 (Bankr. M.D. Fla. 1999) ("In the presence of bad faith, a court may award to the injured party the entire amount of its reasonable attorney's fees as an appropriate monetary sanction. (citing <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 55 (1991)).  Having shown, as set forth above, that Plaintiff acted in bad faith, fees here are justified in addition to the sanction of dismissal.

For the reasons stated above, no alternate relief would suffice in this case.  However, should the court be disinclined to dismiss this case, this Court should impose in the alternative an adverse inference when considering the motion for Summary Judgment (and, if this case proceeds to trial, through an adverse jury instruction), that the Note on the front seat of Desmond Staple's Mercedes was a suicide note and that his laptop, cell phone, and email contained information establishing that his manner of death was suicide.

## <u>CONCLUSION</u>

Wherefore, Northwestern Mutual respectfully requests this Court dismiss this action with prejudice and award its fees and costs or, in the alternative, to establish an adverse inference against Plaintiff, as set forth above.

(remainder of page intentionally blank)

Respectfully submitted,

**SHUTTS & BOWEN LLP**
*Attorneys for The Northwestern Mutual*
*Life Insurance Company*
200 S. Biscayne Boulevard
Suite 4100
Miami, Florida 33131
Tel:  (305) 358-6300
Fax:  (305) 381-9982

By: */s/John Meagher*
      John E. Meagher
      Florida Bar No. 511099
      jmeagher@shutts.com
      Jake Monk
      Florida Bar No. 100321
      jmonk@shutts.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 6, 2020, I filed the foregoing document with the Clerk of Court.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or via US Mail, an authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ John Meagher*
Of Counsel

## <u>SERVICE LIST</u>

Theodore A. Corless, Esq.
Mary Catherine Lamoureux, Esq.
Corless Barfield Trial Group, LLC
6812 W. Linebaugh Ave.
Tampa, FL 33625
service@corlessbarfield.com
tcorless@corlessbarfield.com
mlamoureux@corlessbarfield.com
*Counsel for Plaintiff*

Timothy W. Weber, Esq.
Jeremy D. Baillie, Esq.
Weber, Crabb & Wein, P.A.
5453 Central Avenue
St. Petersburg, FL 33710
timothy.weber@webercrabb.com
jeremy.bailie@webercrabb.com
*Co-counsel for Plaintiff*


Served by CM/ECF