**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**8:17-cv-03066-MSS-TGW**

CHERYL STAPLE,

      Plaintiff/Counter-defendant,

v.

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY,

      Defendant/Counter-plaintiff.

_____/

**DEFENDANT'S RENEWED _DAUBERT_ MOTION TO**
**EXCLUDE PLAINTIFF'S EXPERTS OR, IN THE ALTERNATIVE**
**REQUEST FOR _DAUBERT_ HEARING**

      Defendant, The Northwestern Mutual Life Insurance Company ("Northwestern Mutual"), pursuant to Federal Rules of Evidence 104(a) and 702 and Federal Rule of Civil Procedure 26(a)(2), respectfully requests this Court exclude any testimony by Plaintiff's proffered experts, Drs. Jaime Fernandez, Vernard Adams, Joshua Lenchus, and Stephen Gerrish, and Mr. Robert Beverly, on topics included in Plaintiff's Expert Reports or, in the alternative, schedule a Daubert hearing to consider these matters, and states in support:

**I.  INTRODUCTION**

      The Court's function as the gatekeeper for expert testimony rarely is as important as when an expert seeks to offer testimony outside of his/her expertise, lacking a valid scientific basis, and based upon false facts, exclusively provided to the expert by the litigant's attorney. Such is the case here, where Plaintiff proffers multiple experts to the Court to provide it nothing more than dressed up closing argument, masquerading as expert opinion.

      Plaintiff is suing Northwestern Mutual for $4,000,000 allegedly owed to her as the

beneficiary of four (4) life insurance policies (the "Policies") issued by Northwestern Mutual to her late husband, Desmond Staple ("Staple"), in 2015  On March 14, 2016, at approximately 4:19 p.m., Staple was found unconscious in his car in a Walmart parking lot.  He was admitted to the hospital that day and died on March 16, 2016.  The Hillsborough County Medical Examiner, Selly Rivers, M.D., concluded the "cause" of death was "fulminant hepatic necrosis due to acetaminophen poisoning," *i.e.*, a Tylenol overdose.  That cause of death stands undisputed by the parties.

The Medical Examiner also concluded the "manner" of death was "suicide," based primarily on the toxicological results of Staple's autopsy, finding that, at the time of his hospitalization, Staple had 860 mg/L of acetaminophen (Tylenol) in his blood.  Dr. Kennon Heard, a Board-Certified Forensic Toxicologist, has determined that this level of acetaminophen equates to 112 Extra-Strength Tylenol pills and, considering that the body metabolizes that drug fairly rapidly once ingested, Staple had to take even more than that number to achieve that level. Heard [DE 58-8], 23:7-24:18[1].  Plaintiff has proffered no toxicologist refuting those conclusions.

Dr. Heard also calculated that, using the amount of Tylenol found in Mr. Staple's blood upon admission to the hospital, the well-established "half-life" of Tylenol once ingested, and Mr. Staple's body weight, Mr. Staple had to ingest the 112 Extra-Strength Tylenol pills within 16 to 30 hours of his being found in his car at approximately 4:00 p.m. on March 14, 2018.  Heard [DE 58-8], 35:20-36:10.  Dr. Heard also stated that it was "not medically possible" for Staple to have reached 860 mg/L through a "staggered accidental overdose" (Plaintiff's "theory"); to reach that high a level (literally exceeding the measurement capability of the hospital's equipment) he had

---

[1]   Northwestern Mutual intends to file depositions taken since discovery was reopened under seal, pursuant to the pending Motion to File Deposition Transcripts Under Seal [DE 170].  Those depositions, cited herein, will be cited by last name, such as "West, [page]:[line]."  Depositions for witnesses who have been deposed twice will be referred to as, *e.g.,*  "Adams.1st, [page]:[line]" or "Adams.2nd, [page]:[line]."

to ingest the Tylenol acutely, or he would have died at a much lower acetaminophen level. Heard [DE 58-8], 36:3-39:8.

Dr. Julia Pearson, the Hillsborough County Chief Forensic Toxicologist, who participated in Staple's autopsy, testified that Staple's 860 mg/L was one of the highest acetaminophen levels she had ever seen and that such a high concentration could only be reached by Staple taking "close to a whole bottle of Tylenol." Pearson [DE 58-7], 15:23-19:10. Because Mr. Staple's suicide occurred within one (1) year of his purchase of the Policies, Northwestern Mutual denied Plaintiff's claim for the $4 million death benefit, and instead returned to her the premiums paid for the Policies.

Eight (8) months later, Plaintiff filed this lawsuit, contending that Staple's Tylenol overdose death was not suicide, but was "accidental," and she is entitled to the $4 million death benefit, plus attorneys' fees and costs. In attempted support of this "accidental overdose" theory, Plaintiff proffers the testimony of Jaime Fernandez (a psychiatrist), Dr. Vernard Adams (a forensic pathologist), Dr. Joshua Lenchus (an internist), Dr. Stephen Gerrish (a gastroenterologist/hepatologist), and Robert Beverly (insurance)[2] (collectively "Plaintiff's Experts").

None of the experts proffered by Plaintiff offer any admissible opinion testimony in this action under the standard set forth in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). First, none of Plaintiff's Experts is (or even claims to be) an expert in the field of toxicology, the only "scientific" issue relevant to this case. Accordingly, none of Plaintiff's Experts can competently dispute the opinions of Drs. Pearson and Heard, set forth above.

Because they are unable to attack the "science," Plaintiff's Experts instead offer the Court

---

[2]   Mr. Beverly has no medical training and is offered by Plaintiff on insurance issues. His lack of qualifications for doing so in this case is addressed after the medical witnesses.

their pure speculation, *i.e.*, their factually and scientifically unsupported theory that it is "possible" that Staple died from an "accidental staggered overdose of acetaminophen." Their opinions, however, are in no way based upon the scientific method or any real analysis. Rather, they are based upon the experts' subjective beliefs, relying on facts provided to them by Plaintiff's counsel, *many of which are demonstrably untrue.* See Defendant's Motion to Dismiss for Fraud on the Court [DE 54]. Because Plaintiff's Experts' opinions are nothing more than Plaintiff's counsel's regurgitated closing argument, they should not be admitted.

## MEMORANDUM OF LAW

This Court, in a case strikingly on point here, aptly described the "Daubert"[3] standard for admissibility under Rule 702. See Arquette v. Eslinger, No. 6:08-cv-1836-Orl-35DAB, 2010 WL 11453163, at *1 (M.D. Fla. Jan. 22, 2010). As this Court stated:

> In Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), the Supreme Court set out the applicable standard for the admissibility of expert testimony under Federal Rule of Evidence 702 ("Rule 702"). The Court noted a two-part analysis for expert scientific testimony, finding that the trial court must determine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Id. at 592. This determination, in turn, involves an "assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93; see also Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996) (court "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."). In other words, the purpose of this gatekeeping inquiry is to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589.12
>
> Specifically, the Court considers whether:
>
>> (1)[T]he expert is qualified to testify competently regarding the matters he intends to address; the methodology by

---

[3] Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993).

> which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assist the trier if fact, through the application of scientific, technical, or specialize expertise, to understand the evidence or to determine a fact in issue.
>
> City of Tuscaloosa v. Harcos Chems., Inc., 158 F.3d 548, 562-63 (11th Cir. 1998). The Eleventh Circuit describes these three distinct concepts separately as "qualification, reliability, and helpfulness." United States v. Frazier, 387 F.3d 1244, 1260. The proponent of expert testimony maintains the burden of establishing qualification, reliability, and helpfulness. Id.

Id. at *2.

"Although the Daubert opinion specifically addressed scientific evidence, the Supreme Court later acknowledged, in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147-48 (1999), that the reliability standard enunciated in Federal Rule of Evidence 702 applies 'to all scientific, technical, or other specialized matters within its scope.'" Id. at 2 n.11. "While scientific testimony need not be known to a certainty, Daubert does require that assertions be derived from 'scientific knowledge.' 'Scientific' means proper grounding in the methods and procedures of science, or the 'scientific method.' 'Knowledge' is more than subjective belief or unsupported speculation, but 'applies to any body of known facts or to any body of ideas from such facts or accepted as truths on good grounds.'" Id. at 2 n.12 (quoting Allison v. McGhan Med. Corp., 184 F.3d 1300, 1319 (11th Cir. 1999)).

Simply put, no matter how qualified an expert may be, **"[s]ubjective belief and unsupported speculation are henceforth inadmissible."** See Daubert, 509 U.S. at 590 (emphasis added). As explained by the Eleventh Circuit Court of Appeals:

> Moreover, it is proper and necessary for the trial judge to focus on the reliability of a proffered expert's sources and methods. Under Daubert, the district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct

> from being unscientific speculation offered by a genuine scientist. Courts have deemed expert opinion testimony inadmissible when the only connection between the proffered opinion and the existing data is the expert's own assertions—*ipse dixit* (because I say so).

Chapman v. Procter & Gamble Distributing, LLC, 766 F.3d 1296, at 1306 (2014) (citing Allison v. McGhan Med. Corp., 184 F.3d 1300, 1316–17 (11th Cir.1999)).

In this Court's Arquette case, plaintiff attempted to introduce a medical expert's opinion that the trauma plaintiff allegedly endured during her arrest caused or contributed to a miscarriage. Arquette, 2010 WL 11453163, at *3. In granting defendants' motion to exclude the causation testimony, the Court discussed a number of points directly applicable to the instant motion. First, the Court recognized that the "caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." Id. (citing Quiet Tech. DC-8 v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003)). The Court also stated, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average layperson." Id. at *4. As explained by the Court:

> Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Frazier, 387 F.3d at 1262-63. Thus, when the trier of fact is entirely capable of determining issues in the case without the technical assistance of experts, exclusion of the proffered expert testimony is appropriate. See id. The purpose of this requirement is to prevent the trier of fact from giving the expert testimony undue weight due to the expert's special status. See Cook v. Sheriff of Monroe County, 402 F. 3d 1092, 1111 (11th Cir. 2005).

Id. In excluding the plaintiff's causation testimony, this Court in Arquette found that it was not reliable (as it was not scientifically tested), nor was it helpful, as it "presents only a possibility that the alleged incident caused the injury. This proffered imprecise and unspecific expert opinion will not assist the trier of fact." Id. (citing Frazier, 387 F.3d at 1266).

Such is the case here, where Plaintiff's Experts opine as to mere "possibilities," based on speculation, precariously mounted on false facts.   In <u>Arquette</u>, the Court considered three (3) distinct factors in determining whether an expert should be permitted to testify: 1) Qualifications of the witness; 2) Reliability of the witness's testimony; and 3) The helpfulness of the witness's testimony.  Examining Plaintiff's Experts in a similar fashion leads to the inescapable conclusion that their testimony should be excluded from this action.

I.     **<u>DR. JAIME FERNDEZ SHOULD BE EXCLUDED.</u>**

  A.     **<u>Dr. Fernandez cannot competently opine about Staple's state of mind and manner of death, when she neither treated nor examined him.</u>**

Plaintiff has proffered the testimony of Dr. Jaime Fernandez, a psychiatrist, to offer two (2) opinions.   First, that Mr. Staple's "manner of death is most consistent with accidental acetaminophen overdose" and, second, that the multiple reports in the medical records stating that Mr. Staple's family reported he had expressed suicidal ideation in the weeks before his death should be disregarded by this Court, because it was a result of the multiple authors' "confirmation bias."  Fernandez Report [DE 59-6], at 3. Because both of her opinions are based purely on speculation and her subjective beliefs, both should be excluded under the <u>Daubert</u> standard.

Dr. Fernanez is a psychiatrist, employed by Memorial Hospital Tampa.  Fernandez, 6:1-17.  She currently has less than five (5) private patients. <u>Id.</u>  The majority of her practice deals with providing electroconvulsive therapy ("shock treatment), performing 150-200 cases per month at the hospital.  Fernandez, 6:18-23.  She is not trained in psychoanalysis and does not provide psychotherapy, "except for maybe one patient at this point."  Fernandez, 13:20-14:17.

Dr. Fernandez has never been retained as an expert witness, been admitted to testify as an expert in federal court, or testified to a person's "manner of death."  Fernandez, 19:13-16,

254:20-255:3.  She does not belong to any professional associations relating to the issue of suicide and, indeed, denies that any such organizations exist.[4]  Fernandez, 284:3-285:5.  She has never published an article dealing primarily with the risk of suicide and, while admitting "there are people who look at suicidal risk explicitly…", admits that she is not "one of those people."  Id. at 295-96.

Dr. Fernandez never examined Mr. Staple. Fernandez.2nd, 246:6-15.  Accordingly, she has never reached any "differential diagnosis"[5] for Mr. Staple and is unable to do so. Fernandez.1st, 85:2-11.  As she admits, she's "trying" to testify to a reasonable degree of medical certainty "but there's a lot missing."  Id., 122:3-10.  As she stated, "We are all speculating,…"  Id., 198/18-23.  Dr. Ferndandez also concedes she has no "firsthand knowledge of Mr. Staple's values, so [she] couldn't speak as to what is or isn't important to him or is or isn't stressful."  Fernandez.2nd, 245:10-14.  Nor has she seen any psychiatric records referring to Mr. Staple, despite being told by Plaintiff's counsel that they exist.  Fernandez.1st 66:17-24.  Dr. Fernandez agrees that "many times people who commit suicide don't seek any mental health care at all prior to doing so," stating, "[t]hat is correct; and some of the more interesting statistics, yeah, have to do with exactly that."  Fernandez.1st, 31:20-25.

The only person Dr. Fernandez spoke with this about this case was Plaintiff's counsel, Ted Corless.  Fernandez.1st, 35:13-20.  She did not interview any witnesses, including Plaintiff (Desmond's wife), his close friend Sharon Unruh (who Desmond described as the "only woman

---

[4]    Accordingly, she has never been a member of the American Association of Suicidology (https://suicidology.org/), the International Association for Suicide Prevention (https://www.iasp.info/), or the International Academy of Suicide Research (https://suicide-research.org/); nor had she even heard of these organizations.  Id.

[5]   A differential diagnostic procedure is a systematic diagnostic method used to identify the presence of a disease entity where multiple alternatives are possible.
https://en.wikipedia.org/wiki/Differential_diagnosis

who's loved me" and with whom he texted the morning before he was found), his sisters, his mother, his co-workers, or his friends.

Dr. Fernandez's expert report identifies no article, treatises, or studies upon which she relied in reaching her opinion. See Fernandez Report [DE 59-6]. She stated that, if she had looked at something of that nature, it would have been listed in her report. Fernandez.2nd 311:12-312:14. She admits that hers "was an *ad hoc* analysis looking at all the facts in Mr. Staple's case." Id.

**B.    Dr. Fernandez's "Psychiatric Autopsy" is Inadmissible.**

Although she had never heard the term, Dr. Fernandez's opinion on "manner of death" is known as a "psychiatric autopsy," a "post-death" analysis, in which a psychiatrist or "suicidologist" attempts to opine on the mental state of the decedent. "Psychiatric autopsies," however, are inadmissible in suicide cases to determine the manner of death, as they do not meet the standards set forth in Daubert. See, e.g., Smith v. Prudential Ins. Co. of Am., 2012 WL 1965405, *13 (M.D. TN 2012) (excluding "psychological autopsy" where "suicidal risk factor analysis does not meet the *Daubert* admissibility standards."); Halvorsen v. Plato Learning, Inc., 167 Fed.Appx. 524, 531 (6th Cir. 2006) (psychological autopsy proffered to establish the legal cause of husband's death excluded, as the doctor neither spoke with nor examined [the decedent], did not review any of his medical records, relied entirely on anecdotal evidence supplied by [decedent's wife] and admitted that she had never performed a psychological autopsy before." (bracketed material added)).

In Smith, a case similar to the case at bar, Plaintiffs were seeking $4 million in life insurance benefits from Prudential, which had denied the claim pursuant to the policy's suicide exclusion, as the Medical Examiner had concluded Smith's death was a suicide. The decedent,

Smith, had recently doubled his life insurance, was in financial distress, and had been found dead in an elevated hunting tree stand, with a rifle shot through his chest and the rifle laying on the ground below the stand. Id. at *1.

In support of the plaintiffs' claim of "accidental death," they tendered the expert opinion of psychiatrist, David Street, M.D., who had "experience in evaluating behaviors reflecting suicidal risk." Id. at *9. Like Dr. Fernandez, Dr. Street had never examined the decedent. Unlike Dr. Fernandez, however, Dr. Street had performed his own investigation, interviewing multiple individuals who knew Smith and visiting the site of the Smith's death. Id. at *5. At the conclusion of his investigation, Dr. Street, mirroring Dr. Fernandez's opinions in the case at bar, concluded:

> …[W]ithin a reasonable degree of psychiatric probability there is insufficient psychological evidence for a reasonably competent pathologist/medical examiner to conclude Gary Smith committed suicide. Further based on the totality of my analysis, Mr. Smith did not possess the requisite mental state of one who would commit suicide. As such, I further conclude within a reasonable degree of psychiatric probability that he did not commit suicide." within a reasonable degree of psychiatric probability that [Mr. Smith] *did not commit suicide*."

Id. at *6. In excluding all of Dr. Street's opinions, the Smith court found them defective in several respects. While recognizing Dr. Street as a "highly qualified psychiatrist," it pointed out that he had never performed a "psychological autopsy" before and had difficulty articulating the basis for his methodology, to wit:

> Street's methodology appears to be largely *ad hoc*, perhaps reflecting his unfamiliarity with this type of expert analysis and, in particular, how to conduct such an analysis in compliance with *Daubert* admissibility standards.

Id. at *9. The Smith court further found Street's opinions inadmissible because, among other failings, they were "entirely speculative" and "inherently subjective":

Street's musings concerning the pressures that Smith faced from financial difficulties (and how they actually affected Smith) are also entirely speculative, inherently subjective, outside the scope of his psychiatric expertise, and invade the province of the jury. Similarly, Street's analysis of the 10–page letter that Smith left to his wife constitutes pure speculation: without reference to any authority or methodological technique, Street simply states that the note "does not read like a suicide note" and constitutes "an effort to provide his wife with financial information in the event of his death."

Id. at *11.  Dr. Fernandez offered similar "musings", including but not limited to:

- She had never heard of a person "taking 30 hours to kill themselves in the worst possible way.  People like it fast, neat, and pleasant, and this is as long, messy, and unpleasant as things get.  Just, to me, in a case based on speculation makes me speculate less that this guy who took 30 hours to consume this many pills did it as part of a suicide attempt." [Fernandez.2d 198:9-17];

- The multiple references in the hospital records of Mr. Staple's suicidal ideation resulted from the doctors' and nurses' "confirmation bias", based solely upon "[t]he fact that confirmation bias is a psychological phenomenon that is ever present."  [Fernandez.2d 263:12-16];

- Mr. Staple's statements to the Florida Bar, that he "was still in denial, depressed, sad, dejected, disheartened, disillusioned, shocked, disappointed, upset, and angry over the fact that something [his law license and practice] that [he] loved so much was taken away due to his own stupidity," was not "an actual reflection of his state of mind" and merely him being "hyperbolic" and "manipulative."   [Fernandez.2d 305:18-306:23]; and

- Plaintiff's threat to leave him and take his children with her on the morning he disappeared would "not necessarily" be significant information as to his state of mind, as she "couldn't speak to what is or isn't important to him or is or isn't stressful." [Fernandez.2d 244:13-245:12].

Dr. Fernandez's failure to use any methodology in reaching her conclusions is fatal, under Daubert.  Nor could she even do so if she tried in the area of predicting who did or did not commit suicide.  In State v. Guthrie, 627 N.W.2d 401, 417-18 (S.D. 2001), in finding that that the trial court abused its discretion in admitting the testimony of a "suicidologist," to opine on

the manner of death, the court stated:

> What empirical proof is there that because certain deceased persons in equivocal death cases bore only a few characteristics of a suicidal profile, that therefore they can be declared to have not committed suicide? What studies exist on error rates and falsifiability for such opinions? Berman provided little data.  We think there is substantial reason to doubt the reliability of suicidal profiles if they are to be used to declare unequivocally that a subject's death was self-inflicted.

Of course, even if Dr. Fernandez had interviewed Mr. Staple's wife, relatives and friends, which she did not, such an investigation would not make her opinions admissible, as this is precisely the type of testimony that has been excluded by Courts in the past. In <u>Foster v. Globe Life & Acc. Ins. Co.</u>, 808 F. Supp. 1281, 1286-87 (N.D. Miss. 1992), the Court rejected psychological autopsy testimony, finding it unreliable and based on "pure speculation" where it consisted primarily of anecdotal evidence about the decedent and his zest for life and close relationship with his spouse.

### C.  Dr. Fernandez's opinion on "confirmation bias" is inadmissible speculation.

Dr. Fernandez's opinion that the hospital doctors and nurses were guilty of "confirmation bias" when they were writing, multiple times, that Plaintiff told them Staple had expressed "suicidal ideation" in the days before his Tylenol overdose, is not based upon any data or scientific analysis, nor could it be, since she has never spoken to anyone involved – not even the Plaintiff who hired her, who, when asked at deposition whether she had <u>admitted</u> her husband's suicidal ideation to multiple persons **did not deny doing so – but only said she "could not remember."**  Plaintiff.1st [DE 58-12], 171:23-173:7.  Nor can Dr. Fernandez explain how this "confirmation bias" affected the first responders at Walmart, whose records also note that she had reported "suicidal threats – per family via phone." Hillsborough County Fire Rescue Records [DE 61-51], p.1.

12

Dr. Fernandez's refusal to acknowledge even the possibility that Plaintiff did, in fact, report Mr. Staple' suicidal ideation to the Sheriff, doctors and nurses demonstrates that her testimony is simply a closing argument dressed up as an expert opinion. While an expert need not "rule out all possible alternative causes" of an injury, she must "at least consider other factors that could have been the sole cause of the plaintiff's injury." <u>Guinn v. AstraZeneca Pharm. LP</u>, 602 F.3d 1245, 1253 (11th Cir. 2010). The expert also must "'provide a reasonable explanation as to why he or she has concluded that [any alternative cause suggested by the defense] was not the sole cause' of the plaintiff's injury." <u>Id.</u> (<u>citing</u> <u>Best v. Lowe's Home Ctrs., Inc.</u>, 563 F.3d 171, 179 (6th Cir. 2009). In addition to the general inadmissibility of "psychiatric profiles" to determine manner of death, Dr. Fernandez's failure to perform <u>any</u> independent investigation, her reliance solely on what Plaintiff's lawyer told her, her failure to consider "other factors" supporting the conclusion of suicide, and her inability to provide any "reasonable explanation" as to why the conclusion is incorrect (other than, "I just don't see it"), reveals her opinions to be highly unreliable and, therefore, inadmissible under FRE 702, and Daubert and its progeny.

## II.     DR. VERNARD ADAMS' OPINIONS SHOULD BE EXCLUDED.

### A.     Dr. Adam is not qualified to testify on "toxicology" issues, including how much Tylenol Mr. Staple ingested and when that ingestion occurred.

The only subject matter in this litigation appropriate for expert witness testimony is toxicology. The jury will need an explanation of the following toxicological issues:

1.  how the level of acetaminophen is determined;

2.  the medical significance of Staples acetaminophen level of 860 mg/L;

3.  the fact that 860 mg/L equates to 112 Extra-Strength Tylenol pills;

4.  an explanation of why, using pharmacokinetic analysis, Staple had to have taken the +112 pills within 30 hours of being found, in the afternoon of March 14, 2016; and

**5.**     Why it is not medically possible for Mr. Staple to reach a Tylenol level of 860 mg/L through an "accident chronic staggered overdose," as Plaintiff contends.

Dr. Adams is not qualified to shed light on any of those matters.  Dr. Adams is a former Medical Examiner for Hillsborough County.  He is not a toxicologist (Adams.1st [DE 58-5], 27:22-28:25) and knows very little about Tylenol, including how many Tylenol one has to take to reach 860 mg/L, Mr. Staple's level when hospitalized (Adams.1st [DE 58-6], 156:16-18); the half-life of Tylenol once ingested (Id. at 156:22-24); and the maximum daily recommended amount of Tylenol (Id. at 156:19-21).  He does not perform pharmacokinetic analysis (Adams.1st [DE 58-5], 28:2-8) and, when he was an active Medical Examiner, he relied on the department's toxicologist to "perform the assays to detect the drugs and determine what the concentrations were and body samples."  Id. at 29:1-7.[6]

Despite this near-total lack of knowledge of Tylenol, Plaintiff, in its earlier Opposition to Defendants' Motion for Summary Judgment [DE 81], relied heavily on Dr. Adams to argue that there was a "genuine" dispute over the fact that Mr. Staple consumed 112 Tylenol Extra-Strength tablets within 16-30 hours of his being hospitalized on March 14, 2016, as testified by Dr. Heard, Defendants; retained forensic toxicologist.  As shown above, however, Dr. Adams is not competent to testify on these issues.  His statement that "no one knows when he took the Tylenol," a perfect example of inadmissible *ipse dixit* testimony ("It's true (or not) because I say it's true (or not)"), simply is scientifically incorrect.  Heard Declaration [DE 171-58], ¶7. Adams' testimony is the type of testimony Daubert no longer permits.

Based on the above, it is clear that Dr. Adams does not have any relevant qualifications to speak on the one subject that requires "expert" knowledge in this case – toxicology.

---

[6]   For Mr. Staple's autopsy, the Medical Examiner's toxicologist was Dr. Pearson, who opined that she has "no doubt" that Mr. Staple's death was a suicide.  Pearson [DE 58-7], 19:7-13.

**B.     Dr. Adams' Opinion as the "Manner" of Mr. Staple's Death is Inadmissible.**

Plaintiff's attempt to introduce the testimony of Dr. Adams, a retired Medical Examiner, to opine on the "manner" of Mr. Staple's death, also fails.  This same effort was made, and rejected, in Smith v. Prudential Ins. Co. of Am., 2012 WL 1965405, *13 (M.D. TN 2012), where the plaintiffs attempted to introduce the opinion of a forensic pathologist/medical examiner, Mr. Manion, to support their theory that the decedents death was an "accident" rather than suicide.[7] As Dr. Adams attempts to do here, Manion sought to opine that, to a reasonable degree of scientific certainty, Smith's death was an accident.  Id. at *3.

In excluding the "manner of death" opinion, the Smith court noted:

> Manion purports to conclude that "[t]he facts and circumstances surrounding Gary Smith's death suggest that he had made no plans to commit suicide." (*Id.* at p. 8.) In support of this conclusion, Manion purports to characterize certain evidence as "inconsistent" with an intent to commit suicide. Even if these new opinions were not already subject to exclusion under Rule 37, **the statements are plainly speculative, likely fall outside of Manion's areas of expertise, and amount to no more than *ipse dixit* statements by Manion that are unsupported by a scientific methodology.**

Id. at 4 (emphasis supplied).  A review of Dr. Adams Report shows that his opinion on the manner of Mr. Staple's death suffers from the same fatal flaws as Manion's, characterizing certain evidence as "inconsistent" with suicide, such as the "lack of pill bottles in the car," Mr. Staple's $300 ATM withdrawal at Walmart, and his "purchase of 3 shirts," **all of which turned out to be false.**  See Dr. Adams Report [DE 59-1], at pp. 3-8. The lack of "scientific methodology" underlying Dr. Adams' opinion is best illustrated by how quickly he changed it when, at deposition, he was shown that Plaintiff's counsel had provided him with false

---

[7]  See Section I.B, *supra*, for a description of the facts in Smith.

information[8] – that there were pill bottles in the car, that there was no evidence of any ATM withdrawal, and that Mr. Staple did not purchase "3 shirts," but rather a shirt, pants and shoes, which he changed into after returning to his car. See Pictures of Clothing Purchased [DE 54-47; 54-48; 54-49]; Clothing in Backseat of Car [DE54-33].   It was only then that Dr. Adams essentially said, "Never mind.  Now, it's 50/50 as to whether he committed suicide":

> Q.   (MR. MEAGHER):   Do you believe your consideration of clinical circumstances is sufficient to reach an opinion?
>
> A. (DR. ADAMS):   **I think based on what you have told me today about those two errors that accident is no longer more likely than not.  It's a reasonable possibility, and suicide is a reasonable possibility**, and medical examiner failed to investigate to sort it out.
>
> Q.   So that I'm clear, you went from more likely than not to – so you were saying there was a preponderance of evidence in your opinion that it was an accident; you have changed that to, what, it's a 50/50 call?
>
> A.    Two reasonable possibilities, neither of which rises to the level of more likely than not because of inadequate investigation by the medical examiner.  (emphasis supplied)

Adams Depo [DE 58-6], at 153:10-24.    In addition to changing his opinion at deposition, Dr. Adams also admitted that he had no evidence of another pillar of his opinion that Mr. Staple's death was caused by a "staggered overdose," that Mr. Staple had been "sick for days" prior to going to Walmart:

> Q.    Tell me why for days he had been sick.  What is your evidentiary basis for your statement that clearly he had been sick for days, of acetaminophen intoxications, for days?
>
> A.    Because I don't believe it was suicide.  Therefore, it was unintentional overdosing, and that's going to be over days,

---

[8]   The role of counsel in this regard was also criticized in Smith, where the court stated, "As an initial matter, [Manion's] expert report relied on essentially a verbatim recitation of facts provided to Manion in a retention letter from plaintiffs' counsel, many of which did not appear to have record support."  Smith, 2012 WL 1965405 at *3.  This is exactly what happened here.

> not acutely.
>
> Q.     I am going to keep asking you what your evidentiary basis is other than your conclusion, and you back up the facts or your belief to match your conclusion. I am asking, what is your evidentiary basis? Is there a witness who says he was sick? Is there a hospital record that says he was sick? Is there any evidence other than him throwing up on March 13th in the Walmart that indicates he was sick for days rather than just sick that day?
>
> A.     Right. I understand your question. I didn't say he was visibly sick to witnesses. I said he had been ill with intoxication for days.
>
> **Q.     Please tell me what your evidentiary basis is for that.**
>
> **A.     That is an opinion.**
>
> **Q.     So you have no evidentiary basis; you just believe that's so?**
>
> **A.     Yes. That's correct.**
>
> **Q.     So you can't point to any data to support that opinion; fair enough?**
>
> **A.     That's correct.**

Adams Depo [DE 58-5], 71:1-72:6. A finer example of inadmissible "*ipse dixit*" testimony could not be crafted by a law school professor. Dr. Adams starts with his conclusion ("not suicide") and then "supports it" with pure speculation ("sick for days"). <u>See</u> <u>Guinn v. AstraZeneca Pharm. LP</u>, 602 F. 3d 1245, 1254-56 (11th Cir. 2010) (expert opinion testimony inadmissible when the only connection between the proffered opinion and the existing data is the expert's own assertions); <u>see also</u> <u>Chapman</u>, 766 F.3d at 1306.

Dr. Adams speculation and reliance on "false facts" goes far beyond the "weight" of his testimony – it goes to its very admissibility. For the above-stated reasons, Plaintiff cannot satisfy her burden of establishing that Dr. Adams' opinions satisfy the requirements of <u>Daubert</u> and its progeny and, therefore, he should be stricken as an expert witness in this action.

**III.     <u>DR. JOSHUA LENCHUS SHOULD BE EXCLUDED.</u>**

       **A.     <u>Dr. Lenchus is not qualified to testify on toxicology.</u>**

As with Dr. Adams, Joshua Lenchus, D.O., has no expertise relevant to this action.

Currently, Dr. Lenchus is a hospital administrator with no clinical duties.  Lenchus, [DE58-10] 5:11-6:9.  Dr. Lenchus is not a medical doctor, but an osteopath who is Board-Certified in internal medicine, passing his Board on his third attempt.  Id. at 9:8-13:15.[9]  Dr. Lenchus is not a toxicologist.  Id. at 104:2-3.  He has never testified as an expert in toxicology and has never been recognized as an expert by any Court.  Id. at 24:24-25:7.  When asked whether he had any specialty involving drug overdose cases, he replied, "Not particularly."  Id. at 18:2-4.  While acting as a clinical pharmacist from 1994 to 1996, he dealt with "less than 10" acetaminophen overdose cases.  Id. at 18:24-19:17.  In his 22 years as a doctor, he has dealt with "about six" acetaminophen overdose cases.  Id. at 20:10-17.

Plaintiff's counsel located Dr. Lenchus as a result of comments the Doctor made in a phone interview in 2011-12 about an article regarding "staggered overdoses of acetaminophen…" Id. at 49:8-15.  He was not involved in the writing or researching of that article and did not remember to whom he gave the interview.  Id. at 51:10-25.  He has not performed any research on "staggered overdoses." Id. at 52:22-53:5.

Note that Plaintiff's counsel misrepresented Dr. Lenchus' qualifications and experience to both the Hillsborough County Medical Examiner and Northwestern Mutual.  In his effort to get the Medical Examiner to change its finding of "suicide," Mr. Corless wrote:

> **Dr. Lenchus is a toxicologist** with extensive experience not just in toxicology but also in dealing with toxicity associated with acetaminophen-based products.  (emphasis supplied).

See December 12, 2016 Corless Letter to Medical Examiner [DE 59-2].  Similarly, in submitting Dr. Lenchus' report to Northwestern Mutual, challenging its claim denial, he wrote:

> The second report attached is from Dr. Joshua Lenchus.  Dr.

---

[9]  Dr. Lenchus did not get accepted to any of the medical schools to which he applied over the course of three (3) years, finally being accepted to Nova Southeastern College of Osteopathic Medicine.  Lenchus Depo [DE 58-10], 13:9-15.

> Lenchus was identified after I review [sic] **an article he wrote** about the common deaths associated with Tylenol and other acetaminophen based products**.** According to Dr. Lenchus, **a toxicologist**, Mr. Staple's death is consistent with an accidental ?staggered overdose? [sic] in his use of over the counter medicines containing acetaminophen and a prescription provided to him one week earlier. None of this information as [sic] known to the Medical Examiner at the time of her investigation. (emphasis supplied).

See Corless January 6, 2017 Email [DE 59-3]. Clearly, even Plaintiff did not believe Dr. Lenchus' true credentials qualified him to testify as an expert in this matter.

**B.    Dr. Lenchus' opinions are not reliable or helpful and should be excluded.**

Dr. Lenchus' testimony suffers from the same deficiencies as Dr. Adams'. First, he was supplied the same misinformation by Plaintiff that "no pills or pill bottles were found in the car." Lenchus Report [DE 59-4], at p. 3, ¶3. This "fact," he said in his report, "lends credit to the possibility of a plausible alternative explanation." Id. Despite his deposition being taken a week after Dr. Adams', where the falsity of this fact was established, Plaintiff's counsel did not tell Dr. Lenchus it was untrue. Lenchus [DE 58-10], 43:16-44:1.

Moreover, after conceding that "the mere presence of a toxic blood level may imply **that this was a clear case of acetaminophen induced suicide…,"** see Report [DE 59-4], at 2, he goes onto state his "belief" that that there is "more to the story . . . ," id. One need go no further than his report's conclusion to determine that his "story" is pure inadmissible speculation:

> Based on the information I have reviewed, it is my professional opinion **that there exists a possibility** that Mr. Staple did not commit suicide, but rather suffered acetaminophen-induced acute, decompensated liver failure as a result of an unintentional, staggered overdose, ultimately leading to his demise. (emphasis supplied).

Report [DE 59-4], at 5. At deposition, Dr. Lenchus doubled-down on just how uncertain his opinion was:

Q.     So you would agree with me that sometime between March 7, 2016 and March 14, 2016, the date he was admitted to the hospital, Mr. Staple had suffered severe liver damage due to a Tylenol overdose"

A.     Yes.

Q.     Okay.  Now, you do not believe – it is your opinion that that was what you called a staggered overdose; correct?

A.     It may have been a staggered overdose.

Q.     That's possible; correct?

A.     That is possible.

Q.     **Can you say any more than that or is it just possible?**

A.     **I can say that it's possible.**  I don't know – I was not provided with any records between March 7th and March 14th when he went to the emergency room **so I don't know what happened in the ensuing week.**

Q.     So you have no data backing up your conclusion that it was possible that he had a staggered overdose; is that fair to say?

                    *    *    *    *    *

A.     Based on the article that we went over before, Exhibit 4, he does fit some of the criteria that are encompassed within this study.

Q.     **I'm not asking about any studies.  I'm asking about objective data that you had regarding specifically Desmond Staple.  Isn't it true that you have no data of any kind supporting a conclusion that this was a staggered overdose?**

A.     **I did not examine Mr. Staple so I have no objective data except for any data that I was provided, and this possible based on the data that I was presented.**

Q.     **No, what I'm saying is:  You have no data showing that it happened; correct?**

A.     **I have no data showing that it either happened or did not happen; that would be correct.**

Q.     **It's a mere possibility in your mind; correct?**

A.     **Correct.**

Lenchus Depo [DE 58-10], 63:15-65:10.  But, "mere possibilities" are insufficient to satisfy the

Daubert standard.  As was the case with the expert witness stricken by this Court in Arquette,

supra, Dr. Lenchus does not (and cannot) opine that Staple suffered an "unintentional, staggered

overdose" to a "reasonable degree of medical certainty."  See Arquette, 2010 WL 11453163, at

*4.  When asked to explain how Staple's acetaminophen level could reach 860 mg/L through a

"staggered overdose" (something Dr. Heard, a Board-Certified Forensic Toxicologist said is a "medical impossibility"), Dr. Lenchus gave "several scenarios, such as pre-existing liver damage, alcoholism, and genetic abnormalities, but ultimately admitted **he had no evidence of the existence of any of these factors.** Lenhus [DE 58-10], 38:24-39:7 (admitting that, as to the three (3) ways Dr. Lenchus says one can overdose using a therapeutic amount of Tylenol, he "doesn't have evidence to support any of those three.").

Dr. Lenchus' opinion also is unhelpful, as it presents only the "possibility" that what he says is so, without any evidence. As stated in Arquette, such "proffered imprecise and unspecific expert opinion will not assist the trier of fact." Accordingly, Dr. Lenchus should be excluded.

## IV.   DR. STEPHEN GERRISH SHOULD BE EXCLUDED.

### A.      Dr. Gerrish's qualifications are not relevant to this action.

If possible, Dr. Gerrish's qualifications have even less to do with this case than Drs. Fernandez, Adams and Lenchus. Dr. Gerrish is not a toxicologist, and has no training in toxicology. Gerrish Depo [DE 58-9], 20:24-21:4. He admits he has no expertise regarding the question of the "when the ingestion of Tylenol was taken prior to an acetaminophen overdose." Id. at 26:24-27:2. He does not perform pharmacokinetic analyses. Id. at 27:24-28:6. He does not know the half-life of Tylenol. Id. at 28:9-10. He has never published any articles having anything to do with the issues in this case. Id. at 24-31:12.

Dr. Gerrish is Board Certified in "gastroenterology." Id. at 4:20-21. After first stating that he was "Board Certified" in "hepatology," he later admitted he is not. Id. at 4:20-6:6. During his fellowship at Ochsner Medical Center in New Orleans, he worked with pre and post-transplant liver patients. Id. at 8:22-4. Since moving to Florida in 2008, he has not been involved in liver transplants. As a gastroenterologist, he performs endoscopies and colonoscopies and other like procedures. Id. at 10:12-18. Regarding his treatment of

acetaminophen overdose patients, he is called in if the testing shows liver damage.  Id. at 14:2-4.

While qualified as a gastroenterologist, those qualifications do not relate to the issues in this case.  Staple's death from liver damage is not in dispute.  Moreover, the only evidence of existing liver damage is at the time of Staple's admission to the hospital on March 14, 2016.  Dr. Gerrish agrees that all the liver tests performed at Mr. Staple's Mach 7, 2016 Emergency Room visit, a week before his death, were normal.  Id. at 29:9-30:23.  His opinions should be excluded.

### B.    Dr. Gerrish's opinions are not reliable or helpful and should be excluded.

As with Drs. Adams and Lenchus, Dr. Gerrish was fed the same untrue facts regarding "no pills or pill bottles in his car" and "he had taken out a large sum of money at the ATM." Gerrish Report [DE 59-5].  As with Drs. Fernandez, Adams and Lenchus, he proceeds to throw out multiple speculative theories of how it is "possible" that Staple did not "intentionally" take his +112 Tylenol pills.  With admirable candor, Dr. Gerrish makes clear his opinions are pure guesswork:

> Q.    Let me ask you; have I covered everything upon which you base your opinion that he was so confused he accidentally consumed 112 Tylenol extra-strength tablets?
>
> A.    So, again, well, the answer is – would be yes, but my opinion is that I'm **postulating possibilities.** I'm not saying that is what happened; I am not saying it's not what happened.  I am saying that there's other possibilities that need to be considered on why he – why the events unfolded as they did.

Gerrish [DE 58-9], at 49:20-50:4 (emphasis supplied).  The particular "possibility" that Dr. Gerrish was "postulating" here was his statement that Staple's ingestion of 112 pills in 30 hours could have resulted from his being "encephalopathic," which means "that they are confused, they can sometimes confuse medications with vitamins, candy, food, and take them unintentionally." Id. at 35:4-9.  When asked to identify any evidence of Staple's "confusion," Dr. Gerrish said

there were two (2) items:  First, Staple was a "reportedly successful business person" buying clothes at Walmart using cash, id. at 36:14-23; and, second, Mr. Staple told his sisters he was running late for a meeting and then was seen two hours later shopping for clothes at Walmart, id. at 35:10-25.  Dr. Gerrish eventually admitted that he really had no idea whether those two (2) pieces of "data" indicated confusion.  Id. at p. 40:21- 41:14.  As with all of Plaintiff's experts, these "opinions" are pure argument and there's nothing "technical" about them.

Even Dr. Gerrish's medical-sounding opinions are not based on any evidence in this case. He postulates the possibility that Staple's 860 mg/L of acetaminophen may have been caused by some pre-existing hepatic failure, id. at 52:2-13, or a genetic deficiency, id. at 52:25-53:25, or cirrhosis of the liver, id. at 54:8-13.  But, then, after doing so admits there is no evidence of any such conditions:

> Q.     So, to be clear, although there are other possibilities, none
>        of those possibilities were evidenced in the data that you
>        reviewed, correct?
>
> A.     Correct.

Id. at 54:14-17.  None of Dr. Gerrish's opinions are given to a "reasonable degree of medical certainty."  Accordingly, his rank speculation about what "is possible" does not satisfy the Daubert standard and he must be stricken.

## V.     ROBERT BEVERLY SHOULD BE EXCLUDED.

### A.     Mr. Beverly is not qualified to testify in this action.

Mr. Beverly has never testified before.  Beverly, 5:10-15.  While he sold property and casualty insurance for a total of 3 years while working for his father's insurance agency (he sold his last policy in 2008), he has never taken an application for, or sold, a life insurance policy.  Beverly, 20:7-21:5; 26:6-9.  Nor has he ever been an agent for a life insurance

company, worked in the underwriting department of an insurer, or been employed by an insurance company.  Id.  He has never been involved in the rescission of an insurance policy or worked in the claim department[10] of an insurer.  Id. at 21:2-5.  He does not hold any particular designations in insurance. Id. at 28:11-13.  While Mr. Beverly now runs his father's insurance school and, apparently creates "self-paced" courses for insurance agents, Plaintiff has failed to show how Mr. Beverly is qualified to testify in this action, which involves the rescission of Mr. Staple's life insurance policy.

**B.      Even if qualified, Mr. Beverly's opinions are neither reliable nor helpful to the jury.**

Assuming, *arguendo*, that Mr. Beverly is qualified to testify despite his lack of any experience in selling or underwriting life insurance policies, his opinions remain devoid of admissible testimony and, therefore, should be excluded. Beverly Report [DE 59-8].  His report is a compendium of unsupported, improper, and inflammatory arguments that would not even constitute appropriate argument in an attorney's closing argument to the jury.  These include his "opinions" that Northwestern Mutual:

1. engaged in "unethical practices… beginning at the time of application," id. at 6;
2. violated multiple Florida Statutes, including Sections 626.9541, 627.407, and 627.408, id. at 8-9; and
3. "set out to deny the Staple family's claim, rather than investigate facts," id. at 16.

Further, although he denies it, Mr. Beverly is providing improper legal opinions, arguing that Northwestern Mutual violated the law.  See Dahlgren v. Muldrow, 2008 WL 186641, at *5 (M.D. Fla. 2008) ("Regardless of whether a witness is a lay witness or an expert witness, all witnesses generally are prohibited from testifying as to questions of law regarding the interpretation of a statute, the meaning of terms in a statute, or the legality of conduct.").

---

[10]     At Mr. Beverly's deposition, Plaintiff's counsel withdrew Mr. Beverly as an expert with regard to claim handling issues.  Beverly, 77:1-5.   Therefore, Northwestern Mutual will not address those portions of his report.

"Expert testimony that merely tells the jury what legal conclusion to reach" is not admissible. Id.  Simply put, Mr. Beverly plans to tell the jury that Northwestern Mutual is "unethical" and "broke the law."  That is not the proper subject of expert testimony.

Further, Mr. Beverly also improperly attempts to tell the Court how to "interpret" the Policy.  See Exhibit "H", §1.3 "**Interpretation of Document 600**".  Under Florida law, however, the interpretation of an insurance contract is a matter of law to be decided by the court. Gulf Tampa Drydock, Co. v. Great Atlantic Ins. Co., 757 F.2d 1172, 1174 (11th Cir. 1985). Accordingly, such testimony should not be permitted.

## CONCLUSION

For the above-stated reasons, Defendant, The Northwestern Mutual Life Insurance Company, moves this Court for entry of an Order excluding the testimony of Drs. Fernandez, Adams, Lenchus, and Gerrish, and Mr. Beverly or, in the alternative, scheduling a Daubert hearing to determine the admissibility of the testimony of Plaintiff's experts and granting Northwestern Mutual such other and further relief as this Court deems appropriate.

Respectfully submitted,

**SHUTTS & BOWEN LLP**
*Attorneys for The Northwestern Mutual*
*Life Insurance Company*
200 S. Biscayne Boulevard
Suite 4100
Miami, Florida 33131
Tel:  (305) 358-6300
Fax:  (305) 381-9982

By: */s/ John E. Meagher*
  John E. Meagher
  Florida Bar No. 511099
  jmeagher@shutts.com
  Jake Monk
  Florida Bar No. 100321
  jmonk@shutts.com

25

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 6, 2020, I filed the foregoing document with the Clerk of Court.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or via US Mail, an authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ John E. Meagher*
Of Counsel

### SERVICE LIST

Theodore A. Corless, Esq.
Mary Catherine Lamoureux, Esq.
Corless Barfield Trial Group, LLC
6812 W. Linebaugh Ave.
Tampa, FL 33625
*service@corlessbarfield.com*
*tcorless@corlessbarfield.com*
*mlamoureux@corlessbarfield.com*
 *Counsel for Plaintiff*

Timothy W. Weber, Esq.
Jeremy D. Baillie, Esq.
Weber, Crabb & Wein, P.A.
5453 Central Avenue
St. Petersburg, FL 33710
*timothy.weber@webercrabb.com*
*jeremy.bailie@webercrabb.com*
 *Co-counsel for Plaintiff*

Served by CM/ECF