UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NUMBER: 8:17-cv-03066-MSS-TGW

CHERYL STAPLE,

      Plaintiff,

v.

NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY,

      Defendant,

_____/

NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY,

      Counter-Plaintiff,

v.

ESTATE OF DESMOND H. STAPLE and
CHERYL STAPLE,

      Counter-Defendant.

_____/

**CHERYL STAPLE'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
RENEWED MOTION TO EXCLUDE PLAINTIFF'S EXPERTS**

      Plaintiff/Counter-Defendant, CHERYL STAPLE ("Staple"), by and through her undersigned counsel, for her Memorandum in Opposition to Defendant, The Northwestern Mutual Life Insurance Company's ("Insurance Company") Renewed Motion to Exclude Plaintiff's Experts, Drs. Jaime Fernandez, Vernard Adams, Joshua Lenchus, and Stephen Gerrish, and Mr. Robert Beverly, and states and alleges as follows:

**I.      The Court previously considered and denied these *Daubert* challenges.**

On December 21, 2018, the Insurance Company filed its *Daubert* Motion to Exclude Plaintiff Cheryl Staple's Experts [DE 59], which the Court denied ([DE 94] ¶ 7.) While the Insurance Company adds very limited new legal authorities for its arguments here, it presents no foundation upon which any of these experts would be prevented from testifying, pursuant to *Daubert*.

For the reasons set forth previously by Staple in her response to the original motion [DE 66], and for those reasons stated herein the Court should again deny the same motion for (1) the same lack of authority or facts to support its motion; (2) the totality of evidence presented by the Insurance Company fails to overcome the immense burden it bears to disprove "every other reasonable hypothesis than suicide," due to the absence of information about **Mr. Staple's actual state of mind**, instead of the state of mind of the Insurance Company and its legal counsel about Mr. Staple's life; (3) Staple's experts offer more than mere conclusory statements as they specifically challenge the methodology employed by the Insurance Company's claim personnel and legal counsel as not within the standard of care for assessing suicidal ideation, as it admits its entire defense is borne in "toxicology and histology," rather than through an appropriate mental health expert, and not a toxicologist, like Kennon Heard, MD, Ph.D.[1]: (4) Staple's medical experts, such as Drs. Adams and Fernandez address the proper medical standard for suicide and also present credible, alternative explanations for Mr. Staple's actions other than suicide, which the Insurance Company's sole expert admits to (staggered overdose in the days leading up to his loss of consciousness); (5) the Insurance Company simply ignores genetic variability and the related testimony of Dr. Stephen Gerrish, a gastroenterologist, to explain the reasonable possibility that his liver may have metabolized acetaminophen and aspirin in a unique manner;

---

[1] Plaintiff/Counter-Defendant Cheryl Staple filed her Motion to Exclude Testimony of Kennon Heard, MD Ph.D. Pursuant to *Daubert* [DE 173], which provides a more in-depth profile on the missing elements of Dr. Heard's opinions regarding Mr. Staple's state of mind.

and (6) Robert Beverly, Staple's insurance expert specifically rebuts the evidence offered by the Insurance Company's employee-turned-expert witness Mr. Tim Labecki regarding the elements of the Insurance Company's attempt here to rescind the subject insurance policy.  As such, each of the experts provide more detail about why it is not possible to distinguish between an accident or suicide, making suicide simply a "reasonable possibility" and nothing more, and that the Insurance Company's application defense fails to take flight due to its failure to get the subject insurance application into evidence because the Insurance Company failed to produce a copy of the application when the insurance was <u>issued</u>.

## II.    Staple's medical experts opine that the Insurance Company fails to meet its primary burden, to demonstrate that suicide is more than simply a possibility.

The Insurance Company offers no witness on Mr. Staple's state of mind that would reflect an intent to harm himself.  The Insurance Company offers no medical expert to opine to objective data indicating an intent to commit suicide.  The Insurance Company offers no document, note, email, text, letter, or otherwise, reflecting a desire to harm himself.  Instead, rather than attempt to address the lack of prima facia elements like the state of mind to its suicide defense, the Insurance Company openly admits it is "going all in" on a toxicologist the only foundation for suicide:

> [N]one of Plaintiff's Experts is (or even claims to be) an expert in the field of toxicology, the only 'scientific' issue relevant to this case.

([DE 59], Page. 3-4) (emphasis added).  The Insurance Company represented to the Court in its Motion to Strike ([DE 44], Page 2), **Dr. Heard "did not opine on psychiatric conditions"** of Mr. Staple.  Nonetheless, he opines on self-harm intent from the amount of medication Mr. Staple must have ingested to reach the high level of acetaminophen in his blood.

Proffering an opinion from its sole expert that Mr. Staple's death was "consistent with suicide" fails to provide probative evidence to the ultimate issue in the case.  As noted in Staple's

previous response [DE 66], not only does the Insurance Company have the burden to prove that Mr. Staple's death was caused by suicide, Florida law presumes his death was ***not*** caused by suicide. <u>New York Life Ins. Co. v. Satcher</u>, 12 So. 2d 108, 108 (Fla. 1943). In cases such as this, "when the defendant comes forward with a plea of suicide, [the insurer] must prove it ***beyond a reasonable doubt just as he would the defense in a criminal case***. ***The evidence must exclude every other reasonable hypothesis of death***." *Id.* (emphasis added).

### III.   Staple's experts address alternative medical hypotheses regarding the manner of death, which are virtually ignored by the Insurance Company and its toxicologist.

It is undisputed that Mr. Staple died from liver failure caused by an overdose of acetaminophen. However, how and why Mr. Staple arrived at this condition is merely unknown. The Insurance Company attempts to provide factual and medical details of its theory through speculation that the Insurance Company has now gathered into a list of what it calls "calamities," **without ever offering any data regarding Mr. Staple's actual state of mind** about any of these accusations.  The Insurance Company's theory of suicide, while it may provide one possible explanation, ultimately suffers from a fatal lack of proof, both scientifically and factually.

### A.   The Insurance Company fails to present evidence Mr. Staple was distressed at any level, based upon the accusations leveled in its motions that Mr. Staple's life was in "shambles."

Instead of offering evidence (documents, witnesses, texts, emails, medical records, e.g.), the Insurance Company approaches Mr. Staple's state of mind by providing its own interpretation of Mr. Staple's state of mind, and nothing more.  In its latest Summary Judgment Motion, the Insurance Company writes, "Mr. Staple had more than ample motive to commit suicide," because "[i]n March of 2016, Mr. Staple's life was in a shambles and getting worse." (Defendant's Renewed Motion for Summary Judgment [Doc. 171], Page 47).  Note, **none of the**

**evidence offered** that follows this conclusory statement includes any specific reference to ***how Mr. Staple felt about the data***, which is the only relevant perspective on this question. If the Insurance Company has admissible evidence to reflect a state of mind of Mr. Staple consistent with suicide, it has yet to produce it, after more than one hundred subpoenas, access to his phone, his computer, and more than 30 depositions.

Mr. Staple was married to Staple, had a beautiful home where he and his wife lived with their four children, Sara (then age twelve), Chloe (then seven) and twins Desmond, Jr., and Benjamin (then two and a half). During the days leading up to March 14, 2016, the day he was found unconscious in a Walmart parking lot, he was discussing his future plans and business endeavors. (See [DE 174-6] Page 70, Lines 17-24 of Deposition of Christopher A. Stafford; [DE174-3] Page 59, Lines 4-21 of Deposition of Eric T. Unruh). The day before being found in his car, Mr. Staple called and texted several people. Mr. Staple contacted the family babysitter to advise that he would pick up the boys, Desmond, Jr. and Benji, later than initially planned. (See [DE 174-4] Page 83, Lines 6-18 of Deposition of Lorena Valbuena.) Mr. Staple was a religious man (and "pro-life") who was inseparable from his Bible, which he carried everywhere, and which was found in his car.

While the Insurance Company posits the existence of "factual absolutes" and "medical impossibilities," material gaps are surrounding the manner of Mr. Staple's death. The most obvious and glaring issue is that there is no direct evidence of suicide (e.g., no suicide note, no known plan to commit suicide, no threat of suicide made to others, no obvious pre-planning of death, etc.). There is also the fact that a week before his discovery at Walmart, Mr. Staple sought treatment at the Emergency Room complaining of lower quadrant, "flank" pain of unknown etiology. ([DE 61-49] at Page 4.). On March 7, 2016, following a C.T. Scan, he was discharged and prescribed two medications: a non-narcotic (ibuprofen) and Percocet (acetaminophen plus an

opioid). ([DE 61-49] at Page 9).  Mr. Staple filled these prescriptions two days later at Walgreens

[DE 174-1], presumably still suffering from the pain which led him to the E.R. Other than the 11

Percocet pills purchased at Walgreens on March 9, 2016, neither party has discovered any other

evidence of Tylenol or acetaminophen-based medication purchases. Neither party has found any

evidence of Mr. Staple's actual consumption of Tylenol or acetaminophen-based medications.  It

is unknown what levels of acetaminophen were in Mr. Staple's blood between the time he left

the hospital on March 7, and what he took to raise his levels so high.  It is unknown how many of

the 11 Percocet pills were consumed between March 9 and March 13, but the ibuprofen was

discovered in the trunk of the car.

> **B.     The Insurance Company's Toxicologist Dr. Heard admits he cannot
> eliminate accidental, staggered overdose as a reasonable explanation for
> Mr. Staple's serum metabolite levels.**

The absence of information regarding Mr. Staple's actual dosing swings opens the door

for expert opinion. the Insurance Company's sole expert, Dr. Heard, opines that Mr. Staple's

presentation is "consistent with a single large ingestion of acetaminophen" occurring

approximately 16-30 hours before he presented to the hospital.[2] Without consideration of Mr.

Staple's intent or social history, Dr. Heard proclaims that his death must have been suicide.

However, Staple's experts have a different view of what is possible or probable. Vernard Adams,

M.D., a forensic pathologist and former Chief Medical Examiner of Hillsborough County,

Florida from 1991 to 2012, opined that Mr. Staple's presentation is also "consistent" with him

taking multiple doses over time, i.e., a "staggered overdose" reached by accident and without the

intention to inflict self-harm. Dr. Adams adds, "In reality, there is no way to determine the

---

[2] The Insurance Company claims that it is undisputed that Mr. Staple took over 112 acetaminophen pills, and the bottle of pills is missing. ([DE 59], at 9).  A review of Dr. Heard's opinions compared to the Insurance Company's representations to the Court should be handled with extreme caution.  There is no evidence of these facts; only Dr. Heard's conclusory opinions.  As more fully detailed in the Daubert Challenge filed by Staple to Dr. Heard, his use of the expression "single large administration" does not mean as the Insurance Company posits in their briefs.

dosing from the blood concentrations."[3] ([DE 59-1] Page 10 at 2.) He concludes that the correct

approach to determining the manner of death is to evaluate the patient's history and

circumstances first and then determine whether the laboratory data support the resulting

hypothesis. He opined that the manner of death was an accident and that "accident is not only a

reasonable possibility but, based on the circumstances, is more likely than suicide."[4] ([DE 59-1]

Page 7 at 6.)

    Dr. Heard was questioned regarding the staggered overdose theory supported by Drs.

Adams and Lenchus. He testified, in pertinent part:

> **Question**: Can you tell within a reasonable degree of medical certainty whether or not
> at the time he took his single large ingestion as you call it whether he had
> previously poisoned himself with a staggered overdose?
>
> **Dr. Heard**: *I cannot.*

(Deposition of Kenneth Heard, [DE 173-1], page 19, line 25; page 20, lines 1-5). As was

apparent throughout Dr. Heard's deposition, the entirety of his opinions rest on the toxicology

report showing the concentration of acetaminophen in Mr. Staple's system. But he cannot tell

when the acetaminophen was ingested; in what manner it was ingested, pill, liquid, etc..; what

type of medication containing the acetaminophen was consumed, such as Pepto-Bismol, Tylenol,

etc..; or whether his liver was correctly processing the acetaminophen in the days leading up to

---

[3] According to Dr. Heard, little was known about any dosing he had undertaken with the prescription medications or with any other over-the-counter acetaminophen or non-acetaminophen medications. When he arrived at the hospital where he would eventually die, his blood chemistry reflected a high level of acetaminophen but also a high level of other OTC medications. His level of salicylates was exceptionally high, a phenomenon explained by Dr. Heard as either co-ingestion of aspirin or "laboratory error." Of course, Mr. Staple could have ingested salicylates by taking Pepto-Bismol; for example, a medication often taken for lower quadrant pain and containing salicylates. The speculation as to what medications Mr. Staple took, in what doses, and at what times are endless.

[4] The Insurance Company makes a big deal about the fact that Dr. Adams downgraded his opinion from "more likely than not" accidental to "reasonable possibility" of accidental after learning of errors in the history he was provided. He maintained that the real explanation remains unknowable due to insufficient investigation and data and errors in the medical records. The Insurance Company makes little effort to explain why Dr. Adams would be prohibited from giving that opinion.

his death. Dr. Adams points out that Dr. Heard's testimony and Report do not state that Mr. Staple's consumption of acetaminophen took place in a large single dose to a reasonable degree of medical certainty. (Dr. Heard's Report [DE 61-56]; Dr. Adams Supplemental Report [81-3], page 1). Rather, he merely opined it was consistent with a single large dose. (Dr. Heard's Report, [61-56], page 3 at 5). This does not **_exclude_** the hypothesis set forth by Drs. Adams and Lenchus.

As reflected below, the determination of whether the Insurance Company can overcome the legal presumption against suicide requires consideration of a much broader spectrum of facts, not merely an opinion based entirely on a single value in a blood draw ("860 mg/L means suicide").  Instead, there is a multitude of issues raised by the data, triggering many questions: What was Mr. Staple's level of acetaminophen in the days between his trip to the Emergency Room on March 7, and his trip to Walmart, on March 13?  **Unknown.**  What was Mr. Staple's state of mind leading up the date of his discovery in a Walmart parking lot?  **Unknown.** What was Mr. Staple doing immediately before he lost consciousness? **Unknown.** When, where, and how much acetaminophen did he dose? **Unknown.**  Was he taking multiple medications, not realizing that more than one contained acetaminophen? **Unknown.**  Were there any indications in his writings or statements that he wanted to take his own life? **None, zero.**  Did Mr. Staple metabolize acetaminophen in an expected way, or could he have had a pre-existing liver disease?  **Unknown, and not addressed by the Insurance Company.**  These questions, and others, require the participation of a broad spectrum of experts, first to address the Insurance Company's "method" of assessing his state of mind, before even addressing the admitted facts.  The experts produced by Staple discuss the lack of methodology being employed for this purpose and instead point out the obvious "confirmation bias" occurring when the Insurance Company picks the facts to support its narrative and ignores the rest.

**IV.    Each of Staple's experts is highly qualified in their field to render relevant, reliable, helpful, and admissible opinions, under _Daubert_.**

The Federal Rules of Evidence and the Supreme Court's decisions in <u>Daubert v. Merrell</u>

<u>Dow Pharmaceuticals, Inc</u>., 509 U.S. 579 (1993), and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S.

137 (1999), require the trial judge, as a "gatekeeper" to determine whether an expert's testimony

is reliable and relevant. Fed. R. Evid. 702; <u>Daubert</u>, 509 U.S. at 598; <u>Kuhmo Tire Co.</u>, 526 U.S.

at 141.[5] Under Federal Rule of Evidence 702, an expert opinion must satisfy three prerequisites

before being admitted. First, the expert must be adequately qualified by virtue of "knowledge,

skill, experience, training, and education," which is sufficiently related to the particular subjects

at issue in the case. Federal Rule of Evidence 702; *see, e.g*., Cooper v. Lab Corp. of Am.

<u>Holdings, Inc</u>., 150 F3d 376, 380 (4th Cir. 1998). Second, the expert's opinion must assist "the

trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702(a). If the

opinion "does not relate to any issue in the case," it is "not relevant and ergo not helpful."

<u>Daubert</u>, 509 U.S. at 591. The question is "one of 'fit,' a quality that 'is not always obvious." *Id.*

Third, the expert's opinion and methodology must be reliable, and the expert must reliably apply

the methodology to the facts of the case. <u>Daubert</u>, 509 U.S. at 592-93.

*V.*      **Jamie Fernandez, MD, Board Certified Psychiatrist**

    **A.**      **Dr. Fernandez addresses the Insurance Company's methodology and lack of opinions within the standard of care for assessing suicidal ideation.**

Dr. Jamie Fernandez, a Board-Certified Psychiatrist and Chief of Psychiatry at Memorial

Hospital in Tampa, concluded that Mr. Staple's death was consistent with accidental ingestion of

medication ([DE 59-6] Page 5).  She has conducted at least a hundred chart reviews in which

suicide was considered the manner of death and has evaluated hundreds of patients for safety in

the context of suicidal ideation ([DE 59-6], Page 3).  She is the sole mental health professional

asked to consider the facts and circumstances surrounding Mr. Staple's life and death to opine on

---

[5] Federal law governs the admissibility of expert testimony in diversity actions. <u>See, e.g.</u>, <u>Bryte v. Am Household, Inc.</u>, 429 F.3d 469, 476 (4th Cir. 2005).

the issue of suicide. As an initial matter, and contrary to the unsupported assertions of the

Insurance Company's lawyers, Dr. Fernandez opined that "it is not possible to conclude that

suicide is the manner of death based upon toxicology and histology alone." ([DE 59-6] Page 5).

Thus, Dr. Fernandez addresses the biggest of all of the elephants in the room, which is, **"*can you***

***assess an individual's mental state by lab results only?*"**  Basing her opinion on the more than

150 Baker Act hearings where she has been qualified as an expert, she responds in the negative.

Dr. Fernandez further addresses a litany of social factors and data from the scene

regarding Mr. Staple that weigh against suicide. Dr. Fernandez attacks the methodology and

opinions of both Dr. Heard and Dr. Rivers, the Associate Medical Examiner, rejecting the notion

that suicidal intent can be based upon "toxicology and histology" alone. Contrary to the

Insurance Company's reliance on a toxicologist who determined "manner of death" based upon

blood concentration alone ("he must have wanted to die if it was *this* high"), courts have on

multiple occasions found that a psychiatrist is well qualified to offer opinions regarding an

individual's likelihood of committing suicide. *See, e.g.,* Floyd v. United States, 2010 U.S. Dist.

LEXIS 125247 (M.D. Ala, November 26, 2010, at *31).[6]

As the Insurance Company attempts to create its list of "calamities" as it is being

described in its motion for summary judgment, Dr. Fernandez refutes this as lacking any

scientific foundation, as it is missing an answer to the most basic question: "what was Mr.

Staple's state of mind about any of these allegations?"  The data provided by the Insurance

Company tells us how the Insurance Company and its legal counsel feel, but nothing probative

about Mr. Staple's state of mind, regarding any of these allegations.  In her second deposition,

taken after the third extension to complete discovery, when presented with the "list of

---

[6] The Insurance Company has not offered a single case where a toxicologist was admitted as an expert to opine whether an individual had the state of mind for suicide based on a toxicology value, as it reveals in its brief.

calamities" or other data Dr. Fernandez explains the problem with the Insurance Company's approach:

> **Question**:   So you know no particular stressor he exhibited in his texts on the day he drove to Walmart, March 13, 2016?
>
> **Dr. Fernandez**:   If you consider a stressor that people were asking him to return money he borrowed, we can say that was a stressor, but whether or not Mr. Staple found that distressing I can't tell you from the text messages

(Deposition of Jamie Fernandez, M.D. taken September 24, 2019 [DE 174-2], Page 242, Lines 16-23)

Again, when texts were presented to Dr. Fernandez taken from Mr. Staple's phone, which the Insurance Company claims "proves" his suicidal state of mind, she states:

> **Dr. Fernandez**:   I don't know if Mr. Staple found this stressful, but for me as a mom, there seemed to be some question of who was picking up the kids, but, again, that's me speaking to my state of mind when I'm reading the texts. **I certainly couldn't tell you if that was actually something that he found stressful or not**

([DE 174-2], Page 243, Line 8-14.)

An examination of the data collected and offered by the Insurance Company and its claim personnel demonstrates a lack of understanding of the appropriate methodology to assess an individual's risk of self-harm.  By suggesting that certain "calamities" leveled and stacked against Mr. Staple by the Insurance Company somehow allows it to speculate about his state of mind is entirely ludicious and without real support.  There is not an "objective standard," wherein the Court can presume any of these facts meant anything to Mr. Staple.  Dr. Fernandez explains:

> **Dr. Fernandez**:   I don't have firsthand knowledge of Mr. Staple's values, so I couldn't speak to what is or isn't important to him or is or isn't stressful

([DE 174-2] Page 245, Line 10-12).

***

**Dr. Fernandez**:   **We are all just speculating.  Therein lies the problem in surmising suicide as the cause of death.  We do not have enough information to make that a more reasonable possibility than anything else**.

([DE 174-2], Page 271, Lines 12-15).

**Dr. Fernandez**:   You know, because again, we're making a judgment call with no firsthand knowledge of Mr. Staple's internal barometer of what's right and wrong.  I mean, you can put a sociopath in front of me, who, you know, just killed someone, and if they don't feel remorseful about it, then it wouldn't be a risk factor for them killing themselves.  Whereas, if, you know, I accidentally killed someone with a car, it might carry a bigger burden.  So you just – **without having firsthand knowledge of his state of mind, all of these are open to debate.**

([DE 174-2], Page 302, Lines 12-23).

Note, "being up for debate," means the Insurance Company's theory that these facts are demonstrable evidence of his state of mind fails, and they continue to face the presumption against suicide.  These opinions by Dr. Fernandez, are appropriate for a Board-Certified Psychiatrist to offer, and constitute direct evidence against the Insurance Company's methodology and speculative use of data to support its theory of suicide.

> **B.**     **The only expert offering a "psychiatric autopsy" is the Insurance Company's toxicologist, Kennon Heard, MD, none of the experts engaged by Mrs. Staple.**

The focus of Dr. Fernandez's opinions is to address the Insurance Company's methodology and to identify all reasonable explanations for Mr. Staple's manner of death.  In its brief, the Insurance Company accuses Dr. Fernandez of attempting a "'post-death' analysis in which a psychiatrist or 'suicidologist' attempts to opine on the mental state of the decedent" (Renewed Motion, [DE 172], Page 9).  In support of this, the Insurance Company cites Smith v. Prudential Ins. Co. of Am, 2012 WL 1965405, *13 (M.D. TN 2012) (this case is incorrectly cited by the Insurance Company in its Memo) suggesting Dr. Fernandez's opinion is equivalent to a "psychiatric autopsy," which a court found inadmissible as lacking proper foundation.  The reality is Dr. Fernandez is doing the opposite of what the Insurance Company accuses her of

doing. She is opining there is not enough evidence to conclude with certainty Mr. Staple intentionally took his life.  Dr. Fernandez' testimony is the Insurance company relying upon toxicology alone or lining up self-proclaimed financial or personal "stressors" does not axiomatically dictate a conclusion of suicide. Why? Because no one has "first-hand knowledge" of Mr. Staple's state of mind regarding how he felt about the circumstances of his life; it is pure speculation to project how a person would feel about his/her life situation.

Ironically, the <u>Smith</u> case cited by the Insurance Company is problematic for its own position. The Insurance Company is doing what the <u>Smith</u> court ultimately prohibited: relying upon "entirely speculative" and "inherently subjective" opinions regarding the "pressures" Mr. Staple had to have felt or associating Mr. Staple's feelings and intent with a laboratory blood test result to ultimately assert suicide is the one and only possible explanation for Mr. Staple's manner of death.  The Insurance Company posits that the Court should preclude the testimony of Dr. Fernandez, the Director of Mental Health Services for Memorial Hospital and who has testified in more than 150 Baker Act hearings designed to assess individual's state of mind regarding self-harm.  Alternatively, while arguing against the foundation of Dr. Fernandez's opinion, it then offers an expert with virtually no experience or training to assess individual's state of mind, but who states without equivocation that he is going to testify to Mr. Staple's purported suicidal ideation:

| | |
|---|---|
| **Question**: | Can you tell me within a reasonable degree of medical certainty whether or not Desmond Staple with premeditation committed suicide? |
| **Dr. Heard**: | Yes. |
| **Question**: | You're giving an opinion as to his intent? |
| **Dr. Heard**: | Yes. |

([DE 173-1], Page 6, Lines 24-25; Page 7, Lines 1-5)

For comparison, it is a "psychiatric autopsy" for the Insurance Company's Dr. Heard to speculate that Mr. Staple's manner of death is suicide based upon toxicology alone.  It is <u>not</u> a psychiatric autopsy for Dr. Fernandez to reject the Insurance Company's methodology of extrapolating a person's state of mind from lab values.  It is an improper psychiatric autopsy for Dr. Heard to speculate Mr. Staple's death is "consistent with" a single large ingestion (which the Insurance Company asks the Court to presume means he wanted to die), where there is no evidence regarding any of the medications taken by him in the days and hours before he lost consciousness.  In accordance with <u>Smith</u>, Dr. Fernandez opines you cannot presume any individual's state of mind, including any of the reasons set forth in the Insurance Company's memo. Still, it is an improper psychiatric autopsy for Dr. Heard to exceed his areas of specialty and attempt to address mental health issues.  Using the language from *Smith,* the issue of an individual's disposition being consistent with suicide on these facts by Dr. Heard is "plainly speculative, likely fall outside of [Dr. Heard's] areas of expertise, and amount to no more than *ipse dixit* statements by [Dr. Heard] that are unsupported by a scientific methodology."

**VI.    Stephen Gerrish, MD, Board Certified Gastroenterologist**

**A.    The Court denied both the legal and factual arguments made by the Insurance Company regarding Dr. Gerrish, yet the Insurance Company does nothing more than reassert them in its renewed motion.**

As more fully described in its original <u>Daubert</u> motion [DE 59], the Insurance Company challenged both the qualifications and the relevance of the Report and testimony of Stephen Gerrish, MD, a Board-Certified Gastroenterologist ([DE 59-5], Curriculum Vitae and Report), who provides the opinion undisputed by the Insurance Company and its toxicologist that there is no medical way to eliminate genetic variation and other causes as explanations for Mr. Staple's level of aspirin and acetaminophen metabolites in his blood.  All of the Insurance Company's

attempts to press details are more appropriate for cross-examination, instead of a basis to preclude them under Daubert.

**B.      Dr. Gerrish's opinions, including the fact Mr. Staple's likely genetic variation in the manner in which he metabolizes acetaminophen, are fatal to the Insurance Company claim of suicide.**

The Insurance Company's purported criticism of Dr. Gerrish's use of the term "possible" does not make it speculative, as much as it proves the Insurance Company's expert is applying the wrong standard.  Kennon Heard, MD, who was the only expert hired by the Insurance Company, speaks in terms of his opinion being "consistent with" an intent commit suicide, despite the fact, the Insurance Company must disprove all, other reasonable hypotheses.  Rather than simply ask a toxicologist whether Mr. Staple's blood chemistry is consistent with suicide, the Insurance Company should address the medical explanations offered by Dr. Gerrish, regarding how his blood chemistry could be impacted by genetic variability.  In his disclosures, Dr. Gerrish provided at least one article, which details how acetaminophen is metabolized in the liver, and how there are multiple genetic markers.  The real "speculation" occurs when Dr. Heard and the Insurance Company opt to accept only one explanation for Mr. Staple's manner of death and reject all others.   Dr. Gerrish rejects the Insurance Company's interpretation of the toxicology level as the only possible interpretation because Dr. Heard failed to account for multiple variables that could impact the calculus.[7] Dr. Gerrish offers multiple alternative explanations for why the toxicology number was so high, some of which are not consistent with the intent to take his own life.  Dr. Gerrish addresses the effects of chronic liver disease, genetic variability in acetaminophen metabolism, renal failure, and chronic fibrosis on his toxicology

---

[7] The Insurance Company admits that neither the Medical Examiner (Selly Rivers, MD), the County's Chief Forensic Toxicologist (Julia Pearson, Ph.D.), nor the Insurance Company's retained toxicologist (Kennon Heard, MD) could recall seeing a higher level in their many years of experience in dealing with Tylenol overdoses." (Motion for Summary Judgment [DE 171], Page 37).

level. He notes the "flank pain" and salicylate toxicity as well, factors unexplained by Dr. Heard. In short, Dr. Gerrish opines that the intent of ingestion and time course of ingestion cannot be proven solely by the presence of a significantly elevated acetaminophen level in Mr. Staple's system. ([DE 59-5] Page 5.)

## VII.    Josh Lenchus, D.O., Internist and Registered Pharmacist

Like Dr. Heard, the toxicologist hired by the Insurance Company, Dr. Lenchus agrees an accidental, staggered overdose could have occurred in the days and hours leading up to Mr. Staple's trip to Walmart.  From March 7 to March 9, when Mr. Staple filled his acetaminophen-based pain medication, to March 13, more than enough time existed for Mr. Staple to develop a toxic level of acetaminophen in his body.

Dr. Lenchus is an Internal Medicine Doctor and a Registered Pharmacist; he examined the phases of toxicity that were observable in the data, both in the medical records and the information regarding Mr. Staple's behavior and presentation at Walmart. He described the three phases of acetaminophen toxicity, which include (a) Phase 1: 30 minutes to 24 hours post-ingestion; (b) Phase 2: 18-72 hours post-ingestion, and (c) Phase 3: 72-96 hours post-ingestion. ([DE 59-4] Page 4-5.). He identifies the specific values extracted from Mr. Staple's medical records, as well as examined the state of Mr. Staple's toxicity at Walmart, where he is observed on the video vomiting at a known time of day.

Dr. Lenchus explains that there is no real data in the medical record that would enable one to distinguish between an intentional ingestion or an accidental staggered overdose, particularly given the lack of data regarding his levels in the days preceding his trip to the Walmart. He testified that there is not enough information to exclude a staggered overdose, leaving the notion of intentional overdose a "mere possibility" in itself. He suggests the strong possibility that it was an unintentional overdose, which he defines as "an ingested overdose

absent the objective of self- harm," in light of obvious co-ingestion of other medications and self-medication efforts Mr. Staple must have been making.

### VIII.   Vernard Adams, MD, Former Chief Medical Examiner

If the Insurance Company attempts to introduce the opinions of the Associate Medical Examiner, ("AME") Dr. Rivers, at the very least, Dr. Adams would be permitted to testify to address the lack of foundation for her opinions as to the manner of death.  Dr. Adams was the former Chief Medical Examiner for Hillsborough County, Florida, and has conducted more than 6,800 autopsies, including physical examinations of individuals, to establish the manner of death. He directly rebuts AME Dr. Rivers, who is relied upon and quoted regularly by the Insurance Company.  Dr. Adams rejects the opinion that Mr. Staple's death must have been intentional. Dr. Adams reviewed the complete medical documents, including the materials gathered from the days preceding his discovery in his car. AME Dr. Rivers did not consider the medical records from Florida Hospital Carrollwood from March 7, 2016, and admits she was unaware that Mr. Staple had been prescribed acetaminophen-based pain medication or that he was suffering from flank pain. Indeed, if the Insurance Company intends to present the Associate Medical Examiner's conclusions, then Dr. Adams' opinion directly refutes it.

The primary focus of Dr. Adams' opinions relates to an improper methodology, where the Insurance Company speculates as to Mr. Staple's real state of mind.  Dr. Adams identifies other, equally plausible explanations for how Mr. Staple may have reached the level of 860 mg/L in his blood that does not involve an intent of self-harm. His opinions are specific, credible, and highly relevant to the issues in the case.  When asked whether "having an argument with a spouse" constitutes "evidence of suicidal ideation" without any knowledge regarding Mr. Staple's state of mind, Dr. Adams testified:

> **Question**:   That wasn't significant to you on the day he disappeared that he had this argument with his wife?

**Dr. Adams**:   [Having an argument with his spouse was not significant to Dr. Adams] because "Arguments with spouses occur all the time with married people, so, no, not particularly."

(See Page 25, Lines 20-23 of Deposition of Vernard I. Adams, M.D. taken September 6, 2019 **Exhibit "A".).**

**Question**:   But it wouldn't had changed your opinion if you had known [about him having an alleged argument with his spouse]?

**Dr. Adams**:   No.  It's an argument.  **What I need for a determination of suicide is an expression of intent to kill oneself.  Being sad, being stressed, doesn't do it**.

(See Page 25, Line 25; Page 26, Lines 1-5 of Deposition of Vernard I. Adams, M.D. taken September 6, 2019 **Exhibit "A".).**

Dr. Adams addresses the limited probative value of any of their accusations, absent evidence of

Mr. Staple's actual state of mind:

**Question**:   And, again, you don't find [statements from Staple to Mr. Staple, the Insurance Company claims were made], you don't find that significant, just interesting and useful?

**Dr. Adams**:   It's useful.  It has a bearing on my opinion that suicide is a reasonable possibility, but it does not elevate it to more likely than not.

**Question**:   How do you know without seeing [the statements made]?

**Dr. Adams**:   Well, that's my opinion.  I accept that – I accept it from you when you tell me that she told him she was going to leave him, I accept that as true.  In essence, just a casual hypothetical question.  And based on that, accepting that as true, it does not change my opinion, it just goes to suicide being a reasonable possibility

(See **Exhibit "A"**, Page 37, Lines 5-18).

**Dr. Adams**:   You have a multiplicity of emotional and financial stressors, and **there are plenty of people who deal with those without killing themselves or threatening suicide.**

(See **Exhibit "A"**, Page 38, Lines 7-10).

\*\*\*

**Question**:   Would that [info about Sharon texts] have been valuable information for you to have seen in reaching your opinions?

**Dr. Adams:**   **I think it's useful information.**  It goes to the opinion that suicide  is a reasonable possibility.  **But it's not evidence of intention to kill oneself**

(See **Exhibit "A"**, Page 38, Lines 7-10).

\*\*\*

**Question**:   Other than what you consider to be the absence of evidence of intent to commit suicide, what facts are you relying upon to base your opinion on that this was an undetermined manner of death?

**Dr. Adams:**   **It's the lack of facts that make it undetermined, not the presence of facts**.

**Question:**   **Is there a single fact** that you know of that actually argues in favor of this being an underdetermined manner of death?

**Dr. Adams:**   **The lack of compelling evidence of intent to kill himself.**

(See **Exhibit "A",** Page 56, Lines 20-25; Page 57, Lines 1-7).

**Question**:   I just want to make sure I have the entire basis of your opinion.

**Dr. Adams:**   There's evidence of emotional stress and financial stress, and he took a lot of Tylenol, but nothing's been offered which supports a more-likely than not opinion that this was an intentional death

(See **Exhibit "A",** Page 57, Lines 10-18).

**Dr. Adams:**   **We've gone through all of this detail, and you've shown me all of these texts, and so forth, which support the opinion that suicide is a reasonable possibility.  And what's lacking is clear intent to kill himself.**  That's why that possibility doesn't rise to a level or more likely than not.  And most Tylenol intoxications turn out to be accidents.  So that's still a reasonable possibility.  Neither does that rise to a level of more likely than not.

(See **Exhibit "A",** Page 58, Lines 4-12).

**Dr. Adams:**   The essence here is, for the manner of death of suicide, **you need to have evidence of intent to kill oneself, and it isn't present, so I cannot opine suicide.**  Neither can I opine accident.  They're both reasonable possibilities.  Neither rises to the level of more likely than not.  You've provided additional factual information.  It doesn't change my opinion

(See **Exhibit "A",** Page 59, Lines 14-20).

This observation is less about providing a conclusion, fitting for the party, but instead represents a statement regarding the method being employed by the Insurance Company.   In short, Dr. Adams' opinion is reliable, helpful, and drawn from a lifetime of experience in determining the causes and manners of unexplained deaths.  He does not just give you a conclusion, but tells the fact finder what's missing.

**IX.     Robert A. Beverly, Insurance Consultant**

The Insurance Company filed a counterclaim for rescission based upon alleged misrepresentations in Mr. Staple's application for the 990 policy. To support its claims, the Insurance Company advances the testimony of Tim Labecki, an Insurance Company employee not originally involved in either the application or the underwriting process regarding Mr. Staple and for which no Rule 26 report was furnished. The Insurance Company claims Mr. Staple lied about his occupational history and level of income, and Mr. Labecki opines that the Insurance Company would not have issued the 990 policy had it known the true information. Mr. Labecki is rendering a litigation expert opinion even though he does not possess personal knowledge of the claim and he was not designated as a Rule 26(a)(2) expert witness. The Insurance Company will attempt to introduce Mr. Labecki's alleged opinions in conjunction with Fla. Stat. sec. 627.409, the legal basis for its rescission count.

Staple posits that the application process for Mr. Staple's 990 policy was flawed and the 990 application is not admissible. Without an application, the Insurance Company's claim for rescission must fail. Mr. Robert Beverly is Staple's designated expert witness who will offer testimony about the application process surrounding Mr. Staple's 990 policy and the Insurance Company's failure to comply with certain requirements mandated by Florida Statutes.  The Insurance Company objects that Mr. Beverly is rendering "legal opinions" and these opinions should be excluded. The Insurance Company mischaracterizes Mr. Beverly's opinions as legal

opinions. Mr. Beverly is presenting what Florida law requires in the context of life insurance applications and what the Insurance Company did or did not do to meet those requirements. Notably, the type of testimony Mr. Beverly is offering is akin to the type of testimony of Mr. Labecki is offering.  There is no basis for excluding Mr. Beverly's opinions that will certainly assist the trier of fact..

X.      **CONCLUSION**

For the aforementioned reasons, and those stated in its previous response to the same motion, Plaintiff/Counter-Defendant, Cheryl Staple, prays this Court deny the Defendant's Renewed Motion to Exclude Cheryl Staple's Experts, Drs. Jaime Fernandez, Vernard Adams, Joshua Lenchus, and Stephen Gerrish, and Mr. Robert Beverly and any and all other relief the Court deems just and equitable.

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document has been electronically filed with the Clerk of Court using the *CM/ECF Portal* and served via *CM/ECF Portal* Electronic Mail to: **John E. Meagher, Esq. and Jake Monk, Esq.,** SHUTTS & BOWEN, LLP, 200 S. Biscayne Blvd., Suite 4100, Miami, Florida 33131, and Plaintiff's Co-Counsel, **Timothy W. Weber, Esq, and Jerry D. Bailie, Esq.**, 5453 Central Ave., St. Petersburg, Florida 33710 on this **21st day of January, 2020**.

**CORLESS BARFIELD TRIAL GROUP, LLC**

**_/s/ Theodore A. Corless_**
**THEODORE A. CORLESS, ESQUIRE**
Florida Bar No: 176192
**MARY CATHERINE LAMOUREUX, ESQUIRE**
Florida Bar No: 872288
6812 W. Linebaugh Avenue
Tampa, Florida 33625
Telephone: (813) 258-4998
Facsimile: (813) 258-4988

Primary email: service@corlessbarfield.com
*Attorneys for Plaintiff/Counter-Defendant*

**WEBER, CRABB & WEIN, P.A.**
***/s/ Timothy W. Weber***
**TIMOTHY W. WEBER, ESQUIRE**
Florida Bar No: 086789
**JERRY D. BAILIE, ESQUIRE**
Florida Bar No: 118558
5453 Central Avenue
St. Petersburg, Florida 33710
Telephone: (727) 828-9919
Facsimile: (727) 828-9924
Timothy.weber@webercrabb.com
Jeremy.bailie@webercrabb.com
*Co-Counsel for Plaintiff/Counter-Defendant*