**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**CHERYL STAPLE,**

      **Plaintiff,**

**v.**                                                         **Case No: 8:17-cv-3066-T-35TGW**

**NORTHWESTERN MUTUAL LIFE**
**INSURANCE COMPANY,**

      **Defendant.**

---

## ORDER

**THIS CAUSE** comes before the Court for consideration of Defendant's Renewed Motion for Summary Judgment, (Dkt. 171), the response in opposition thereto, (Dkt. 194), and the reply in support, (Dkt. 220); Plaintiff's Motion for Summary Judgment on Coverage, (Dkt. 174), the response in opposition thereto, (Dkt. 193), and the reply in support, (Dkt. 221); Defendant's Renewed Daubert Motion or Request for Daubert Hearing (Dkt. 172), and the response in opposition thereto, (Dkt. 182); and Plaintiff's Daubert Motion to Exclude Dr. Heard, (Dkt. 173), and the response in opposition thereto. (Dkt. 184) Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court orders that Defendant's Motion for Summary Judgment is due to be **GRANTED IN PART and DENIED IN PART**, Plaintiff's Motion for Summary Judgment is due to be **GRANTED IN PART and DENIED IN PART,** Plaintiff's Daubert Motion to Exclude Dr. Heard is due to be **DENIED**, and Defendant's Renewed Daubert Motion is due to be **GRANTED IN PART and DENIED IN PART**.

## I.   BACKGROUND

### A.  Factual History

The limited facts that the Parties concede or that the Court can determine are undisputed in the record are as follows.

Desmond Staple ("Mr. Staple"), the decedent whose life insurance policies anchor this dispute, was, at one time, a practicing lawyer. On October 16, 2014, a Florida Bar complaint was initiated against Mr. Staple based on an overdraft/insufficient funds in his trust account. (Dkt. 171-2) On May 6, 2015, Mr. Staple signed and submitted to the Florida Bar a Petition for Disciplinary Revocation with Leave to Reply for Readmission. (Dkts. 195 at ¶ 5; 171-3) This is a petition whereby a lawyer agrees to surrender his or her law license with permission to seek reinstatement at a later time in exchange for dismissal of pending disciplinary cases. (Dkt. 171-3) On July 9, 2015, the Supreme Court of Florida granted the petition and entered an order of disciplinary revocation of Desmond Staple's law license, which became effective on August 8, 2015, with leave to seek readmission after five years. (Dkt. 171-4) It appears that after his law license was revoked, Mr. Staple intended to become a restaurateur. On August 4, 2015, Mr. Staple applied for a lease for restaurant space for a restaurant bearing the name CLOSA, LLC d/b/a Mama Willie's Caribbean Kitchen ("Closa, LLC") (Dkt. 171-35)

During his Bar disciplinary proceedings, Mr. Staple began a business relationship with Defendant and Counter-Claimant Northwestern Mutual ("Defendant" or "Northwestern Mutual"), seeking to transfer the cash value of his existing life insurance policy with RiverSource Life Insurance (formerly IDS Life Insurance Company) worth $1.5 million to Northwestern Mutual. (Dkts. 58-1 at 86:10–87:16; 171-5; 175-6) In 2015,

Defendant issued four life insurance policies on the life of Mr. Staple: (1) Policy Number 21144517; (2) Policy Number 21144525; (3) Policy Number 21200595; and (4) Policy Number 21316990 (the "990 Policy") (collectively, the "Policies"). (Dkt. 195 at ¶ 1) Plaintiff Cheryl Staple ("Plaintiff") was Mr. Staple's wife and is the beneficiary of each of the Policies. (Id. at ¶ 2) Policies 21144517, 21144525, and 21200595 have a combined total death benefit of $1,000,000. (Id. at ¶ 3) The 990 Policy has a total death benefit of $3,000,000. (Id. at ¶ 4) Mr. Staple applied for the four Policies with the assistance of Northwestern Mutual financial advisors Aubrey Rosser and Eric Fleming, and Rosser's assistant Sarah Williams.[1] (Dkt. 58-1 at 127:12–28:12, 135:17–22; Dkt. 58-12 at 79:11–12)

The Policies were issued in a staggered fashion, with the first two policy applications bearing a signature date of March 19, 2015, (Dkt. 171-8 at 43, 71) The first two policies bear a "Date of Issue" of March 19, 2015. (Id. at 13, 52) Another application bearing Mr. Staple's signature is dated May 3, 2015. (Id. at 99) Along with this application, Mr. Staple also completed a Personal Health and Status Declaration ("Form 600") confirming, *inter alia*, that to the best of his knowledge and belief there had been no change in his medical, occupational, and financial condition since providing the answers in his most recent application. (Id. at 102) The resulting third policy bears a "Date of Issue" of May 3, 2015. (Id. at 80)

A fourth and final application bearing Mr. Staple's signature is dated August 10, 2015 ("990 Policy Application"), two days after Mr. Staple's disbarment became effective.

---

[1] Rosser was made aware of Mr. Staple's plans for his restaurant venture by Plaintiff, though the extent of his knowledge is disputed. (Dkts. 58-1 at 57:7–59:18, 81-7, 81-8) He was not told, however, about Mr. Staple's Bar disciplinary proceedings or his ultimate disbarment.

(Id. at 127) A second Form 600 dated the same day bears Mr. Staple's signature. (Id. at 130) It contains no exceptions or changes. (Id.) On August 13, 2015, six days after Mr. Staple's disbarment became effective, Northwestern Mutual sent Rosser a message requesting, among other things, further information regarding Mr. Staple's annual income, which was listed as "$75k" in the 990 Policy Application. (Dkt. 171-8 at 126, 171-9) The message stated, in pertinent part:

> An income of $75K supports an income replacement need of ~ $1.2M. We note that he is self employed. Is this only his salary? What K-1 distribution did he take in 2013 and 2014? What does he anticipate his total reported income to be this year? Did you complete a personal balance sheet as part of the fact finder supporting a personal line of $4M? If yes, please submit it so that we can verify the client's current net worth.

(Dkt. 171-9) On August 16, 2015, Rosser then sent an email to Plaintiff, seeking to confirm additional information about Mr. Staple's income. The email stated, in pertinent part:

> We note that [Mr. Staple] is self-employed. Is this only his salary? What K-1 distribution did he take in 2013 and 2014? What does he anticipate his total reported income to be this year? Please get back when you can. Estimations are fine on expected income.

(Dkt. 171-10) Plaintiff forwarded the email to Mr. Staple, who responded on August 18, 2015:

> Aubrey, regarding question number two: $250K in 2013; $250K in 2014 and anticipated $250K in 2015. These amounts reflect my distributions, not my law firm's intake. Thanks. Desmond.

(Dkt. 171-10) Notably, the signature block on this email contains Mr. Staple's name and the name of his then defunct law practice. (Id.)

Defendant proffers the declaration of its employee Timothy J. Labecki to testify concerning the approval and issuance of the insurance policies to Staple. As an initial matter, the Court overrules Plaintiff's objection to the admissibility of Labecki's

declarations. Plaintiff asserts that Labecki lacks the requisite personal knowledge and competence to make the statements set forth therein. (Dkts. 194 at 60–61, 221 at 21–22) Under Federal Rule of Civil Procedure 56(c)(4), when an affidavit is used to support a summary judgment motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Labecki attests that he is employed by Northwestern Mutual as a Life Technical Underwriting Consultant and has worked for Defendant for 23 years. (Dkt. 171-8 at 1, 193-1 at 1) He further attests that his declarations were made "based on personal knowledge and on [his] review of the business records and procedures of Northwestern Mutual." (Dkts. 171-8 at 1, 193-1 at 1) "With reference to competency, '[a]n affidavit submitted by a corporate representative in support of summary judgment is properly considered when the corporate representative expressly verifies that the matters stated therein are based on his own personal knowledge gained    through review of    business records.'" Lewis    v. Residential Mortg. Sols., No. 1:17-CV-1422-ELR-WEJ, 2018 WL 5276221, at *4 (N.D. Ga. Aug. 31, 2018), report and recommendation adopted, No. 1:17-CV-01422-ELR, 2018 WL 5276190 (N.D. Ga. Oct. 16, 2018), aff'd, 800 F. App'x 830 (11th Cir. 2020) (quoting Cargo Airport Servs. USA, LLC v. Transcarga Int'l Airways, C.A., Inc., No. 17-20768-CIV-MORENO, 2017 WL 4898292, at *2 (S.D. Fla. Oct. 27, 2017)); see also Atl. Marine Fla., LLC v. Evanston Ins. Co., No. 08-CV-538-J-20TEM, 2010 WL 1930977, at *1-2 (M.D. Fla. May 13, 2010) (denying motion to strike declaration of corporate representative against a challenge that the statements contained inadmissible hearsay and were not based on personal knowledge—corporate representative's review of business records established

the requisite personal knowledge, and on summary judgment, court is capable of disregarding inadmissible statements and determining whether admissible statements create a material factual issue); In re Trafford Distrib. Center, Inc., 414 B.R. 858, 862 (Bktrcy. S.D. Fla. 2009) ("[A]s a matter of law, 'personal knowledge can come from the review of the contents of business files and records.'") (quoting Washington Cent. R.R. Co., Inc. v. Nat'l Mediation Bd., 830 F. Supp. 1343, 1353 (E.D. Wash. 1993)). Labecki's review of Defendant's business records provides an adequate basis for his personal knowledge, and he is competent to testify on the matters stated based on his extensive experience working as a Life Technical Underwriting Consultant for Defendant. His testimony, which is uncontested by any competing evidence, is therefore accepted for purposes of resolving the cross motions for summary judgment.

Labecki attests that after consideration of his submissions, Northwestern Mutual approved Mr. Staple for coverage for the 990 Policy on or about August 24, 2015. (Dkt. 193-1 at 2) He further attests that upon this approval, the 990 Policy was assembled pursuant to Northwestern Mutual's standard operating procedures for all of its life insurance policies, and, pursuant to this procedure, the 990 Policy Application and Form 600 were attached to and included in the 990 Policy. (Id.) The package was then mailed to Rosser for delivery to Mr. Staple. (Id.) Labecki further avers that "Mr. Staple received the 990 Policy, containing a copy of the 990 Policy Application and the Form 600 on October 5, 2015." (Dkt. 193-1 at 3) As support, Labecki points out that Mr. Staple signed a Policy Delivery Acknowledgement form indicating that he received the 990 Policy on this date. (Id. at 3, 36) The fourth policy—the 990 Policy—bears a "Date of Issue" of August 10, 2015. (Id. at 8) Labecki attests that it is Defendant's standard practice to set

the "Date of Issue" to the latter of the date of the application, the date of the medical questionnaire, or the date of the medical/paramedical exam when a policy is prepaid, as was the case with Mr. Staple's policy. (Id. at 3)

The four Policies contain a two-year incontestability clause, providing that the Policies will not be contested by Defendant two years after the Date of Issue and a one-year suicide exclusion, providing that the full death benefits due under them would not be payable in the event of a suicide within one year from the Date of Issue. (Dkt. 171-8 at 20, 55, 83, 112)

On March 7, 2016, seven months into the coverage period for the 990 Policy, Mr. Staple sought treatment at the Emergency Room of Florida Hospital Carrollwood complaining of pain. (Dkt. 171-51 at 3–4) He was diagnosed with acute left flank pain of unknown etiology and discharged from the hospital with prescriptions for eleven (11) 325/5 mg acetaminophen-hydrocodone tablets and twenty-eight (28) 600 mg ibuprofen tablets. (Id. at 9). Two days later, Mr. Staple filled the two prescriptions at Walgreens. (Dkt. 174-1)

On March 14, 2016 at approximately 4:19 p.m., Mr. Staple was found unconscious but breathing in a parked car in a Walmart parking lot. (Dkt. 171-53) He was admitted to the hospital and died two days later on March 16, 2016, a few days short of one year from the date of issue of the first two policies and several months short of the one-year period in the other two policies. (Dkt. 195 at ¶ 6; Dkt. 171-8 at 20, 55, 83, 112) The Hillsborough County Medical Examiner, Dr. Selly Rivers, who performed an autopsy on Mr. Staple on March 17, 2016, concluded the cause of death was "fulminant hepatic necrosis due to acetaminophen poisoning." (Dkt. 171-56 at 4) Neither party disputes that this was the

cause of Mr. Staple's death; however, the manner of death remains heavily disputed in this record. The medical examiner concluded that Mr. Staple had committed suicide.[2] (Id.)

Defendant has proffered the expert report of toxicologist Dr. Kennon Heard, who has testified that due to the extremely high concentration of acetaminophen in Mr. Staple's blood, it is his medical opinion that Mr. Staple's overdose was intentional. (Dkt. 171-57) Dr. Heard opines that it is "only medically possibl[e] for [Mr. Staple], who had normal liver and kidney function on March 7, 2016, to reach a level of 56 grams of acetaminophen on March 14, 2016 with a massive, deliberate ingestion 16-30 hours before his hospitalization . . . ." (Dkt. 171-58 at 4)

In support of its theory that Mr. Staple committed suicide, Defendant additionally points to evidence that Mr. Staple was unhappy in his marriage and was experiencing financial struggles.[3]  Plaintiff admitted in her deposition that in the weeks prior to his death, Mr. Staple was "under a great deal of stress" regarding his finances and the restaurant. (Dkt. 58-12 at 148:16) Mr. Staple was apparently in arrears on his rent for Closa, LLC's restaurant space. (Dkt. 171-37) On March 2, 2016, Closa, LLC was served with an Eviction Summons/Non-Residential and Complaint for failure to pay rent in January and February of 2016. (Id.) On February 10, 2016, Plaintiff and Mr. Staple were notified that their accounts were past due at their children's private school and that the children would not be permitted to attend the school beginning February 17, 2016 if the past-due

---

2 Plaintiff objects to the Court's consideration of the medical examiner's opinion concerning manner of death. (Dkt. 194 at 15–19) As discussed *infra*, Plaintiff's objection is overruled.
3 Plaintiff objects to the Court's consideration of this evidence concerning Mr. Staple's social and financial issues. (Dkt. 194 at 31–32) As discussed *infra*, the Court overrules Plaintiff's objections concerning the admissibility of this evidence.

accounts were not paid. (Dkt. 171-15) The school sent similar correspondence to the Staples the month prior. (Dkt. 171-13)

Defendant proffers additional evidence that Mr. Staple was in debt. (Dkts. 171-17–171-32) Wilbert Desir, one of the individuals to whom Mr. Staple owed money, testified that he was texting Mr. Staple the week before Mr. Staple's death in a really "rough" manner, threatening to call the police if he did not get paid. (Dkt. 203 at 46:10–47:1) Letters found on Mr. Staple's computer indicate that he was attempting to borrow additional money from individuals prior to his death, writing to one person:

> When I tell you that my marriage, family, home and sanity rest on this, it is no overstatement. I have tried to do this all on my own because I am a very proud man. However, I am at the point now where I have nowhere else to turn . . . please help me!

(Dkts 171-33, 171-34).

Mr. Staple was also facing further complaints from the Florida Bar in the months immediately preceding his death. On January 5, 2016, the Florida Bar sent a letter to Mr. Staple initiating a complaint against him concerning his alleged forgery of another attorney's signature on a demand letter dated October 29, 2015, after he had been disbarred. (Dkt. 171-41, 171-42) On January 20, 2016, Mr. Staple submitted his response to the Florida Bar in which he admitted his conduct and stated that at the time of his actions he was "still in denial, depressed, sad, dejected, disheartened, disillusioned, shocked, disappointed, upset, and angry over the fact that something [he] loved so much was taken away due to his own stupidity." (Dkt. 171-43) A second complaint was initiated against Mr. Staple on January 5, 2016 concerning similar allegations of falsification of an attorney's name on demand letters. (Dkt. 171-46) Mr. Staple's response to this complaint

contained the same language as his other response concerning his "poor state of mind." (Dkt. 171-47)

There is also evidence in this record of discord in the Staples' marriage and that Plaintiff herself had expressed concerns about Mr. Staple's mental well-being. On March 13, 2016, Plaintiff discovered that Mr. Staple had failed to pay the mortgage on their home, resulting in an uncomfortable conversation, according to Plaintiff. (Dkt. 58-12 at 127:8–23) That morning, at 8:08 am, Mr. Staple texted Sharon Unruh that Plaintiff was "threatening to leave" him and "[t]ake the kids." (Dkt. 170-4) Plaintiff testified that she began calling Mr. Staple the afternoon of March 13, 2016, telling him, "[L]et's talk some more, we'll figure everything out with regard to the mortgage. I'm with you. I love you. I love you." (Dkt. 58-12 at 129:16–21) Mr. Staple did not return home that night. (Id. at 167:3–18) After taking the children to school the morning of March 14, 2016, Plaintiff left work early and called the police to report Mr. Staple missing. (Id. at 167:19 - 69:8) Deputy Donald Randall responded to Plaintiff's call. (Dkt. 171-53 at 23–24) In his report, Deputy Randall states, in part:

> Approximately one week ago, Mr. and Mrs. Staple were in a verbal argument and Mrs. Staple directly asked Mr. Staple if he "felt like hurting himself," and he replied that he did not want to hurt himself, and "could not be further from that feeling." I asked Mrs. Staple why she would ask her husband that, and she said that it was because he hugged the children and told them that he loved them. However, Mr. Staple made no statement saying that he wanted to hurt himself, and this was one week prior to the above call.

(Id.) Mr. Staple's medical records also reveal statements from Plaintiff expressing Mr. Staple's possible suicidal ideation[4]:

---

4 Plaintiff objects to the Court's consideration of these reports and the statements therein. (Dkt. 194 at 19–31) As discussed *infra*, the Court overrules Plaintiff's evidentiary objections concerning the reports and any statements therein attributable to Plaintiff.

> Wife reports that patient has been under significant amount of stress. She denies any prior psychiatric history, no alcohol abuse, no substance abuse. She last spoke to the patient yesterday morning and he seemed okay at that time. Patient did express some suicidal ideation, but that was a week ago and family felt that he was improving.

(Dkt. 171-55 at 4) "When I spoke to his wife she did state that about a week ago he had expressed a view of possibly hurting himself." (Id. at 5)

On the other hand, Plaintiff denies that her husband was suicidal or that she threatened to leave him on March 13, 2016, and testified that she never heard him talk about harming himself—"[h]e considered it a sin." (Dkt. 58-12 at 148:2–3; Dkt. 212 at 369:8–20) She has proffered medical experts who opine that it is medically possible that Mr. Staple suffered from a staggered, unintentional overdose and a former medical examiner who rebuts Dr. Rivers' conclusion of suicide, opining that Mr. Staple's manner of death is undetermined. (Dkts. 59-4, 59-5, 59-1)

On March 16, 2016, the day of Mr. Staple's death, Plaintiff, as the beneficiary under the Policies, made a claim for benefits under all four Policies to Northwestern Mutual. (Dkt. 195 at ¶ 7) In a letter dated May 23, 2016, Northwestern Mutual informed Plaintiff's counsel and Plaintiff that the amount payable under the Policies was limited to a return of the premiums paid, consistent with the suicide exclusions. (Dkt. 171-65) Included with the letter, Defendant enclosed a check in the amount of $10,096.49, representing the premiums paid for the policies plus interest. (Id. at 3) Plaintiff endorsed and deposited the check. (Id.)

## B. Procedural History

Plaintiff filed this action against Defendant in the Circuit Court for the Thirteenth Judicial Circuit, in and for Hillsborough County, Florida on November 20, 2017. (Dkt. 2)

On December 21, 2017, Defendant removed the case to this Court pursuant to 28 U.S.C. § 1332. (Dkt. 1) Plaintiff's Complaint alleges that Defendant breached the four Policies and seeks declaratory relief and payment of all benefits due under the Policies. (Dkt. 2) Defendant filed a counterclaim and Amended Counterclaim seeking rescission of the $3 million 990 Policy only. (Dkts. 4, 20) On December 13, 2018, after the close of discovery, Northwestern Mutual filed a Motion to Dismiss for Fraud on the Court, in which it sought dismissal of the matter with prejudice as a sanction for Plaintiff allegedly having misrepresented facts, concocted stories, and hidden certain evidence, including Mr. Staple's cellphone, laptop, and items from Mr. Staple's car, including a piece of paper that Defendant believed to be a possible suicide note. (Dkt. 54) Defendant also moved for summary judgment and to exclude Plaintiff's expert witnesses. (Dkts. 59, 62) The Court held a hearing on the motions and denied the Motion for Sanctions, denied the Motion for Summary Judgment without prejudice, and re-opened discovery to allow Defendant to examine Mr. Staple's cellphone and laptop, take second depositions of the experts, and take depositions of additional witnesses. (Dkt. 94)

At the close of the reopened discovery period, Defendant filed several motions seeking sanctions for alleged spoliation and discovery violations, (Dkts. 134, 170), which motions the Court has denied. (Dkt. 236) Defendant also filed a Renewed Motion for Summary Judgment, (Dkt. 171), and a Renewed Daubert Motion seeking to exclude all expert testimony by Plaintiff's proffered experts Drs. Jaime Fernandez, Vernard Adams, Joshua Lenchus, and Stephen Gerrish, and Mr. Robert Beverly, or alternatively to schedule a Daubert hearing. (Dkt. 172) Plaintiff also filed a Motion for Summary

Judgment, (Dkt. 174), and a <u>Daubert</u> Motion to exclude Defendant's expert Dr. Kennon

Heard. (Dkt. 173) The motions are ripe for the Court's review.

## II.   STANDARD OF REVIEW

### A.  <u>Daubert</u>

Federal Rule of Evidence 702, which governs expert testimony, states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case.

Rule 702 requires district courts to ensure "that an expert's testimony both rests on a

reliable foundation and is relevant to the task at hand." <u>Daubert v. Merrell Dow Pharm.,</u>

<u>Inc.</u>, 509 U.S. 579, 597 (1993). <u>Daubert</u> "requires the trial court to act as a gatekeeper to

insure that speculative and unreliable opinions do not reach the jury." <u>McClain v.</u>

<u>Metabolife Int'l, Inc.</u>, 401 F.3d 1233, 1237 (11th Cir. 2005). "This function inherently

requires the trial court to conduct an exacting analysis of the foundations of expert

opinions to ensure they meet the standards for admissibility under Rule 702." <u>United</u>

<u>States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (alterations and internal

quotation marks omitted). "The proposed testimony must derive from the scientific

method; good grounds and appropriate validation must support it." <u>McClain</u>, 401 F.3d at

1237.

In considering proffered expert testimony, the Court considers that "[t]he burden of

laying the proper foundation for the admission of expert testimony is on the party offering

the expert, and the admissibility must be shown by a preponderance of the evidence."

McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002) (quoting Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999)). In determining the admissibility of expert testimony under Rule 702, the Court applies a "rigorous" three-part inquiry. Frazier, 387 F.3d at 1260. Expert testimony is admissible if: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact . . . ." Id.; see also United States v. Hansen, 262 F.3d 1217, 1234 (11th Cir. 2001). The admission of expert testimony is a matter within the discretion of the district court, which is accorded latitude in making its determination. Cook v. Sheriff of Monroe County, 402 F.3d 1092, 1103 (11th Cir. 2005); Frazier, 387 F.3d at 1258–59.

The first requirement for the admissibility of expert testimony is that the expert is qualified to testify competently regarding the matters he or she intends to address. Frazier, 387 F.3d at 1260–61. The plain language of Rule 702 provides that a person may qualify as an expert based upon his or her knowledge, skill, experience, training, or education. Id. Determining whether a witness is qualified to testify as an expert "requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." Jack v. Glaxo Wellcome, Inc., 239 F.Supp.2d 1308, 1314–16 (N.D. Ga. 2002). In other words, a district court must consider whether an expert is qualified to testify competently regarding the matters intended to be addressed. City of Tuscaloosa v. Harcros Chem., Inc., 158 F.3d 548, 562–63 (11th Cir. 1998).

The second requirement, discrete and independent from the witness's qualifications, is reliability. Frazier, 387 F.3d at 1261. Courts have "considerable leeway

in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Id. at 1262 (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)). While the inquiry is "a flexible one," the focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 594–95. However, "conclusions and methodology are not entirely distinct from one another . . . [and] nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). "Rather, the trial court is free to 'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183, 1194 (11th Cir. 2010) (citing Joiner, 522 U.S. at 146). "The trial judge in *all* cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." Frazier, 387 F.3d at 1262 (quoting Fed. R. Evid. 702 Advisory Committee Notes (2000 amends.)) (emphasis in original).

The third requirement for admissibility is that the expert testimony must assist the trier of fact. Id. Thus, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person," and "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. at 1262–63. While an expert witness may not offer a legal conclusion, Rule 704(a) provides that an opinion or inference is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact. Cook, 402 F.3d at 1112–13 n.8. However, "courts must remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury

regarding the applicable law." Id. (quoting United States v. Milton, 555 F.2d 1198, 1203 (5th Cir. 1977)).

Finally, expert testimony which satisfies these three requirements may nonetheless be excluded under Rule 403 if the probative value of the expert testimony is substantially outweighed by its potential to confuse or mislead the jury or if it is cumulative or needlessly time consuming. Frazier, 387 F.3d at 1263.

### B. Summary Judgment

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)). Which facts are material depends on the substantive law applicable to the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

Evidence is reviewed in the light most favorable to the non-moving party. Fennell, 559 F.3d at 1216 (citing Welding Servs., Inc., 509 F.3d at 1356). A moving party discharges its burden on a motion for summary judgment by showing or pointing out to the Court that there is an absence of evidence to support the non-moving party's case. Denney v. City of Albany, 247 F.3d 1172, 1181 (11th Cir. 2001) (citation omitted).

When a moving party has discharged its burden, the non-moving party must then designate specific facts (by its own affidavits, depositions, answers to interrogatories, or admissions on file) that demonstrate there is a genuine issue for trial. Porter v. Ray, 461 F.3d 1315, 1320-1321 (11th Cir. 2006) (citation omitted). The party opposing a motion for

summary judgment must rely on more than conclusory statements or allegations unsupported by facts. Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value.").   "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may grant summary judgment if the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

## III.   DISCUSSION

### A. Daubert Motions

#### i.  Dr. Jamie W. Fernandez

Defendant seeks to exclude Dr. Fernandez from testifying as an expert in this matter. (Dkt. 172 at 7–13) Dr. Fernandez is a board-certified psychiatrist and Chief of Psychiatry at Memorial Hospital in Tampa. (Dkt. 59-6 at 2) Dr. Fernandez asserts that she has conducted "hundreds of chart reviews of patients for safety in the context of suicidal ideation and [has] conducted at least a hundred chart reviews in which suicide was considered the manner of death." (Id. at 3) Dr. Fernandez's principal opinions are: (1) that Mr. Staple's "manner of death is most consistent with accidental acetaminophen overdose" and (2) that multiple reports in the medical records regarding Mr. Staple's suicidal ideation are the result of confirmation bias. (Id. at 5)

Principally, the Court finds that Dr. Fernandez is not qualified to opine as to whether Mr. Staple committed suicide. She has never treated Mr. Staple and she knows no more of what was in his mind prior to his death than any lay person would. The "majority" of her practice entails electroconvulsive therapy, and she has between three to five patients whom she sees for outpatient medication management, but she "really

[doesn't] do psychotherapy in the formal sense." (Dkt. 209 at 6:20–8:5) Under certain circumstances, courts have admitted the expert testimony of psychiatrists, psychologists, and "suicidologists" to perform a psychological, psychiatric, or suicide autopsy—a post-death reconstruction of the decedent's state of mind to determine the cause of a confirmed suicide or the manner of death when suicide is at issue. See e.g., Bennett v. Forest Labs., No. 2:06-CV-72-FTM-38DNF, 2015 WL 1579404, at *5 (M.D. Fla. Apr. 9, 2015) (admitting psychological autopsy to determine what led to a suicide); Fanning v. Sitton Motor Lines, Inc., No. 08-CV-2464 CM/DJW, 2010 WL 4261476, at *10 (D. Kan. Mar. 10, 2010) (admitting expert to testify as to whether decedent's exhibited certain suicidal risk factors, but excluding opinion that decedent committed suicide as unreliable).

To be admissible under Daubert, the suicide autopsy "must be issued by an appropriately qualified expert, must be supported by a reasonable methodology that involves a thorough consideration of all relevant evidence bearing on the decedent's state of mind, and must not offer an opinion concerning the legal cause of the decedent's death." Smith v. Prudential Ins. Co. of Am., No. 3:10-CV-00845, 2012 WL 1965405, at *9 (M.D. Tenn. May 31, 2012). Though certainly qualified in her field, Dr. Fernandez is not qualified to perform such an examination in this case. She has never conducted such an examination and was unfamiliar with the term when questioned about it in her deposition. (Dkt. 210 at 254:14–19) Moreover, her psychiatric practice is admittedly more focused on the area of electroconvulsive therapy, rather than psychotherapy. (Dkt. 209 at 6:20–8:5)

However, even assuming that Dr. Fernandez is qualified to testify regarding Mr. Staple's suicide risk factors—or lack thereof—and render an opinion that there is insufficient evidence of suicide, her opinions lack the requisite reliability and helpfulness

18

governing admissibility under Daubert. At her deposition, Dr. Fernandez had difficulty articulating a reliable methodology used to reach her opinions. She states that she formed her opinion regarding Mr. Staple's manner of death based principally on a lack of information in the record. (Dkt. 209 at 77:1–5) In her report, she lists several facts from the case and posits that they are inconsistent with suicide, (Dkt. 59-6 at 4), and admits hers was "was an *ad hoc* analysis looking at all the factors involved in Mr. Staple's case." (Dkt. 210 at 312: 7–14) This analysis is no different than what a jury would be tasked to undertake. Her musings concerning the lack of suicidal risk factors in Mr. Staple's life are entirely speculative, inherently subjective, and outside the scope of a psychiatrist's expertise. For example, Dr. Fernandez opines as part of her opinion that Mr. Staple's death is inconsistent with suicide because he was in a long-term marriage and had four young children. (Dkt. 59-6 at 4) However, when questioned about whether his wife's threats to leave him prior to his death could have impacted his state of mind, she testified that she did not know because she could not know his values and whether this was important to him. (Dkt. 210 at 244:24–45:12) In the absence of a reliable scientific methodology to support her conclusion regarding whether or not Mr. Staple committed suicide, Dr. Fernandez's conclusions improperly invade the province of the jury and are inadmissible under Daubert.

Dr. Fernandez's opinion regarding confirmation bias is also unreliable, as she admits that "[t]here's no methodology" for reaching this opinion. (Id. at 263:12–54:3) She did not interview any of the medical personnel or first responders to reach her conclusions regarding their confirmation bias, which she asserts is apparent throughout their records based solely on her belief that the phenomenon "is ever present." (Id.) Based on her

testimony, the Court finds that this opinion also lacks sufficient science-based methodology to meet the <u>Daubert</u> standard of admissibility.

Plaintiff counters that Dr. Fernandez is merely offered to challenge the methodology of Defendant's medical experts in concluding that "it is not possible to conclude that suicide is the manner of death based on toxicology and histology alone." (Dkt. 182 at 9–10) However, one need not be a psychiatrist to reach such a conclusion. Absent a well-grounded scientific methodology for the formation of her opinions, Dr. Fernandez's expert report is unreliable. Moreover, the Court finds that her opinions invade the province of the jury and would be both confusing and unhelpful. As such, the Court finds that Defendant's Motion is due to be granted as to Dr. Fernandez, and her testimony will be **EXCLUDED**.

### ii.  Dr. Vernard I. Adams

Defendant seeks to exclude Plaintiff's expert, Dr. Adams, from testifying about (1) toxicology matters and (2) Mr. Staple's manner of death. (Dkt. 172 at 13–17) Dr. Adams is a former medical examiner who served as the chief medical examiner for Hillsborough County from 1991 to 2012. (Dkt. 59-1 at 1) He also served as the program director for the fellowship training program in forensic pathology of the University of South Florida from 1991 to 2012, during which time he provided training in forensic pathology to physicians. (<u>Id.</u>) He has performed more than 6,800 autopsies and has issued cause-of-death opinions in a similar number. (<u>Id.</u> at 2)

In his report, Dr. Adams opines that the manner of Mr. Staple's death is an accident because suicide as a manner of death "is a possibility that does not rise to the level of more likely than not." (<u>Id.</u> at 6–7) During his deposition, when crossed on the errors in

factual history that he was provided, Dr. Adams downgraded his initial opinion—that Mr. Staple's death was more likely than not accidental—to both suicide and accidental death being reasonable probabilities, with neither rising to the level of more likely than not. (Dkt. 204 at 29:24–30:12) However, the burden lies with Defendant, not Plaintiff, to prove by a preponderance of the evidence that Mr. Staple committed suicide. All that Plaintiff needs to do is offer reasonable alternative hypotheses in support of accidental death. As such, Dr. Adams' downgrading of his opinion, which remains that accidental death is a reasonable probability, does not preclude its admissibility. Dr. Adams also altered his opinion as to manner of death from accident to "undetermined." (Id. at 30:18–20) Dr. Adams states that his experience as a former medical examiner and "[t]he lack of any compelling evidence of [Mr. Staple's] intent to kill himself" forms the basis for his opinion that the manner of death is undetermined. (Id. at 57:3–25)

It does not appear that Dr. Adams is attempting to opine on toxicology matters, as Defendant suggests, but rather that he challenges the methodology of the medical examiner in determining that Mr. Staple's death was a suicide. (Dkt. 59-1) The Court finds that Dr. Adams is qualified to testify based on his extensive prior work as a medical examiner. The Court further finds that his testimony in this regard is both reliable and would be helpful to the trier of fact to rebut the testimony of Dr. Rivers. Dr. Adams' opinion, while slightly altered by the change in certain facts, ultimately remains the same—that the medical examiner did not have sufficient information to rule Mr. Staple's death a suicide. Defendant's challenges to his opinions to go their weight, not admissibility. As such, the Court finds that Defendant's Motion is **DENIED without prejudice**, as to the request to

exclude Dr. Adams at this stage in the proceedings. Defendant is free to reassert any challenge to his opinions after *voir dire* at trial.

### iii.  Dr. Joshua D. Lenchus

Defendant seeks to exclude Dr. Lenchus's expert opinion that "there exists a possibility that Mr. Staple did not commit suicide, but rather suffered acetaminophen-induced acute, decompensated liver failure as a result of an unintentional, staggered overdose, ultimately leading to his demise." (Dkt. 59-4) Dr. Lenchus is board certified in internal medicine and worked for three years as a pharmacist prior to becoming a physician. (Id. at 2) He is currently the chief medical officer at Broward Health, and previously worked at the University of Miami department of internal medicine as a hospitalist—a physician trained in one of a variety of specialties that takes primary care of patients who are hospitalized. (Dkt. 58-10 at 5:14–7:3) Dr. Lenchus opines, based on the medical records, that Mr. Staple was taking the acetaminophen/hydrocodone agent that he had been prescribed the week prior to his overdose due to flank pain, and he may have been combining it with other acetaminophen-containing agents, leading to an unintentional, staggered overdose. (Dkt. 59-4 at 4) Dr. Lenchus also explains the "clinical course of acetaminophen toxicity" and "salicylate toxicity" and opines that "the constellation of symptoms leading up to [Mr. Staple's] unresponsiveness was due to the overlapping of salicylate and acetaminophen toxicity." (Id. at 4–6) Dr. Lenchus's opinion is based on his medical experience and knowledge and review of the record in this case. (Id.)

Defendant questions Dr. Lenchus's qualifications based on his difficulties getting into medical school and his being an osteopath rather than a doctor of medicine. (Dkt.

172 at 18) These challenges to Dr. Lenchus's qualifications are not persuasive. Dr. Lenchus has been a licensed physician since 2001 and has been board certified in internal medicine since 2006. (Dkt. 59-4) His medical expertise and experience as a hospitalist, including treatment of patients with acetaminophen overdose, qualify him to testify as to the medical possibility of a staggered overdose in Mr. Staple's case.

Defendant next questions whether Dr. Lenchus's opinion satisfies the <u>Daubert</u> standard because he cannot opine to a reasonable degree of medical certainty that Mr. Staple did, in fact, suffer an unintentional, staggered overdose. (Dkt. 172 at 19–21) However, this is not the opinion that Dr. Lenchus has presented. Dr. Lenchus's opinion that a staggered overdose is but one "possible" alternative explanation for Mr. Staple's death is both admissible and relevant to this matter, especially in this case, where Defendant has the burden of proving that Mr. Staple committed suicide. Defendant shall be permitted during trial to cross examine Dr. Lenchus on this opinion and his certainty or uncertainty as to whether it is supported by the underlying facts of this case.

### iv.  Dr. Stephen T. Gerrish

Defendant seeks to exclude Dr. Gerrish, a physician who is board certified in gastroenterology and who completed a fellowship in gastroenterology and hepatology. (Dkt. 58-9 at 4:20–5:7; Dkt. 59-5 at 1) During his fellowship, he was "intimately involved in the diagnosis and management of numerous liver disorders, including acetaminophen-induced liver failure." (Dkt. 59-5 at 1) He continues to practice general gastroenterology and hepatology and treats acetaminophen-induced liver injury regularly. (<u>Id.</u>) Dr. Gerrish opines that the extremely high level of acetaminophen found in Mr. Staple's system does not "in and of itself prove a suicide attempt" and that it is entirely possible that Mr. Staple,

being encephalopathic, "could accidentally ingest large doses of any medication believing it to be food, candy, or other medication that is necessary for [his] health or well-being." (Id. at 4) He also opines that the presence of vomiting and encephalopathy while at Walmart "may have been due to already existing hepatic failure from prior ingestion of acetaminophen, perhaps chronic suratherapeutic doses for several days in an attempt to treat his documented flank pain." (Id.) Dr. Gerrish further opines that "[s]erum acetaminophen levels can also be affected by other factors, including chronic liver disease, presence of renal failure, and genetic variability in enzymes involved in acetaminophen metabolism" and that intent and time of ingestion "cannot be proven solely by the presence of a significantly elevated acetaminophen level in Mr. Staple's system." (Id. at 5)

Defendant contends that Dr. Gerrish's qualifications are not relevant to this action; however, the Court finds that his medical expertise and experience treating patients with acetaminophen-induced liver failure qualify him to testify regarding alternative possible explanations for Mr. Staple's increased levels of acetaminophen. Dr. Gerrish's testimony concerning "other factors" that could have affected Mr. Staple's serum acetaminophen levels is relevant and helpful in this matter, even though Dr. Gerrish concedes that there is no evidence of such other factors in the data he reviewed. (Dkt. 58-9 at 57:15–25) Again, because it is Defendant's burden to prove that Mr. Staple committed suicide, it is Defendant's burden to disprove any reasonable alternative possible explanations, not Plaintiff's. The lack of evidence concerning the existence of these factors in the record does not mean that they did not, in fact, exist in Mr. Staple's case. The Court finds that

Dr. Gerrish's opinions are relevant and would assist the trier of fact. Defendant's concerns about Dr. Gerrish's opinions go to their weight and not admissibility.

### v. Robert Andrew Beverly

Defendant seeks to exclude Plaintiff's insurance expert, Mr. Beverly. (Dkt. 172 at 23–25) Mr. Beverly was formerly the director of an independent insurance agency. (Dkt. 59-8 at 1) While working there, he sold property and casualty insurance until 2008, when he sold his agency. (Dkt. 211 at 21:9 – 23, 73:8–18) He has been employed as the President of The Florida Insurance School, Inc. d/b/a Andy Beverly School since 2011. (Dkt. 59-8 at 1) In that capacity, Mr. Beverly develops curricula for insurance agents with topics including "concepts, policy forms, ethical conduct, agency operations, Florida statutes which insurance professionals are required to know and abide by, and Florida Administrative Code relevant to insurance," and he teaches and mentors insurance agents. (Id. at 1, 22) He testified that he has certified between 1,500 and 2,000 students each year. (Dkt. 211 at 78:13 – 18) Mr. Beverly has been licensed to sell life insurance in Florida since January of 2013, (Id. at 19:14–19); however, he has never sold a life insurance policy. (Id. at 20:16–17)

Mr. Beverly opines that (1) that "[t]he rescission of [the 990 Policy] is based on unethical practices by [Northwestern Mutual], beginning at the time of application," and (2) Defendant's "actions show that it set out to deny the Staple family's claim, rather than investigate facts." (Dkt. 59-8) Despite this second opinion, Plaintiff concedes that Mr. Beverly is not being called as an expert to discuss Northwestern Mutual's claims handling procedures. (Dkt. 211 at 77:1–5) With regard to his first opinion, Mr. Beverly testified that the procedure in which Defendant altered the date on the application signature page to

make it appear that Mr. Staple signed the application three times on three different occasions was unethical. (Dkt. 211 at 33:4–21)

Defendant contends that Mr. Beverly is not qualified to testify as a life insurance expert, having never taken an application for or sold a life insurance policy. (Dkt. 172 at 23–24) Even if qualified, Defendant contends that Mr. Beverly's opinions are inadmissible because they are not reliable or helpful. (Id. at 24–25) "For nonscientific expert testimony, 'the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.' A district court may decide that nonscientific expert testimony is reliable based 'upon personal knowledge or experience.'" American Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1338 (11th Cir. 2009) (quoting Kumho Tire, 526 U.S. at 150-52) (internal citations omitted)); see also Longoria v. Texas, No. 5:02cv112, 2007 WL 4618452, at *4 (E.D. Tex. May 18, 2007) ("A special circumstance exists when the expert testimony concerns 'social sciences' rather than 'hard' sciences. In such cases, the research, theories, and opinions cannot have the exactness of 'hard' science methodologies. Consequently, other indicia of reliability are considered under Daubert, including professional experience, education, training, and observations, and trial judges are given broad discretion to determine whether Daubert's specific factors are or are not reasonable measures of reliability in a particular case.") (citing United States v. Simmons, 470 F.3d 1115, 1122 (5th Cir. 2006)) (internal citations omitted)).

The Court finds that Mr. Beverly's experience in teaching and educating insurance agents provides him with the requisite qualifications to offer an expert opinion on industry standards for selling and applying for insurance, as well as to opine that Rosser did not

follow such standards in handling Mr. Staple's application. His report contains sufficient detail for Defendants to attack its credibility in this regard through cross-examination. However, to the extent that Mr. Beverly's report purports to interpret the Form 600, such opinions are impermissible. Additionally, Mr. Beverly would be prohibited from rendering any opinions that Defendant violated the law at trial. As explained herein, for purposes of resolving the motions for summary judgment, the Court did not consider any of Mr. Staple's alleged misrepresentations in the 990 Policy Application that Mr. Beverly opines was unethically prepared. Thus, to the extent any of Mr. Beverly's opinions are admissible, they were not necessary to the resolution of the motions for summary judgment. As such, Defendant's Motion as directed to Mr. Beverly is **DENIED without prejudice**. If Mr. Beverly is called as a witness by Plaintiff, Defendant is free to reassert any challenges to any admissible opinions at trial after *voir dire* of the witness.

### vi.  Dr. Kennon Heard

Plaintiff seeks to exclude Defendant's proffered expert toxicologist, Dr. Heard, who opines that Mr. Staple committed suicide. (Dkt. 173) Dr. Heard reasons that the concentration of acetaminophen in Mr. Staple's blood was "so high that it is only consistent with a large ingestion or multiple large ingestions with self-harm intent." (Dkt. 183-2 at 18:18–20)

Dr. Heard is board certified in medical toxicology and emergency medicine, sees patients and teaches medical toxicology and emergency medicine at the University of Colorado School of Medicine, and had training in his fellowship and Ph.D. in drug pharmacology and pharmacokinetics. (Dkt. 171-57) He has seen "[h]undreds" of acetaminophen overdose patients in the course of his career, (Dkt. 183-2 at 10:22–24),

and has "published more than 30 scientific papers on acetaminophen pharmacology and poisoning including six papers focused on acetaminophen poisoning due to overuse with therapeutic intent." (Dkt. 171-57 at 1)

Dr. Heard opines that "the amount of acetaminophen that was in [Mr. Staple's] system at the time he arrived at the hospital is not consistent with therapeutic intent." (Dkt. 183-2 at 18:10–18) Dr. Heard discusses the half life of acetaminophen, which he states is "fairly rapidly cleared" from a person's system. (Id. at 24:1–14) Dr. Heard bases his opinion that Mr. Staple committed suicide on his review of the records in this case and his skill, training, and medical experience. He also discusses a peer-reviewed research study he conducted that examined patients taking acetaminophen with therapeutic intent versus patients taking the drug with self-harm intent. (Id. at 26:14–29:18)

Plaintiff contends that Dr. Heard, though qualified as a toxicologist, is not qualified to opine as to Mr. Staple's manner of death, which requires a determination regarding Mr. Staple's intent and state of mind. (Dkt. 173) Plaintiff also objects to Dr. Heard's reliance on a "Rumack-Matthew Nomogram" to predict Mr. Staple's intent from his reported serum concentration levels, without consideration of social data. (Id.)

Plaintiff's contention that determining manner of death is solely within the domain of forensic pathologists or mental health experts is belied by her own reliance on medical experts outside of those fields, including Drs. Lenchus and Gerrish, to support her theory that Mr. Staple's death was accidental. Dr. Heard is qualified to testify about toxicology matters, including Mr. Staple's serum acetaminophen levels, and opine that such levels cannot be reached by a patient self-medicating with therapeutic intent.

Dr. Heard's consideration of the peer-reviewed research study described, which he conducted, does not render his opinions unreliable under Daubert. Despite Plaintiff's contention, it is not apparent anywhere from either Dr. Heard's testimony or his report that the chart in Exhibit D to his report is based on the "Rumack-Matthews Nomogram." Plaintiff shall be permitted to cross examine Dr. Heard on his opinions and medical study at trial. Rosenfeld v. Oceania Cruises, Inc., 654 F.3d 1190, 1193 (11th Cir. 2011) ("Indeed, 'in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.'"). The ultimate decision of whether the evidence supports that Mr. Staple committed suicide will be a matter for the jury to determine. As such, Plaintiff's motion directed to Dr. Heard is **DENIED**.

## B. Summary Judgment Motions

In their cross motions for summary judgment, the Parties both seek entry of summary judgment on the issues of (1) whether the suicide exclusion applies, (2) whether an accord and satisfaction supersedes Plaintiff's claims, and (3) whether Defendant is entitled to rescission of the 990 Policy. (Dkt. 171, 174) The Court addresses each issue in turn.

### i. Suicide Exclusion

As mentioned *supra*, the manner of Mr. Staple's death is material to resolution of this matter and vehemently contested by the Parties. Defendant bears the burden of proving suicide under the exclusion. Franklin Life Ins. Co. v. Heitchew, 146 F.2d 71, 74 (5th Cir. 1944)[5] ("It is well settled in a case like this, where the policy promises payment

---

5  See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1207 (11th Cir. 1981) (adopting as binding precedent all decisions of the former Fifth Circuit issued on or before September 30, 1981).

on death, and death by suicide is made an exception, that the insurer has the burden of proving his special defense . . . ."); see also 31B Fla. Jur. 2d Insurance § 3567 ("An insurer who wishes to invoke a suicide exclusion from liability under a life insurance policy as a defense to payment on such a policy has the burden of proof to establish suicide."). To meet this burden, Defendant must show that Mr. Staple possessed "the intent to achieve self-destruction." Charney v. Illinois Mut. Life Cas. Co., 764 F.2d 1441, 1443 (11th Cir. 1985) (citing Gulf Life Ins. Co. v. Nash, 97 So. 2d 4, 6 (Fla. 1957)). Absent intent of self-destruction, "there would be no suicide because the death would be accidental." Id. An accidental death would be covered by the Policies.

A general presumption against suicide applies under Florida law. See Mutual Life Ins. Co. of New York v. Johnson, 166 So. 442, 445 (Fla. 1936). However, the presumption against suicide is overcome when the insurer introduces "credible evidence of suicide." C.M. Life Ins. Co. v. Ortega, 562 So. 2d 702, 703 (Fla. 3d DCA 1990); see also Yonkers v. Riversource Life Ins. Co., 2011 WL 332830, at *5 (S.D. Fla. 2011). In Florida, "in determining whether death was by accident or suicide, courts and juries may rely upon circumstantial as well as direct evidence." Travelers Ins. Co. v. Bell, 188 F.2d 725, 726 (5th Cir. 1951).

Defendant has proffered sufficient circumstantial evidence of suicide that, if believed, would overcome the general presumption against suicide. Contrary to Plaintiff's arguments, the evidence concerning Mr. Staple's financial and social life stressors is admissible and relevant to support suicidal motive. "The courts generally agree that the presumption against suicide will stand until overcome by evidence sufficient to outweigh it. Many considerations enter into this determination such as the presence or absence of

30

motive, physical facts surrounding the death, the place where the body was found, its position . . . the habits and temperament of the insured, his domestic and social environment, as well as pecuniary circumstances." Johnson, 122 Fla. at 576; see also Yonkers, 2011 WL 332830, at *5 (holding that insured's death "must be viewed in light of all the problems he was having," including physical ailments, mental health issues, and social issues); New Horizons Telecasting Corp. v. Prof'l Ins. Corp., 200 So. 2d 835, 836 (Fla. 4th DCA 1967) (considering as relevant evidence that "the insured was despondent, was in ill health, addicted to alcohol, and had recently suffered severe financial reverses" as well as evidence of the insured's wife's own fear as to the consequence of suicide); Hill v. Am. Home Assur. Co., 193 So. 2d 638, 641 (Fla. 2d DCA 1966) (considering insured's lack of financial problems, marital or family difficulties as evidence in favor of beneficiary's case that death was accidental); Bell, 188 F.2d at 726 (considering insured's lack of "financial distress at the time of his death, such as would reveal a motive for suicide," good health, and stable family situation as circumstantial evidence supporting accidental death).

In addition to the expert testimony of Dr. Heard, which the Court has already ruled is admissible to support Defendant's theory of suicide *supra*, Defendant has proffered evidence that Mr. Staple was in a poor state of mind over losing his law license and that he was under significant financial stress, which Plaintiff admitted in her deposition. (Dkts. 171-43, 171-47, 58-12 at 148:16) Just by way of example, Mr. Staple was apparently in arrears on his rent for the restaurant space for his new venture, Closa, LLC. (Dkt. 171-37). There is also evidence that Mr. Staple was having some marital issues, as evidenced by Plaintiff's admission that they had an uncomfortable conversation the morning of his

disappearance and as documented by a text message he sent suggesting that Plaintiff was threatening to leave him hours before he was found in his vehicle. (Dkt. 170-4) This evidence is both relevant and admissible to support Defendant's theory regarding Mr. Staple's suicidal motive. Plaintiff may point to competing evidence to contradict the evidence of Mr. Staple's suicidal motive, but the issue of fact regarding the existence of a suicidal motive remains for a jury to determine.

Defendant also proffers Plaintiff's own statements to first responders, located in the St. Joseph North Hospital records, Hillsborough County Fire Rescue Report, and Hillsborough County Sheriff's Report, concerning Mr. Staple's possible suicidal intent as additional evidence of suicide. (Dkts. 171-55 at 4–5, 171-53 at 23–24) Plaintiff contends that these reports are inadmissible and the references to suicide therein are double hearsay. (Dkt. 174 at 19–31) Federal Rule of Civil Procedure 56 provides that "[a] party may object that the material cited to support or dispute a fact *cannot be presented in a form that would be admissible in evidence.*" Fed. R. Civ. P. 56(c)(2) (emphasis added). Under the 2010 amendment to Rule 56, which became effective on December 1, 2010, "authentication of documents no longer is required at the summary judgment stage." Agee v. Chugach World Services Inc., 2014 WL 5795555 at *5 (N.D. Ala., 2014). A "district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." Jones v. UPS Ground Freight, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (citing Macuba v. Deboer, 193 F.3d 1316, 1323 (11th Cir. 1999)). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." Id. at 1294.

Plaintiff's objection to the Court's consideration of these reports is overruled because these documents are public records capable of admission at trial under either Federal Rule of Evidence 803(6), which allows contemporaneous records or reports of events and conditions made in the regular course of business activity to be introduced through a custodian or qualified witness, or 803(8), the public records exception.[6] Fed. R. Evid. 803(6)(D), (8). Moreover, any statements contained therein that are attributable to Plaintiff[7] are not hearsay, as they are an opposing party's statement offered against that party. See Fed. R. Evid. 801(d)(2); City of Tuscaloosa, 158 F.3d at 557.

Defendant also points to the medical examiner's report to support its defense that Mr. Staple committed suicide. (Dkt. 171-56) Plaintiff contends that this report is inadmissible based on Florida law, which she contends prohibits the introduction of coroner opinions on suicide in insurance cases. (Dkt. 174 at 15–19) Plaintiff contends that Florida courts have held that a "coroner's" finding or verdict is not admissible in an insurance action on the issue of suicide. (Id. at 16) As noted by Defendant, the cases cited by Plaintiff in which coroners were excluded are inapposite. (Dkt. 220 at 10–11); see e.g., Charleston Nat'l. Bank v. Hennessy, 404 F.2d 539, 541–42 (5th Cir. 1968) (excluding coroner's entry as untrustworthy when coroner was a justice of the peace, a "layman without medical training", his experience was not proved, no autopsy was performed,

---

6 Moreover, though authentication is not required for admissibility at the summary judgment stage, Defendant has proffered declarations from the record custodians for the Medical Examiner, Hospital, and Fire and Sheriff's Department Reports, establishing the admissibility of the reports as business records. (Dkt. 220-1)

7 Plaintiff testified in her deposition that she was the person who spoke with the first responders at the scene. (Dkt. 58-12 at 157:2–15; Dkt. 212 at 251:15-18) Further, Defendant contends that the ATT records show only one phone call being made from Mr. Staple's cell phone on March 14, 2016, the day he was found—to Plaintiff's home phone number. (Dkt. 170-1 at 27; Dkt. 58-12 at 131:12-15) Thus, to the extent that the first responders do not recall who made the statements they recorded in their notes, Defendant has sufficiently established that such statements were made by Plaintiff.

there was "no evidence of any kind showing him to be qualified as an expert on causes of death."); <u>World Ins. Co. v. Kincaid</u>, 145 So. 2d 268, 270 (Fla. 1st DCA 1962) (excluding the opinion of coroner that decedent committed suicide as prejudicial; coroner was "a brother of [decedent's] widow, who was justice of the peace and coroner for the justice's district in which the tragedy occurred.").

Moreover, "[r]ules of procedure encompass rules of evidence, and therefore, the Federal Rules of Evidence, not state evidentiary rules, apply to evidentiary disputes in a federal diversity action," unless the state evidentiary rules are substantive in nature. <u>ML Healthcare Servs., LLC v. Publix Super Markets, Inc.</u>, 881 F.3d 1293, 1299 (11th Cir. 2018).

The Court finds that Dr. Rivers' opinion regarding Mr. Staple's death in the medical examiner's report is admissible either through her direct testimony at trial or through her report, pursuant to the public records hearsay exception or as a record of regularly conducted activity. Fed. R. Evid. 803(6), (8). She is a medical doctor, board certified in anatomic, clinical, and forensic pathology, and has performed between 700 to 800 autopsies. (Dkt. 58-2 at 39:4–11, 41:2–17) She testified based on her medical expertise that the level of acetaminophen in Mr. Staple's blood was too high to be consistent with a chronic ingestion, stating:

> It wouldn't have gotten up so high because when you're chronically ingesting, when you're starting to up and you're starting to get so many milligrams of Tylenol or acetaminophen in your blood, you start to get certain side effects. And one of the first side effects is you're starting to get really nauseous. And you'd start -- on certain levels you'd start vomiting profusely, so you couldn't even take anymore. So you can't get up to this 860 because you're vomiting so much. And then a little bit more -- I think it's between 400, you start -- you pass out. You can't -- you can't -- even if you wanted to take more, you're totally incapacitated. So you can't get up to that 860.

(Id. at 58:2–14) Contrary to Plaintiff's assertions, Dr. Rivers' opinions are not conclusory or untrustworthy, and are admissible, science-based medical opinions.

Though Defendant has proffered ample evidence to support its theory of suicide, summary judgment is not warranted in its favor because Plaintiff has set forth evidence to support her theory that Mr. Staple's death was an accidental overdose. (Dkts. 59-1, 59-4, 59-5) Plaintiff contends that this proffer warrants an award of summary judgment in her favor because Defendant bears the burden of excluding "every possible hypothes[i]s of death other than suicide beyond a reasonable doubt." (Dkt. 174 at 12)

The presumption against suicide

is not a rigid, arbitrary rule of law, but is only a special recognition of that common knowledge and experience which forms the background of every trial and the test of every question of probability or credibility. It rests upon the common knowledge, which may be noticed without proof by a judge and jury, that sane persons do not ordinarily kill themselves. That knowledge suffices to tip the scale in favor of accident where it appears that one has died from his own act, but there is nothing to show whether the act was or was not intentional, as well as when a death is proved by the manner of it cannot be ascertained. . . . It does not regulate nor change the burden of proof, but it is an evidentiary presumption which may aid a lack of evidence but cannot prevail against the evidence.

Franklin Life Ins. Co., 146 F.2d at 74 (quoting Travelers' Ins. Co. v. Wilkes, 76 F.2d 701, 704 (5th Cir. 1935)). Plaintiff contends that where an insurance company relies upon circumstantial evidence to prove that an insured's death was by suicide, the evidence "must be such as is inconsistent with every reasonable hypothesis of accidental death." Weinstock v. Prudential Ins. Co. of Am., 247 So. 2d 503, 506 (Fla. 3d DCA 1971) (quoting Mut. Life Ins. Co. of New York v. Johnson, 122 Fla. 567, 576 (1935)). Defendant counters that the standard of proof is the preponderance of the evidence, as "[o]nce credible evidence of suicide appears, the presumption against suicide 'vanishes' and the

case must be decided on all the evidence." Ortega, 562 So. at 703 (citing World Ins. Co. v. Kincaid, 145 So. 2d 268, 271 (Fla. 1st DCA 1962)). The Parties' assertions are not mutually exclusive. Once the Defendant offers evidence to rebut the presumption against suicide, Plaintiff offers every reasonable, evidence-based hypothesis of accidental death. Defendant must offer proof to establish by a preponderance of the evidence that those hypotheses fall under the weight of the evidence of suicide. See Ortega, 562 So. 2d at 703 ("The facts are weighed by the trier of fact, who may make the determination that the insured committed suicide by considering circumstantial as well as direct evidence. Florida, along with a majority of jurisdictions, requires proof of suicide to be established by a preponderance of the evidence.") (internal citation omitted). At that point, the laboring oar is passed to the jury. "[C]redibility determinations and the weighing of evidence 'are jury functions, not those of a judge.'" Feliciano v. City of Miami Beach, 707 F.3d 1244, 1252 (11th Cir. 2013) (quoting Anderson, 477 U.S. at 255)). Thus, on the evidence presented, summary judgment for either Party on this issue of suicide is improper, and the determination of whether Mr. Staple's death was accidental or suicide shall be properly left to the trier of fact.

### ii.   Accord and Satisfaction

The Parties have also cross-moved for summary judgment on the issue of whether an accord and satisfaction bars Plaintiff's claims. (Dkts. 171, 174) Defendant contends that when it tendered a check for a refund of the policy premiums to Plaintiff and Plaintiff endorsed and deposited the check, she did so in satisfaction of her outstanding claim for full death benefits under the Policies. (Dkt. 171 at 50–52) Plaintiff contends that no accord and satisfaction has been entered because there was no conspicuous statement—on

either the negotiable instrument itself or the letter with which it was enclosed—stating that the check was being tendered in full satisfaction of the claim. (Dkt. 174 at 13–15)

"A defense of accord and satisfaction involves a two-step process of proof that (1) the parties mutually intended to effect settlement of an existing dispute by entering into a superseding agreement, and (2) there was actual performance with satisfaction of the new agreement which acted to discharge the debtor's prior obligation." Rudick v. Rudick, 403 So. 2d 1091,1093-94 (3d DCA 1981) (internal citation omitted). "In short, under Florida law an accord and satisfaction must contain the elements of a normal contract, which include offer, acceptance, and consideration." Air Prod. & Chemicals, Inc. v. Louisiana Land & Expl. Co., 806 F.2d 1524, 1529 (11th Cir. 1986). Where an accord and satisfaction concerns the use of a negotiable instrument, the UCC as adopted by the Florida Legislature governs. Florida Statute § 673.3111 provides, in relevant part:

> (1) If a person against whom a claim is asserted proves that that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, that the amount of the claim was unliquidated or subject to a bona fide dispute, and that the claimant obtained payment of the instrument, the following subsections apply.
> (2) Unless subsection (3)[8] applies, the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim.

The term "conspicuous" means "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is 'conspicuous' is a decision for the court." Fla. Stat. § 671.201(10).

---

[8] Subsection (3) provides additional situations where a claim is not discharged under subsection (2), despite the presence of a conspicuous statement in the instrument or accompanying writing. Fla. Stat. § 673.3111(3).

Here, it is clear, and Defendant does not appear to contest, that the check and accompanying letter did not contain a conspicuous statement that the instrument was being tendered in full satisfaction of Plaintiff's claim, as would be required under the UCC. Instead, Defendant contends that the UCC does not apply and this matter is governed by Florida common law. (Dkt. 193 at 11–13) The Court need not determine whether the UCC applies to the context of this case, as the defense of accord and satisfaction fails under either the UCC or Florida common law.

As mentioned above, under Florida law, "an accord and satisfaction is a new agreement between two parties, a debtor and creditor, which results when the debtor tenders to the creditor **and the creditor accepts and negotiates in full satisfaction and discharge of a prior disputed debt** an amount owed to the creditor by the debtor." Burke Co. v. Hilton Dev. Co., 802 F. Supp. 434, 438 (N.D. Fla. 1992) (emphasis added). Defendant predominantly relies on Burke Co., Fabric v. Provident Life & Acc. Ins. Co., 115 F.3d 908 (11th Cir. 1997), and Martinez v. S. Bayshore Tower, L.L.L.P., 979 So. 2d 1023, 1024 (Fla. 3d DCA 2008), as controlling authority to support that an accord and satisfaction has occurred by virtue of Plaintiff's having cashed the policy premiums check. (Dkt. 171 at 51–52; Dkt. 193 at 11–13) Notably, in Burke Co., the court explained that under Florida law, "an accord and satisfaction results as a matter of law when the creditor accepts payment tendered **only on the express condition that its receipt is to be considered a full or complete satisfaction of the amount originally in dispute**." Id. (emphasis added). The Court explained, "[w]hen a creditor negotiates the tendered check with knowledge of the debtor's intent, whether through discussions, correspondence, or

unambiguous language on the check, he is then bound to the agreement and cannot later turn around and sue for the remaining balance due under the former dispute." Id. at 439.

In the instant case, a single check and a letter were sent to Ms. Staple's counsel on May 23, 2016. (Dkt. 171-65) Neither document contains **any** language that would indicate in any way that Defendant intended the check to be full or complete settlement of Ms. Staple's claim for death benefits under the Policies. (Id.) The check itself contains no conditional or other notable language, and the letter merely states the insurance company's position that due to Mr. Staple's manner of death, Plaintiff is entitled only to a return of the premiums paid for the policy, plus interest. (Id.)

Burke Co., Fabric, and Martinez are easily distinguishable and inapposite to the facts of this case, in that they all contained a clear communication from the debtor to the claimant containing the conditional language needed to convey the debtor's intent that a payment would resolve the claim in full. See Fabric, 115 F.3d at 911 (final check recited that it was "FULL settlement of claim originating on or about February 3, 1989" and contained the following language: "This is a full and final payment as you have received the maximum allowance under this contract."); Burke Co., 802 F. Supp. at 436 (check was "designated as 'full and final settlement of all sums owed to the payee by the payor on the Holiday Inn Job 57'"); Martinez, 979 So. 2d at 1024 (check returning purchasers' deposits was accompanied by "a letter stating that cashing the check would serve as an accord and satisfaction, terminating the parties rights and obligations under the contract."). No such language is present in either the policy premium check or letter relied on by Defendant. (Dkt. 171-65) See St. Mary's Hosp., Inc. v. Schocoff, 725 So. 2d 454 (Fla. 4th DCA 1999).

Moreover, Defendant sent follow-up correspondence to Plaintiff on June 15, 2017, advising that it had decided to "reopen the claim file on his policies to conduct a full contestable review" and advising that "[a]s soon as we have reviewed all relevant information, we will provide our claims final decision." (Dkt. 194-5) If the initial letter and check were intended to be a final satisfaction of Plaintiff's claim for full benefits under the Policies, there would be no reason for Defendant to initiate further review of the claim file.

Finally, Plaintiff contends that Defendant has conceded in discovery that the letter and settlement check constitute the entirety of its evidence on the issue of accord and satisfaction. (Dkt. 174 at 15) Plaintiff moved to compel Defendant to produce documents and facts in support of its accord and satisfaction defense, (Dkt. 41), to which Defendant responded that it had produced all documents related to the defense—"the Letter and Check (along with the entire claim file)"—in its initial Rule 26 production. (Dkt. 46) Based on this evidence, the Court finds that the defense fails as a matter of law. As such, Plaintiff's Motion for Summary Judgment is due to be granted on the issue of accord and satisfaction.

### iii.   Rescission

Finally, the Parties both move for summary judgment on Defendant's counterclaim for rescission of the 990 Policy. (Dkts. 171, 174) The basis for Defendant's counterclaim is that Mr. Staple made material representations regarding his occupation and income in the application for the 990 Policy. (Dkt. 20 at 9–15) Specifically, Defendant contends that Mr. Staple misrepresented in the 990 Policy Application, dated August 10, 2015, that his occupation was "medical malpractice attorney" and that his annual income as most recently reported to the IRS was $75,000, despite his disbarment on July 9, 2015. (Id. at

11–12) Defendant also contends that Mr. Staple made misrepresentations in the Form 600, also dated August 10, 2015, in which he declares that the answers provided in his "most recent application sent to the Company are still, to the best of [his] knowledge and belief, complete, true, and correct today" and that "since providing the answers [he has] not . . . had a change in the hours or duties in employment or occupation or begun to work in a new occupation . . . ." (Id. at 12; Dkt. 171-8 at 130) This was sent despite Mr. Staple's disbarment and mandatory cessation of work as an attorney of any kind and his undertaking to open a restaurant.

The 990 Policy states, in pertinent part: "While the insurance is contestable, the Company, on the basis of a material misstatement in the application(s), may rescind the insurance or deny a claim." (Dkt. 171-8 at 112) Florida Statute § 627.409(1) governs representations in the context of insurance:

(1) Any statement or description made by or on behalf of an insured or annuitant in an application for an insurance policy or annuity contract, or in negotiations for a policy or contract, is a representation and not a warranty. Except as provided in subsection (3),[9] a misrepresentation, omission, concealment of fact, or incorrect statement may prevent recovery under the contract or policy only if any of the following apply:

(a) The misrepresentation, omission, concealment, or statement is fraudulent or is material to the acceptance of the risk or to the hazard assumed by the insurer.

(b) If the true facts had been known to the insurer pursuant to a policy requirement or other requirement, the insurer in good faith would not have issued the policy or contract, would not have issued it at the same premium rate, would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss.

---

9 Subsection 3 provides: "For residential property insurance, if a policy or contract has been in effect for more than 90 days, a claim filed by the insured cannot be denied based on credit information available in public records." Fla. Stat. § 627.409(3). Subsection 3 is not applicable in this case because this action does not involve residential property insurance.

"The Florida Supreme Court has unambiguously held that 'where an insurer would have altered the policy's terms had it known the true facts or the misstatement materially affects risk, a nonintentional misstatement in an application will prevent recovery under an insurance policy.'" William Penn Life Ins. Co. of New York v. Sands, 912 F.2d 1359, 1362 (11th Cir. 1990)) (quoting Continental Assurance Co. v. Carroll, 485 So.2d 406, 407–08 (Fla. 1986)). "Furthermore, as long as the misstatement satisfies subsections (b) or (c) of the statute, it need not be made fraudulently or knowingly to void the policy." Id.

"An essential prerequisite to the application of Florida Statutes section 627.409(1) is that the insured make an inaccurate statement in his application." Id. Ordinarily a discrepancy between the facts stated and the facts established would suffice to show an inaccurate statement. Miguel v. Metro. Life Ins. Co., 200 F. App'x 961, 965 (11th Cir. 2006)[10]; Hauser v. Life Gen. Sec. Ins. Co., 56 F.3d 1330, 1334 (11th Cir. 1995). However, when the insurance application contains contractual language requiring that statements be true to the best of the applicant's knowledge and belief, a different requirement of accuracy is imposed than provided in § 627.409(1). Hauser, 56 F.3d at 1334. "Where the language an insurance company chooses in its insurance application shifts the focus from a determination of truth or falsity of an applicant's statements to an inquiry into whether the applicant believed the statements to be true, the applicant's answers must be assessed in light of his actual knowledge or belief." Id.; see also Green v. Life & Health of Am., 704 So. 2d 1386, 1391 (Fla. 1998) ("[W]e cannot ignore the fact that Life & Health

---

[10] The Court notes that "[a]lthough an unpublished opinion is not binding on this court, it is persuasive authority.   See 11th Cir. R. 36-2."   United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000).

chose to draft and incorporate a different 'knowledge and belief' standard in its application, thereby bypassing the rigid statutory standard.").

> [T]he twin qualifiers [knowledge and belief] require[ ] that knowledge not defy belief. . . . What the applicant in fact believed to be true is the determining factor in judging the truth or falsity of his answer, but only so far as that belief is not clearly contradicted by the factual knowledge on which it is based. In such event, a court may properly find a statement false as a matter of law, however sincerely it may be believed. To conclude otherwise would be to place insurance companies at the mercy of those capable of the most invincible self-deception—persons who having witnessed the Apollo landings, still believe the moon is made of cheese.

Hauser, 56 F.3d at 1335 (alterations in original) (quoting Sands, 912 F.2d at 1365).

### a. Admissibility of Application

As a threshold matter, presumably to avoid the impact of the declarations Mr. Staple made in the application, Plaintiff asserts that the 990 Policy Application and Form 600 are inadmissible pursuant to Florida Statute § 627.408(1), which provides as follows:

> An application for the issuance of any life or health insurance policy or annuity contract is not admissible in evidence in an action relative to the policy or contract unless a true copy of the application was attached to or otherwise made a part of the policy or contract when issued.[11]

The statute does not define the term "issued." Plaintiff contends that the "Date of Issue" on the 990 Policy—August 10, 2015—is the relevant date. (Dkt. 194 at 49–50; 221 at 13–21) Defendant contends that the term "Date of Issue" is different than the "when issued" reference in Florida Statute § 627.408(1). (Dkt. 193 at 15–19) The former, Defendant contends, is a contractual term of art by which other events in the contract are

---

11 Typically rules of procedure encompass rules of evidence; however, "[s]ome state evidentiary rules are substantive in nature, and transcend the substance-procedure boundary, meaning that sometimes a state's evidentiary rule can trump a federal evidentiary rule." ML Healthcare Servs., LLC, 881 F.3d at 1299 (citation and quotation marks omitted). Interestingly, the Tenth Circuit has determined that an Oklahoma statute that is nearly identical to Florida Statute § 627.408(1) is procedural and does not control in a federal court. Mut. Life Ins. Co. of New York v. Bohlman, 328 F.2d 289, 293–94 (10th Cir. 1964). However, neither party has briefed this issue, and the Court finds that it need not decide the matter because the application is admissible regardless of whether the Court applies state or federal law.

measured.[12] (Id. at 15) Defendant argues that the latter is the temporal reference to the date the 990 Policy was packaged for delivery to Mr. Staple, allegedly occurring on August 24, 2015. (Dkt. 193 at 15–19; Dkt. 193-1 at 3)

The Court finds that Defendant's contention is correct. The plain meaning of the word "issue" supports this finding. Black's Law Dictionary defines the verb "issue" as "[t]o be put forth officially" or "[t]o send out or distribute officially." ISSUE, Black's Law Dictionary (11th ed. 2019). Similarly, Merriam-Webster defines the verb as "to put forth or distribute usually officially" or "to send out for sale or circulation." ISSUE, Merriam-Webster, https://www.merriam-webster.com/dictionary/issue (last visited September 18, 2020). The Oxford English Dictionary defines the verb as to "[s]upply or distribute (something)" or to "[f]ormally send out or make known." ISSUE, Oxford English Dictionary, https://www.lexico.com/en/definition/issue (last visited September 18, 2020). These definitions all support that the date suggested by Defendant—i.e. the date that the 990 Policy was "put forth," "distributed," or "formally sen[t] out" to Mr. Staple—is the date that the 990 Policy was "issued" for purposes of the statute, and the August 10, 2015 "Date of Issue," a phrase with special meaning in the insurance contract, does not control.

This interpretation also makes logical sense when applied to the facts of the instant case. It is clear from the record that Mr. Staple's 990 Policy was not, in fact, issued to the insured on the "Date of Issue" listed on the Policy. Northwestern Mutual was still in the process of underwriting the 990 Policy—and indeed requested confirmation of additional information from Mr. Staple required to approve him for the requested Policy—on August

---

12 For example, the "Date of Issue" is the date against which the two-year deadline for contestability of the policy is measured.

16, 2015. (Dkt. 171-10; Dkt. 193-1 at 2–3) Thus, factually, it is clear that the "Date of Issue" of August 10, 2015 is not the date the 990 Policy was "issued."

Defendant's representative Labecki attests the 990 Policy was issued when it was approved by Defendant, after the underwriting risk had been completed, on or about August 24, 2014. (Dkt. 193-1 at 2–3) Labecki further declares that upon this approval, "the 990 Policy was assembled pursuant to Northwestern Mutual's standard operating procedure for all of its life insurance policies." (Id.) Pursuant to this standard procedure, Labecki attests that the 990 Policy Application and the Form 600 were attached to, and included in, the 990 Policy, which was then mailed to Rosser for delivery to Mr. Staple. (Id.) Plaintiff does not proffer any evidence to contest that the 990 Policy Application and the Form 600 were attached to the Policy on August 24, 2015. Plaintiff also does not proffer any evidence to rebut Labecki's declaration that the 990 Policy delivered to Mr. Staple included the attached 990 Policy Application and Form 600. Though the Policy Delivery Acknowledgement form signed by Mr. Staple did not specifically reference these documents, the Policy Delivery Acknowledgement form does establish that Mr. Staple received the 990 Policy. The 990 Policy that Mr. Staple acknowledged receiving expressly references the application as being attached. (Dkt. 171-8 at 108 (referencing the application in the Table of Contents), 112 (referencing the application in Section 1.3; "This Policy, together with the attached application and any application supplements . . . are the entire contract.")) Plaintiff proffers no evidence that the 990 Policy Application and Form 600 were not attached when Mr. Staple signed the Policy Delivery Acknowledgement form. As such, the Court finds that the 990 Policy Application and Form 600 are admissible pursuant to Florida Statute § 627.408(1).

b.  <u>Material Misrepresentation</u>

Defendant does not assert that any misrepresentations were made in Mr. Staple's applications for the first three policies. Defendant asserts, however, that once Mr. Staple was disbarred, effective August 8, 2015, the statement in the 990 Policy Application that he was a "medical malpractice attorney" and the declarations concerning his occupation made in the Form 600 were knowingly false.[13]  (Dkt. 171 at 54–55)

Plaintiff does not, and could not, suggest that Mr. Staple did not know that he was no longer a malpractice attorney as of August 10, 2015. The undisputed facts establish that on May 6, 2015, Mr. Staple signed a Petition for Disciplinary Revocation with Leave to Reply for Readmission, in which he requested that his membership in the Florida Bar be revoked in exchange for dismissal of all pending disciplinary cases, "with revocation to take effect in 30 days to allow petitioner time to close out his practice." (Dkt. 171-3 at 4; Dkt. 195 at ¶ 5) Therein, he also stated that he "knowingly and voluntarily submits this petition with full knowledge of its effect." (Dkt. 171-3 at 1) On July 9, 2015, the Supreme Court of Florida entered an Order of Disciplinary Revocation of Desmond Staple's law license. (Dkt. 195 at ¶ 5; Dkt. 174-4) The Order of Disciplinary Revocation became effective on August 8, 2015. (Dkt. 171-4) Two days later, on August 10, 2015, Mr. Staple completed the Form 600, which asked him to declare, among other things, that the answers provided in his most recent application were true and correct to the best of his knowledge. Specifically, the form asked him to confirm that "*since* providing the answers"

---

13 Defendant also contends that Mr. Staple's supplemental statement in the email to Rosser that he anticipated earning $250,000 in 2015 was knowingly false. (Dkt. 171 at 54–55) Though questionable, the Court need not address this alleged misrepresentation because it finds that summary judgment is due to be granted in Defendant's favor on the counterclaim for rescission of the 990 Policy based on Mr. Staple's misrepresentations regarding his occupation.

he had not experienced a "change in the hours or duties in employment or occupation or begun to work in a new occupation." (Dkt. 171-8 at 130) (emphasis added) The Form 600 provided a space for Mr. Staple to disclose any exceptions to those statements and "explain in full." (Id.) Fully aware of his disbarred status, Mr. Staple listed no exceptions and provided no explanation.

Thus, the representation in the 990 Policy Application that Mr. Staple's occupation was "medical malpractice attorney" and the declaration in the Form 600 that "since providing the answers" in the 990 Application Mr. Staple had not experienced a "change in the hours or duties in employment or occupation or begun to work in a new occupation" were demonstrably false as of August 10, 2015.

To avoid the clear import of these false statements, Plaintiff contends that the 990 Policy Application itself is invalid as evidence of a misrepresentation attributable to Mr. Staple due to various errors made by Defendant in connection with its preparation and submission. (Dkt. 174 at 15–22) Specifically, the evidence indicates that, rather than have Mr. Staple complete a new application, Defendant re-used portions of Mr. Staple's original application from March of 2015 and altered the date on the signature page. (Id. at 15–20) Rosser testified that "protocol" when reusing an old application would be to just resubmit the old application with a Form 600. (Dkt. 58-1 at 144:20–145:8) He testified that he was "unsure" why or how the date on the signature page of the 990 Policy Application was changed. (Id. at 145:9–12) Moreover, Plaintiff contends that Mr. Staple never received a copy of the original application before signing it, so he cannot be held to know what its

contents contained.[14] (Dkt. 174 at 19–20) Thus, Plaintiff contends that Mr. Staple cannot be held to know what was in an application he never saw.

Even assuming *arguendo* Plaintiff's position is correct that the Court should not consider the 990 Policy Application due to the claimed errors concerning the signature page and Mr. Staple's allegedly having never seen it prior to endorsing it, the Court finds that summary judgment remains due to be granted to Defendant on the issue of rescission. Even without consideration of the truth of the representations in the 990 Policy Application, the record establishes conclusively that Mr. Staple made a material misrepresentation in the Form 600 that he signed on August 10, 2015. (Dkt. 171-8 at 130) Despite Plaintiff's assertion that the form is not, itself, an application, (Dkt. 174 at 19), it is clear that the Form 600 was part of Mr. Staple's application for the 990 Policy. The Form 600 is an application supplement. Labecki testified that the Form 600 is a document that "supplement[s] the information on the application" and while not an application itself, is a "supplemental document." (Dkt. 58-3 at 23:6–23) He testified that Mr. Staple would have been required to submit the Form 600 when applying for the 990 Policy. (Id. at 24:18–21) Likewise, Rosser testified that the Form 600 "is a supplement to an application" and was required to obtain the 990 Policy. (Dkt. 58-1 at 46:3–13) The Form 600 itself states that it "is submitted for . . . New Application for Insurance *(Complete one copy and submit with new application)*." (Dkt. 171-8 at 130) And the 990 Policy incorporates this application supplement by reference in Section 1.3: "This Policy, along with the attached

---

14 This contention too is without evidentiary support. No one will be able to competently testify to this assertion. Moreover, Mr. Staple also signed Policy Delivery Acknowledgement forms for his three prior policies, acknowledging receipt of those policies on May 26, 2015. (Dkt. 171-8 at 48, 76, 105) As with the 990 Policy, Plaintiff proffers no evidence that the previous policies did not include their respective applications when delivered, and the policies plainly state that they did. (Id. at 12, 19, 51, 55, 79, 83)

application *and any application supplements* . . . is the entire contract." (Id. at 112) (emphasis added). Thus, any misrepresentation in the Form 600 is grounds for rescission of the 990 Policy.

> The Form 600 contains the following declaration, in relevant part:
>
> This declaration supplements and updates the answers provided in my most recent application for insurance sent to the Company. I understand that my most recent application may include more than one form, and always includes a medical underwriting form or questionnaire. If this declaration is submitted for (1) or (2) above, I understand that my most recent application to the company will be attached to the policy including a copy of this declaration. I declare that my answers provided in my most recent application sent to the Company are still, to the best of my knowledge and belief, complete, true, and correct today. **I declare that I am in good heath and, specifically, that since providing the answers I have not: . . .**
>
> 7. **had a change in the hours or duties in employment or occupation or begun to work in a new occupation . . . .**
>
> If there are any exceptions to any of the above statements, explain in full, including all names and addresses of health care providers and related dates in the space below (attach additional paper, if necessary).

(Id. at 130) (emphasis added) The Form 600 was signed and dated by Mr. Staple on August 10, 2015, and, unlike the 990 Policy Application, there is no dispute that Mr. Staple endorsed this document on that date. (Id.)

Plaintiff contends that the statement "I declare that my answers provided in my most recent application sent to the Company are still, to the best of my knowledge and belief, complete, true, and correct today" is not inaccurate, because Mr. Staple did not have his most recent application to review for accuracy. (Dkt. 194 at 46–47) The Court finds, however, that the declaration that follows, highlighted in bold, would not have required Mr. Staple to have reviewed his most recent application or to have even known what statements that application contained to render it false. It was not a question that

required him to compare his answers to an earlier application. This sentence merely includes a temporal reference to the date that Mr. Staple provided the answers listed in his most recent application, whenever that would have been. Of course, on August 10, 2015, just two days before he signed the Form 600, Mr. Staple experienced a significant change in his "hours or duties in employment or occupation"—he was effectively disbarred. It was an event he could not have forgotten. Thus, his statement that "since providing the answers" in his most recent application he had not "had a change in the hours or duties in employment or occupation" was existentially false.

Plaintiff points to evidence that Rosser had knowledge of Mr. Staple's plans to open a restaurant in order to create a factual dispute as to the falsity and materiality of this statement and to support her argument that Defendant has waived its right to seek to rescission. (Dkt. 194 at 55, 58–60) However, this argument is a red herring. Whether or not it was material that Mr. Staple had begun to work in an additional occupation by opening a restaurant or had disclosed his intent to do so to Rosser is irrelevant. By all accounts Mr. Staple was no longer authorized to work in his occupation as a licensed attorney. Plaintiff proffers no evidence that Defendant was ever made aware that Mr. Staple was no longer an attorney or that he had been disbarred.

Labecki attests, of course, that the "omissions, concealment of facts and/or incorrect statements and/or misrepresentations contained in the Application and the 990 Policy Form 600 were material to the acceptance of the risk by Northwestern Mutual." (Dkt. 171-8 at 7) He declares that if Defendant knew Mr. Staple had changed his occupation from lawyer to restaurateur, "underwriting would have made further inquiry to determine why a lawyer, practicing for many years, was now working as a restauranteur."

(Id.) He further declares that "[i]f Northwestern Mutual had been aware at the time of application for the 990 Policy and during underwriting that Mr. Staple had been disbarred as an attorney, therefore having a change in occupation, Northwestern Mutual in good faith would not have issued the 990 Policy whatsoever." (Id.) Plaintiff has offered no evidence otherwise. Thus, on this record, the Court finds as a matter of law that Mr. Staple made a material misrepresentation in his application that warrants rescission of the 990 Policy. As such, summary judgment is due to be granted on Defendant's counterclaim for rescission of that policy.

## IV.   CONCLUSION

Upon consideration of the foregoing and being otherwise fully advised, it is hereby **ORDERED** as follows:

1. Defendant's Renewed Motion for Summary Judgment, (Dkt. 171), is **GRANTED IN PART and DENIED IN PART**. Judgment is **GRANTED** in favor of Defendant and against Plaintiff on Defendant's counterclaim for rescission of the 990 Policy. The remainder of Defendant's Motion is **DENIED**.

2. Plaintiff's Motion for Summary Judgment on Coverage, (Dkt. 174), is **GRANTED IN PART and DENIED IN PART**. Judgment is **GRANTED** in favor of Plaintiff and against Defendant on Defendant's Fifth Affirmative Defense of accord and satisfaction. The remainder of Plaintiff's Motion is **DENIED**.

3. Defendant's Renewed Daubert Motion or Request for Daubert Hearing (Dkt. 172), is **GRANTED IN PART and DENIED IN PART**.

4.  Plaintiff's Daubert Motion to Exclude Dr. Heard, (Dkt. 173), is **DENIED**.

**DONE** and **ORDERED** in Tampa, Florida, this 30th day of September 2020.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person